UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                                    CASE NO. 11-37867-AJC

SAGAMORE PARTNERS, LTD.,

          Debtor.                              VOLUME II
_____/


          CONTINUED CONFIRMATION HEARING

          D.E. 216, D.E. 423, D.E. 417


          Friday, December 7, 2012


     The above-entitled cause came on for hearing before the Honorable A. JAY CRISTOL, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 51 S.W. 1st Avenue, Miami, Dade County, Florida on December 7, 2012, commencing at or about 2:00 p.m., and the following proceedings were had.


                    Reported By:

                    Karen B. Patlak

Page 250

APPEARANCES:


MELAND RUSSIN & BUDWICK, P.A., by
PETER D. RUSSIN, Esquire
JOSHUA W. DOBIN, Esquire
ZACHARY N. JAMES, Esquire
On behalf of the Debtor


BILZIN SUMBERG BAENA PRICE & AXELROD, LLP, by
SCOTT BAENA, Esquire
JAY M. SAKALO, Esquire
JEFFREY I. SNYDER, Esquire
On behalf of JPMCC 2006-LDP7
Miami Beach Lodging, Inc.



- - - - - -



I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| NEIL SAZANT | | | |
| By Mr. Russin | 255 | | 291 |
| By Mr. Baena | | 279 | |
| | | | |
| EDWARD C. BROWN | | | |
| By Mr. Baena | 343 | | 380 |
| By Mr. Russin | | 376 | |

- - - - - - -

Page 251

E X H I B I T S   I N   E V I D E N C E

                                                         PAGE

Debtor's Number 70 ................  258

Debtor's Number 74 ...............  263

Debtor's Number 9-A..............  266

Debtor's Number 73..............  270

Debtor's Number 72 .............  272

Debtor's Number 71 .............  275

Debtor's Number 20 .............  325

Lender's Composite A ...........  347

Lender's B ......................  349

Lender's C ......................  362

Lender's D ......................  365

Lender's E ......................  366

Lender's F ......................  367

Lender's Composite I and J ......  384

                     - - - - - - -

Case 1:13-cv-20708-KAM Document 1 Entered on FLSD Docket 02/27/2012 Page 4 of 141
Case 1:13-07807-AJC Doc 527 Filed 04/03/13 Page 4 of 141

Page 252

THE COURT: We are on the continued confirmation hearing in connection with Sagamore Partners. I believe we left off with Mr. Brown on the witness stand.

MR. RUSSIN: Do you want appearances, Your Honor?

THE COURT: Yes, we may as well do that.

MR. RUSSIN: Peter Russin, Zach James and Josh Dobin, Meland Russin & Budwick on behalf of the debtor.

MR. BAENA: May it please the Court, good afternoon, Your Honor. Scott Baena, Jay Sakalo and Jeff Snyder on behalf of the secured lender.

THE COURT: Well, shall we proceed?

MR. BAENA: May it please the Court, when we were last here, Mr. Russin had concluded his examination of Mr. Brown, and Mr. Brown was admonished not to talk to us or anybody about his testimony in anticipation of my cross-examination of him. We have stayed true to those instructions. I haven't spoken to Mr. Brown, seen Mr. Brown. I haven't even spoken to him ---

THE COURT: Well, that was your loss.

MR. BAENA: It was. It was. I haven't even spoken to him about the last budget or the last interim order. Notwithstanding, Your Honor, I am not going to

Case 1:13-cv-20308-AUC Doc 527 Filed 01/03/13 Page 5 of 141

Page 253

cross-examine Mr. Brown. I will call Mr. Brown on our case in chief in respect of our objection to confirmation, the debtor's objection to our claim and to the cure and reinstatement issues under 1124.

THE COURT: Very well. No cross for Mr. Brown.

Anything else, Mr. Russin?

MR. RUSSIN: Yes, Your Honor. I need to -- because of the delay between the last day of trial and this day of trial, that pushes our projections to a late December effective date. So we have prepared slightly revised projections, which we have provided to Mr. Baena, and we would like to call Mr. Sazant back to the stand to go through those projections and the impact of those projections on money necessary to confirm the plan. I don't think it's going to be a long ---

THE COURT: Well, let me ask you this question: How many other witnesses or evidentiary materials do you have?

MR. RUSSIN: That will be it with regard to witnesses. The only other things we are going to do is ask you to consider the Berkadia corporate rep deposition, which we have both designated -- as both sides have designated. We are going to propose that we actually read the designated portions into the record, as

Page 254

opposed to you reading them on your own, but would defer, of course, to whatever Your Honor wishes to do. Then I will ---

THE COURT: The reason I'm asking is because I'm wondering whether we will finish today.

MR. RUSSIN: We think we will.

THE COURT: In which event it would be very helpful to have this revised stuff in the record. But if we are not going to finish today, I think we are wasting our time putting it in and then having to come back and put another set of revised in.

MR. RUSSIN: Both sides are making a serious effort to finish today.

THE COURT: Very well then.

MR. RUSSIN: So the Berkadia corporate rep deposition designation, and then I will be asking you to consider a couple of non-evidentiary matters, as well as making sure that all of the evidence we think is in the record, is in the record.

THE COURT: All right. Put Mr. Sazant on.

MR. RUSSIN: Thank you. Mr. Sazant.

THEREUPON:

NEIL SAZANT,

was called as a witness and, after having been first duly sworn, was examined and testified on his oath as follows:

Page 255

DIRECT EXAMINATION

BY MR. RUSSIN:

Q.   Mr. Sazant, can you please state your name for the record.

A.   Neil Sazant.

Q.   And remind the Court what you position is with Sagamore?

A.   Vice-president of Sagamore Partners Limited.

Q.   Okay.  And you also are a principal of Harbor Realty Associates, correct?

A.   Correct.

Q.   Okay.  Let me show you what we have marked as Exhibit 70.

MR. RUSSIN:  And, Your Honor, if I may approach the Bench and give you a set, as well as opposing counsel and the witness.

THE COURT:  Very well.  Thank you.

MR. RUSSIN:  And these exhibits are -- may seem oddly numbered, but what we did was, in terms of supplemental exhibits and not certain what we'd be using and what we wouldn't be using, we simply had them marked, and then we will organize them or help organize them for the Court after the trial is completed.

BY MR. RUSSIN:

Q.   Do you recognize Exhibit 70?

Case 1:13-cv-20708-AUC Doc 527 Filed 01/03/13 Page 8 of 141

Page 256

A.      Yes.

Q.      What is Exhibit 70?

A.      This is our projection through the bankruptcy, which originally was a 36-month plan, which we have now extended through the term of the loan, and it is now beginning in January.

Q.      Okay.  And it's beginning in January why?

A.      When we were last here, it began in December, however, due to the passage of time and the potential for confirmation at a later date, we now began it as far as January 1st.

Q.      Okay.

A.      So we dropped off December of 2012.

Q.      Understood.  Is this a document prepared by someone employed by the debtor?

A.      Yes.

Q.      Who was that?  Yourself?

A.      Myself in conjunction with Marty Christianson.

Q.      Okay.  And was it your duty or job responsibility to create the document?

A.      I don't actually do the inputting on the spreadsheet, but she and I will work together on the numbers.

Q.      So you are fully familiar with all of the

Page 257

numbers in this document?

A.    Correct.

Q.    Okay.  Was this document made by or from information transmitted by a person with personal knowledge of the matters described in the document?

A.    Yes.

Q.    And is the document kept in the course of the debtor's regularly conducted business activity?

A.    Yes.

Q.    And is it the regular practice of the debtor to make this document?

A.    Yes.

MR. RUSSIN:  Okay.  Your Honor, we would move this document into evidence.

THE COURT:  All right.  For identification purposes, previously you moved a number of documents into evidence.  Do you remember the corresponding document that this one replaces?

MR. RUSSIN:  Yes, Your Honor.  This would replace Exhibit Number 24.

THE COURT:  Okay.  Yes, 24 were your projections --

MR. RUSSIN:  Yes.

THE COURT:  -- based on the last ten years.  Okay.  So this is now Exhibit 70 to replace Exhibit 24.

Page 258

Mr. Baena, any objection?

MR. BAENA: No, sir.

THE COURT: Very well.

(Thereupon, Debtor's Exhibit Number 70 was admitted into evidence.)

BY MR. RUSSIN:

Q. Now, Mr. Sazant, you said a moment ago that you extended the projections through the maturity date; is that right?

A. Yes.

Q. So if you turn to the last page of the projections, it shows that they proceed through March of 2016; is that correct?

A. Yes.

Q. And that's your understanding of the date of maturity?

A. Yes.

MR. RUSSIN: I apologize for asking some leading questions, Your Honor. I'm just trying to move this along, and I will ---

THE COURT: Well, when Mr. Baena objects, we will sustain them.

MR. RUSSIN: Okay. Fair enough.

BY MR. RUSSIN:

Q. Now, if you could just walk me through how

Page 259

these projections -- or walk the Court through how these projections have changed, other than starting in January of 2013.

A.   Okay.  Well, to begin with, it's the exact same format as far as the revenues at the top and the expenses carried forward through the document.  The most notable change is on the prior draft we had the real estate taxes being fully paid in March of 2013 for the tax year of 2012.  We now are paying those taxes by the end of this month to take advantage of the discount, and also because December being such a strong cash flow month, we felt it was prudent to go ahead and pay them this year.  So, now on the -- on the -- and that is also regarding the personal property tax.  So on the line items that are designated personal property and real property, as far as the beginning of January, that is now the escrow that will carry us through to 2013 to be able to pay the 2013 taxes.

Q.   And does that also apply to the personal property tax?

A.   Yes, both line items.

Q.   Okay.  So by removing those, that also increased the available cash; is that right?

A.   Correct.

Q.   Okay.  Now, what happened to the surplus from

Case 1:1-37867-AUC Doc 527 Filed 01/03/13 Page 72 of 141

Page 260

distribution of funds line item?

A. That went down approximately 100 -- about a-hundred-and-some-odd-thousand dollars, I believe.

Q. Was it 500, I believe?

A. I think it was five or five-fifty, yes.

Q. And what's the number now?

A. Now it's $418,000.

Q. Okay. And what is the lowest cumulative net cash shown on these projections? In other words, how low does the cash go during this time period? Perhaps it's on the first page.

A. In October of 2013, the lowest cumulative net income is $143,914 to the positive.

Q. $143,914?

A. Yes.

Q. And what was it previously?

A. It was about a-hundred-and-some-odd-thousand dollars less.

Q. Okay. So you never dip below $143,000 in cash?

A. Correct.

Q. Okay. And when you added the months of December 2016 -- December, January, February, March of 2016, did you change anything in terms of the formulas you used for the income and expenses?

Page 261

A.   No, it is consistent throughout.

Q.   Okay.  And what is the -- what do the projections show that you will have in cash in March of 2016?

A.   $1,480,244, net.

Q.   Okay.  So when all is said and done, you have made all of the debt service payments to the lender, you've made all of the general unsecured creditor payments, you've made all the interest payments to the general unsecured creditors, you've paid all of the expenses in consideration of these projections, your expectation is to find yourself with how much money in cash in March of 2016?

A.   A-million-four-eighty-two-forty-four.

Q.   Okay.  Let me ask you to take a look at Exhibit 74 that I'm going to hand you in a moment.

MR. RUSSIN:  Your Honor, again, if I may approach --

THE COURT:  You may.

MR. RUSSIN:  -- the witness, Your Honor and opposing counsel.

THE COURT:  Thank you.

BY MR. RUSSIN:

Q.   Please identify this document or these documents.

Page 262

A.    The top sheet is the 2012 personal property taxes.

Q.    And what does that show would be due and payable for personal property taxes?

A.    Well, if paid prior to December 31, 2012, which is our plan, the amount would be $23,746.80.

Q.    Okay.  What's the next document?

A.    The next document is the property tax --

Q.    Actually --

A.    -- no.

Q.    -- let me ask you this:  Is the first document just a notice of proposed taxes?

A.    Yes.

Q.    Okay.  What is the next document?

A.    The next document is the tax bill.

Q.    The actual tax bill?

A.    Correct.

Q.    And how much does that document show would be required to be paid for a three percent discount by the end of December?

A.    By the end of December, $31,662.40.

Q.    Okay.  And the next document?

A.    The next document, which I guess really you should look at, is the -- the next two documents are the real estate taxes.

Case 11-37867-AJC Doc 527 Filed 01/03/13 Page 15 of 141

Page 263

Q. Right.

A. And there is a number reflecting if it's paid by, again, December 31, 2012, the amount is $405,844.71.

MR. RUSSIN: Your Honor, we would ask that this composite exhibit be admitted into evidence.

THE COURT: Any objection?

MR. BAENA: No objection.

THE COURT: Very well. Composite Exhibit 74 admitted without objection.

(Thereupon, Debtor's Composite Exhibit Number 74 was admitted into evidence.)

MR. RUSSIN: I'm sorry one moment, Your Honor.

BY MR. RUSSIN:

Q. Let me ask you to turn to Exhibit 9-A.

MR. RUSSIN: And, Your Honor, if I may approach everyone again?

THE COURT: You may.

MR. RUSSIN: And this is the amendment, Your Honor, to the Crescent agreement, which actually was approved by this Court at the hearing on the motion to assume. We don't need to go through this if Your Honor will take judicial notice that the Crescent agreement has been amended and extended.

THE COURT: Let me see, was that the oral

agreement?

MR. RUSSIN: No, this was the written agreement with Crescent.

THE COURT: Yeah, that's the written agreement.

MR. RUSSIN: Right.

THE COURT: And that was just a few days ago.

MR. RUSSIN: That was literally yesterday.

THE COURT: Was it yesterday?

MR. RUSSIN: Yeah. It seems like forever, though.

Mr. Baena, do you have any objection to the admission of the Crescent amendment that extends that management agreement?

MR. BAENA: For what it is. For what it is.

MR. RUSSIN: Well, it's being offered to prove that we have an existing enforceable management agreement with Crescent that has a term through 2016.

THE COURT: Well, it's the Crescent management agreement, and it was approved for assumption. That was what you indicated yesterday. What it proves may be different than what either of you think. But, as far as taking judicial notice of it, that's not a problem. It's in the record.

MR. RUSSIN: Well, let me just -- let me just

Page 265

do it this way -- Your Honor, you should -- you should have a copy of it, as well, which is Exhibit 9-A.

THE COURT:  I just looked at it, yes.

MR. RUSSIN:  Okay.

BY MR. RUSSIN:

Q.    Mr. Sazant, can you take a look at Exhibit 9-A?

A.    Do I have it?

MR. RUSSIN:  Your Honor, if I may approach the witness?

THE COURT:  You may.

BY MR. RUSSIN:

Q.    Can you describe for the Court what that document is?

A.    This is the first amendment to the management agreement.

Q.    And what is the purpose of that document?

A.    To extend the term of the existing agreement.

Q.    And what does it extend it to?

A.    The term of this agreement shall commence on the date hereof and shall continue until October 1, 2016, unless sooner terminated.

Q.    Okay.  And were any other substantive changes made to the original Crescent agreement?

A.    No.

Page 266

MR. RUSSIN: Your Honor, we would ask that that document be admitted into evidence.

THE COURT: No, you mean you want me to take judicial notice.

MR. RUSSIN: Well, we will just move it into evidence, because it's now in the record.

THE COURT: All right. So that's Exhibit 9-A?

MR. RUSSIN: Yes.

THE COURT: Mr. Baena, any objection?

MR. BAENA: Not to the admission of it, Your Honor.

(Thereupon, Debtor's Exhibit 9-A was admitted into evidence.)

BY MR. RUSSIN:

Q. Let me ask you now to take a look at -- well, actually, let me ask you a few questions.

Are you aware of any provisions in the loan documents that prohibit the owner from being involved in the operations of the hotel?

A. No.

Q. Are you aware of any provisions in any of the loan documents that prohibit the owner from having any say in how management performs its job functions?

A. No.

Q.   Are you aware of any provisions in the loan documents that prohibit the owner from being involved in the hiring and firing of employees at the hotel?

A.   No.

Q.   Are you aware of any provisions in the loan documents that require that the manager have unfettered discretion in the management of the hotel?

A.   No.

Q.   Let me ask you now to turn to Exhibit 71.

MR. RUSSIN:   I will hand that exhibit out to everyone.   If I may approach, Your Honor?

THE COURT:   You may.

THE WITNESS:   I have it.

MR. RUSSIN:   Mr. Sazant, I have it.

BY MR. RUSSIN:

Q.   What is this document?

A.   This was a transaction history report that was produced to us by LNR reflective of the suspense account or what is also known as the lockbox account.

Q.   And what does this document show is the current -- or as of the date of this document, which is 12-6-2012, the current balance in the lockbox?

A.   As of December 6, 2012, it shows that it's $2,598,540.65.

Q.   Okay.  And the debtor has no access to the

Page 268

lockbox account, correct?

A.    Correct.

Q.    You have to rely on LNR providing that information to you?

A.    Correct.

Q.    Okay.  And the debtor does not get bank statements, for example, or any other records from LNR to show the current balance.

A.    No.

Q.    It just relies on this transaction history report, correct?

A.    Correct.

Q.    Okay.  Does the debtor regularly conduct its own reconciliations of the lockbox account?

A.    Of our own account, yes.

Q.    Okay.  So, in other words, you know what LNR is reporting is in that lockbox, and you also know how much money is swept --

A.    Correct.

Q.    -- into the lockbox every day?

A.    Correct.

Q.    And you also know how much money you requisition out of the lockbox, correct?

A.    Correct.

Q.    So you have an ability to requisition or to

Case 1:13-cv-20708-KAM Document 4 Entered on FLSD Docket 02/27/2013 Page 21 of 141
Case 1:07807-AUC Doc 527 Filed 01/03/13 Page 21 of 141

Page 269

reconcile how much you believe is in the lockbox at any given moment --

A. Yes.

Q. -- is that right?

A. Correct.

Q. Okay. Let me ask you to take a look at Exhibit 73.

MR. RUSSIN: And, Your Honor, if I again may approach. May I approach, Your Honor?

THE COURT: You may.

BY MR. RUSSIN:

Q. And what is this document?

A. This is a document that we prepared, as you previously described, our own internal reconciliation of what should be in the lockbox.

Q. Okay. And this is a document prepared by your office --

A. Yes.

Q. -- with persons with knowledge of the information contained in the document?

A. Yes.

Q. And it's a document made in the ordinary course of your business?

A. Correct.

Q. And it's the regular practice of the debtor

Page 270

to create this document?

A.    Yes.

MR. RUSSIN:  Okay.  Your Honor, I would ask that this document be moved into evidence.

THE COURT:  Any objection?

MR. BAENA:  No.

THE COURT:  Very well.  Exhibit 73 is admitted without objection.

(Thereupon, Debtor's Exhibit Number 73 was admitted into evidence.)

BY MR. RUSSIN:

Q.    So does this document reflect additional revenues swept by LNR into the lockbox?

A.    Yes.  If you look at the column titled transfers to lockbox, under the last box in amount, starting on November 30th, there are one, two, three, four, five -- there are five transfers to the lockbox that were prior to December 6th that for whatever reason were not reflected in LNR's schedules.

Q.    Okay.  So not reflected in Exhibit 71?

A.    Correct.

Q.    So there is actually $176,680.10 more in the lockbox than Exhibit 71 indicates?

A.    Correct.

Q.    So what is the total -- what is your

Case 1:11-37867-AUC Doc 527 Filed 01/03/13 Page 23 of 141

Page 271

understanding of the total amount currently in the lockbox?

A.    Again, if you look towards the bottom of that same transfer to lockbox column, there is a reconciliation, which shows there $2,598,540.65, and the additional monies that we show of $176,680.10, for a total of $2,775,220.75, again, only through December 6th.

Q.    Okay.  And since that time has more money been swept into the lockbox?

A.    Well, right now we are -- we are probably in the best week of the entire year due to Art Basel, and the revenues that are being generated currently are approximately $100,000 a night, and those revenues, about three or $400,000, should hit the lockbox by first thing next week.

Q.    And let me show you what has been marked as Exhibit 72.

          MR. RUSSIN:  Your Honor, if I may approach?

          THE COURT:  You may.  Thank you.

BY MR. RUSSIN:

Q.    Now, what is this document?

A.    This is the account activity from our Sabadell bank account, which will show the flow through of monies into the lockbox, which is -- which the prior Exhibit 73 report is prepared based on.

Page 272

Q.   And does this document show what you previously testified to as the additional $176,680.10 being swept into the lockbox?

A.   Yes.

MR. RUSSIN:  Your Honor, I would ask that this document be admitted into evidence.

THE COURT:  Any objection?

MR. BAENA:  No.

THE COURT:  Admitted without objection.

(Thereupon, Debtor's Exhibit Number 72 was admitted into evidence.)

MR. RUSSIN:  We are having a good day so far, Judge.

BY MR. RUSSIN:

Q.   Now, you mentioned that you are in the middle of Art Basel.  Now what is the significance of Art Basel to your particular hotel?

A.   Well, for our hotel, we are uniquely situated, since we are known as the art hotel.  We have made our mark in the international community of the art hotel, because of the collection and the various events that transpire, and so it's a natural that Art Basel -- our hotel is somewhat of a quote, headquarters, for the event.  And because of that, the rates and the parties that take place drive a significant amount of revenue

Case 1:13-cv-20708-KAM Document 1 Entered on FLSD Docket 02/27/2013 Page 25 of 141

over the three, four days of the event.

Q. And do you host any particular events at your hotel?

A. Yes.

Q. What do you host?

A. Our signature event, which we host every year, is the Saturday brunch, which is put on by Mr. and Mrs. Taplin and our family, and there is people from all over the world who attend every Saturday.

Q. And that brunch is tomorrow, correct?

A. Tomorrow.

Q. And what sort of revenue do you anticipate over the next few days?

A. Well, over the course of Art Basel, it's anywhere from three to $400,000 through Saturday or Sunday, starting Wednesday, Thursday.

Q. Okay. And is it your understanding -- well, what do you believe will happen to the funds in the lockbox?

A. They are going to grow significantly, not only after Basel, but continuing through the end of December.

Q. And will there be net increases, even net of the expenses to running the hotel?

A. There will be a substantial increase in the

Case 1:13-cv-20708-KAM Document 4 Entered on FLSD Docket 02/27/2013 Page 26 of 141
Case 1:11-37867-AJC Doc 527 Filed 01/03/13 Page 26 of 141

Page 274

lockbox by the end of December.

MR. RUSSIN: Your Honor, if I may approach, this is a demonstrative exhibit, updating the last demonstrative exhibit showing how much money is needed for confirmation or for the effective date.

THE COURT: Show it to counsel.

MR. RUSSIN: We are not seeking to admit it. It is just a helpful tool to go through the document.

THE COURT: Any objection to it?

MR. BAENA: I haven't seen it yet, Judge.

MR. RUSSIN: Your Honor, in case I forgot, we would ask that exhibit ---

THE COURT: Seventy-one?

MR. RUSSIN: Perhaps it's 71, yes, LNR's transaction history report.

THE COURT: You did not ask that it be admitted.

MR. RUSSIN: We would like it to be admitted.

THE COURT: Very well. Any objection, Mr. Baena?

MR. BAENA: I'm sorry, Judge, what are ---

MR. RUSSIN: I'm sorry. Scott, it's the transaction history report. I forgot to ask ---

MR. BAENA: No objection.

THE COURT: Very well. Exhibit 71 is

Page 275

admitted without objection.

(Thereupon, Debtor's Exhibit Number 71 was admitted into evidence.)

MR. BAENA: Judge, I am reading a piece of paper, and I'm not sure what it proves just yet.

THE COURT: Well, I'm not sure it will prove anything.

MR. BAENA: Or anything.

THE COURT: It will be an illustration for which counsel wishes to --

MR. BAENA: That's fine.

THE COURT: -- walk me somewhere and I walk slowly.

(Laughter.)

MR. RUSSIN: Fair enough. If I may approach, Your Honor?

THE COURT: You may. Thank you.

BY MR. RUSSIN:

Q. Tiptoeing through this document, what is this meant to reflect?

A. This reflects the cash available that is in your trust account and in the lockbox account, which is then offset by the expenses that are anticipated for confirmation.

Q. To be paid on the effective date.

Page 276

A. To be paid on the effective date, correct.

Q. Now, you will notice that the document provides $5.2 million in my trust account.

MR. RUSSIN: And, Your Honor, I will represent to the Court that I do have, in fact, $5.2 million in my trust account.

THE COURT: Is it associated with this case, or is it ---

(Laughter.)

MR. RUSSIN: It is associated with this case, and is available for the purpose of paying funds on the effective date, assuming the plan is confirmed.

THE COURT: Very well. The Court accepts your representation.

MR. RUSSIN: Well, come to think of it, I haven't checked the balance in a while.

BY MR. RUSSIN:

Q. Now, that's an increase of $200,000, correct?

A. Correct.

Q. Okay. And you will also note that it provides for all of the administrative fee claims, correct?

A. Yes.

Q. And the working capital reserve has been reduced to $418,000?

Case 1:11-37867-AUC Doc 527 Filed 01/03/13 Page 29 of 141

Page 277

A.    Correct.

Q.    And that's consistent with your projections, correct?

A.    Yes.

Q.    And it includes the 2012 real estate taxes, the amount that's required by December 31st?

A.    Yes.

Q.    The amount that you testified to a moment ago, correct?

A.    Yes.

Q.    And it also includes the 2012 personal property taxes that are due by December 31, 2012, in the amount you previously described, correct?

A.    Yes.

Q.    Okay.  And it also includes the FF&E reserve, without including one of the contracts that we did not seek approval of for cure, correct?

A.    Yes.

Q.    Okay.  So that's a -- is that an accurate number as what's required to cure the arrearage on the agreements that were assumed yesterday?

A.    Yes, it is.

Q.    Okay.  And it includes the agreed upon FF&E reserve?

A.    Correct.

Q.    And it includes the note rate interest and late fees due to the secured lender, correct?

A.    Yes.

THE COURT:  What number is that?

MR. RUSSIN:  $4,910,477.33.

THE COURT:  Very well.

BY MR. RUSSIN:

Q.    And do we have available to us more money than we have to pay out, assuming our plan is confirmed and we go effective in December in the manner in which we request the Court?

A.    Yes, we do.

Q.    Okay.  In fact, we have got almost $10,000 extra, correct?

A.    Yes.

MR. RUSSIN:  Okay.  Your Honor, I have no further questions of Mr. Sazant at this time.

THE COURT:  Very well.  I have been looking at this document, which you handed me.  I see where Footnote 2 is identified, but I don't see where Footnote 1 comes in.

MR. RUSSIN:  Footnote 1 ---

THE COURT:  Where is it?  Is it on there?

MR. RUSSIN:  It's actually under Class II. It has ---

Page 279

THE COURT: Oh, yes, there it is. Okay. Yes, it's -- usually, they go one, two. This one goes two, one. Okay. Thank you.

MR. RUSSIN: Sorry about that.

THE COURT: Anything else for this witness?

MR. RUSSIN: No, Your Honor.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. BAENA:

Q. Good afternoon, sir.

A. Hi.

Q. Let's start with Exhibit 70, if you will, which was the notice of filing that included the revised projections. Are you there?

A. Yes.

Q. Okay. I just want to confirm what I thought I understood your testimony previously to be. At the bottom of each of the projection pages there's a line that's net -- that's entitled net income. Do you see that?

A. Yes.

Q. And, as I understood it, that represents on a cash basis the earnings of the debtor on a monthly basis from operations, correct?

A. Yeah. It's not necessarily cash. It's

somewhat accrual and cash.  It's a mix.

Q.    Okay.  And cumulative net income line item which follows is the aggregate amount of the monthly operating or net income from operations, correct?

A.    Correct, starting from day one.

Q.    And do you deem that to be a cash number?

A.    I'm not sure I understand the question.

Q.    Well, let's go to the last page.

A.    Okay.

Q.    In the last column for March of 2016, you identified the amount of $1,480,244 as the cumulative net income for the entire period, right up to the reinstated maturity date of the Sagamore loan, correct?

A.    Correct.

Q.    Did you mean to say that that would be the cash on hand at that point in time?

A.    That should be the cash on hand.

Q.    Okay.  And is that before or after the payment of the $31-1/2 million note?

A.    This does not take into account.  This is showing the operations.

Q.    Okay.  Are there any other funds that will be available to the debtor from its operation to repay that note?

A.    From the operations?

Page 281

Q.    Right.

A.    Well, the operations will be analyzed at a potential refinancing to determine the refinancing ---

Q.    That wasn't my question.  From the operations will there be cash of $31-1/2 million?

MR. RUSSIN:  If he could be allowed to answer the question.  He was interrupted.

THE COURT:  Answer the question.

A.    (Continuing)  In real estate there is no operation that will produce cash to then -- to generate an amount to refinance an entire mortgage.  What you do is you show the NOI, not even cash.  The NOI will then get capped at a different rate depending on interest rates at the time, depending on values at the time, and will generate a certain amount of available money that a mortgage company will say they are comfortable loaning on that amount.

BY MR. BAENA:

Q.    Okay.  You will have to borrow -- you will have to borrow money.

A.    You are mixing apples and oranges by saying cash versus the amount that you can refinance.

Q.    Okay.  I apologize if I am mixing apples and oranges.  But let's talk about that.

At March of 2016, will the debtor have cash

Case 1:11-37867-AJC Doc 527 Filed 01/03/13 Page 34 of 141

Page 282

without the benefit of refinancing of $31-1/2 million?

A. The question just doesn't make sense. I'm sorry.

Q. Okay. Will the debtor have $31-1/2 million of cash on March 31 from its operation? I'm just asking.

A. Again, it's not an appropriate question.

Q. Well, can the debtor repay the note in March of 2016 without a refinancing of the mortgage?

THE COURT: Well, Mr. Baena, if the question is: Will these operating figures generate cash to pay $31 million, on their face it's clear they won't.

MR. BAENA: I just ---

THE COURT: Now, will they have cash without refinancing? Maybe not. Maybe he will win the lottery and have $31 million.

MR. BAENA: I understand that, Judge. I just want to make sure we all understand. This does not include -- the debtor does not have another $31-1/2 million anticipated in its coffers at that moment in time.

THE COURT: From operations?

MR. BAENA: Correct.

THE COURT: I mean --

MR. BAENA: Correct.

THE COURT: We still -- but you were just

Page 283

asking if it had to be from refinancing.  It could be from numerous sources.

MR. BAENA:  Correct.

THE COURT:  Maybe his wealthy uncle will leave him $31 million.

MR. BAENA:  Correct.

MR. RUSSIN:  Or father-in-law.

BY MR. BAENA:

Q.    With regard to the tax bills, which was Composite Exhibit 74, last year you had tax bills, as well, correct?

A.    Yes.

Q.    And last year those bills were paid, correct?

A.    Yes.

Q.    And you paid them in time to get the benefit of a discount, right?

A.    I don't remember the last time we paid them last year.  I'm just not sure.

Q.    And do you recall that they were paid from the suspense account or the so-called lockbox?

A.    I believe so, yes.

Q.    Okay.  Thank you.

Let's go next to your Exhibit 9-A, the first amendment to the management agreement with Crescent.

A.    Okay.

Q.    Are you there?

A.    Yeah.

Q.    Okay.  Now, this document says it was dated as of October 1, 2012, correct?

A.    Yes.

Q.    Okay.  And on the second page it says those executed as of the date set forth first above, which was October 1, 2012, does it not?

A.    Yes.

Q.    Is that the date it was executed?

A.    That may have been the date that Crescent executed.  I don't remember the date that they executed it and sent it to us.

Q.    When you last testified in this proceeding --

A.    Right.

Q.    -- I thought I understood you to say you had not executed this agreement.

A.    Correct, we had not executed this agreement.

Q.    Okay.  So sometime between ---

A.    I didn't say that -- I didn't say that Crescent didn't execute it.  I said that we had not executed it.

Q.    Okay.  Do you know whether Crescent had executed by the last hearing?

A.    I don't know the date.  Really, honestly, I

Case 1:1-37867-AUC Doc 527 Filed 01/03/13 Page 37 of 141

Page 285

don't know the date.

Q.   Do you know if they had executed it by the last date?

A.   I don't know the date, no.

Q.   You don't know the date?

A.   No.

Q.   Okay.  Now, is it your understanding that by this document all of the terms of the former agreement with Crescent are just being continued for an additional period of time?

A.   Correct.

Q.   Okay.  And there are no other changes to the terms and conditions of the management agreement with Crescent, correct?

A.   Correct.

Q.   Okay.  And would that include the fee provisions of the management agreement?

A.   Yes.

Q.   Okay.  And so what is your understanding of what the fees will be that are due to Crescent under this extended agreement?

A.   This original agreement included a flat fee against a percentage of the revenue.  At some point we exchange e-mails where it confirmed that we were no longer going to pay them a percentage, just the flat fee.

Page 286

Q.    Okay.  And the flat fee, is that the flat fee referred to on Page 3 of Exhibit 6 at Paragraph 5.

MR. RUSSIN:  Exhibit 9.

MR. SAKALO:  Exhibit 9.

BY MR. BAENA:

Q.    Paragraph 5 on Page 3.

A.    Right.  That was the original deal.

Q.    Okay.  So the original deal was what's there?

A.    Correct.

Q.    And what's in Paragraph 5 is $12,000 a month, not $10,000 a month, right?

A.    The percentage of the revenues, yes.

Q.    Plus a percentage?

A.    Right.

Q.    Okay.  The percentage is gone?

A.    Correct.

Q.    How about the 12,000?

A.    It was reduced to 10,000.

Q.    Okay.  So where is all of that memorialized?

A.    I believe in an e-mail.

Q.    Okay.  And where is that e-mail?

A.    I don't know.  I would have to go look for it.

Q.    And the reason it wasn't memorialized in the amendment?

Case 1:11-37867-AJC Doc 527 Filed 01/03/13 Page 39 of 141

Page 287

A.    I can't answer.  I don't know.

Q.    Okay.  Well, are there any other changes that you know of?

A.    Not that I'm aware of.

Q.    Who would know?

A.    I don't know.

Q.    You don't know?

A.    No.

Q.    Okay.  Now, what is your understanding of what the loan agreement provides in respect of the debtor's ability to serve as a qualified manager?

MR. RUSSIN:  Objection, Your Honor.  That's not an issue in this case.  We are not asserting that the debtor is a qualified manager.  It's irrelevant.

THE COURT:  Well, I assume that Mr. Baena wants to get into the issue of whether or not the debtor has met its obligations regarding a management company under the agreement.  However, I would say that what he thinks or believes is irrelevant.  The documents speak for themselves.

MR. BAENA:  Okay, Judge.  I thought we were listening to what he thought about a qualified management activities by the debtor previously.

THE COURT:  Okay.  Well, then --

MR. BAENA:  But I will move on.

Case 1:11-37867-AUC Doc 527 Filed 01/03/13 Page 40 of 141

Page 288

THE COURT: -- you may ---

MR. BAENA: No, I will move on.

THE COURT: I mean, if you want to ask him a question --

MR. BAENA: I'll move on.

THE COURT: -- but there was an objection to the prior question. You can ask him that question if you wish and we will be happy to hear his opinion. But, as I said, I think that if he has an opinion that is different than the document, it's not going to change the document.

MR. BAENA: Okay. I will accept that, Your Honor.

BY MR. BAENA:

Q. Let's talk about Exhibit 72. Now, can you describe for the Court just how this lockbox arrangement works? Are you familiar with the arrangement?

A. Excuse me?

Q. Are you familiar with the lockbox arrangement?

A. Yeah, I haven't even pulled out Number 72.

Q. Okay. I'm sorry.

A. If you will give me one second --

Q. Sure.

A. -- so I know what you are referring to.

Q. It's a Sabadell bank account statement.

Page 289

A.     Yes.  Okay.  I'm sorry ---

Q.     Are you familiar with the lockbox?

A.     Yes.

Q.     Okay.  You've had occasion to provide instructions for transfers to and from that lockbox, correct?

A.     Yes.

Q.     Okay.  And when you refer to the lockbox, are you referring to the account that the debtor maintains at Sabadell Bank, or are you referring to the account that's maintained at Berkadia, the master servicer?

A.     It's the account that's at Berkadia.

Q.     Okay.

A.     I believe you guys call it the suspense account.

Q.     The suspense account, correct.  But there is a lockbox, correct?

THE COURT:  A real box?  Really?

A.     I don't know that.  I mean, there's a suspense account.  I don't know.

BY MR. BAENA:

Q.     Okay.  Now, there is an account that's maintained at Sabadell by the debtor, correct?

A.     Correct.

Q.     Okay.  And the proceeds from operations are

deposited into that account?

A.    They flow through that account immediately into the suspense account.

Q.    Nothing in between?

A.    No.

Q.    No intermediary account?

A.    It goes through our account and then into your account, I believe.

Q.    You are not sure?

A.    Not 100 percent.  But I believe that's the way it is.

Q.    Okay.  So you are not sure if the transfers that you identified that weren't on that transaction history, you are not sure if those transfers were made from this Sabadell account to another account or directly to the suspense account, are you?

A.    No, no.  I'm sure they go from the Sabadell account to the suspense account.

Q.    From this Sabadell account --

A.    Yeah.

Q.    -- the one in Exhibit 72?

A.    Yes.

Q.    Okay.  And, of course, the demonstrative, the last document.

A.    Yes.

Case 1:13-cv-20708-KAM Document 1 Entered on FLSD Docket 02/27/2013 Page 43 of 141
Case 11-37867-AJC Doc 527 Filed 01/03/13 Page 43 of 141

Page 291

Q.    Okay.  Now, this doesn't provide for anything beyond contract rate interest and late fees to the secured lender; is that correct?

A.    No, it includes late fees.

Q.    That's what I said.  Nothing beyond contract rate interest --

A.    Oh, sorry.

Q.    -- and late fees.

A.    Correct.

Q.    Okay.  It doesn't include default interest?  It doesn't include attorney's fees?  Nothing else?

A.    Correct.

MR. BAENA:  Okay.  Thank you.

MR. RUSSIN:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. RUSSIN:

Q.    With regard to the Crescent agreement, you said that there was an e-mail memorializing a reduction of the fee to $10,000 a month, correct?

A.    I believe so, yes.

Q.    And how long have you been paying only $10,000 a month to Crescent?

A.    I would have to go back and look.  Probably about a year or so.  Maybe a little more than a year.  But, again, everything is in conjunction with the typical

Page 292

weekly draws to LNR, which they approve.

Q.    The 10,000 a month?

A.    Yes.

MR. RUSSIN:  Okay.  No further questions, Your Honor.

THE COURT:  Any recross on that redirect?

MR. BAENA:  No, sir.

THE COURT:  Very well.  You are excused, sir.

(Witness excused.)

MR. RUSSIN:  Your Honor, all I wish to do at this point is to just make sure I have gone through everything I need to go through before we rest.

THE COURT:  Well, what about that deposition?

MR. RUSSIN:  Yes, exactly.  That is one of them.  We would like to introduce the Berkadia corporate representative depo excerpts.  We have an easy to use copy for you.

THE COURT:  Well, why don't we take a recess and let Mr. Baena look at it, and then ---

MR. BAENA:  We helped prepare it, I believe.

THE COURT:  Oh, okay.

MR. BAENA:  It's a joint designation, Your Honor.  It identifies what they designated, what we designated --

THE COURT:  All right.

MR. BAENA: -- and what we both designated.

THE COURT: All right. Then it's admitted in evidence, and it's the deposition of ---

MR. RUSSIN: The deposition of the corporate representative of Berkadia Commercial Mortgage.

THE COURT: Just a second.

MR. RUSSIN: B-E-R-K-A-D-I-A, and it's our Exhibit, and our Exhibit 38 also has all the exhibits to that deposition. But we have prepared for Your Honor an easy to read version with colors.

THE COURT: Who has got what color?

MR. RUSSIN: Your Honor, the lender has blue and the debtor has yellow, and then there is green for both.

MR. SAKALO: There is a key on the first page.

THE COURT: Oh, okay.

MR. BAENA: We do wish to supplement our designations based upon the testimony that you just heard.

THE COURT: You are free to do so. Are you ready to do that?

MR. BAENA: Yes, we are ready to do that now.

THE COURT: All right.

MR. RUSSIN: Well, this is the first we are

Page 294

hearing of it, so we may need to --

MR. BAENA:  Well, I just --

MR. RUSSIN:  -- do a cross-designation.

MR. BAENA:  -- heard the witness.

MR. RUSSIN:  I'm not faulting you for it.
I'm just saying we may need to cross designate.

MR. SAKALO:  Judge, maybe it makes sense to
take up your offer for a quick recess to go over this.

THE COURT:  Why don't we do that?  What do
you need?  Three minutes?

MR. RUSSIN:  Five.

THE COURT:  Let me know when you are ready.

MR. RUSSIN:  Five in lawyer time.

(Thereupon, a recess was taken, after which
the following proceedings were had.)

MR. RUSSIN:  Your Honor, the purpose of the
break was to designate certain portions of the Berkadia
rep's deposition, which indicates how the money flows
from these fortunately named accounts.  And Mr. Sakalo
and I agree and can stipulate that the purpose of our
testimony was not to indicate there was money missing.
It was simply to indicate that on the transaction report
certain money was not accounted for that may or may not
have reached the suspense account yet, but would at some
point.

Case 1:11-37867-AUC Doc 527 Filed 01/03/13 Page 47 of 141

Page 295

THE COURT: Okay.

MR. RUSSIN: So that's really the only ---

THE COURT: So you are in accord on the base amount in the account, that is 170 big ones, that Sabadell shows was sent.

MR. RUSSIN: Or is in transit, at least.

THE COURT: That's not uncommon. As a matter of fact, historically, every time you get a wire transfer on Friday afternoon, in the old days when interest was paid, the banks lost it until Monday, so they could pick up the float over the weekend, and maybe that's where it is.

MR. SAKALO: Actually, Judge ---

THE COURT: The rate they are giving today, I believe, basically they are giving .0001 percent.

MR. RUSSIN: They actually would owe you money.

MR. SAKALO: Judge, just so the record is clear, in this case there are two accounts before you get to the suspense account. There is the debtor's account that they collect funds into and that gets moved in.

MR. RUSSIN: Which is locked. We can't -- once it goes into that account, we can't control it. It's there and it ---

THE COURT: And where is that?

Page 296

MR. RUSSIN:  That's actually the lockbox, to tell you the truth.

THE COURT:  Is that the Sabadell account or is that still a third account that I don't know about?

MR. BAENA:  It's Sabadell.

MR. SAKALO:  That's at Sabadell.

THE COURT:  Okay.

MR. SAKALO:  It goes from there into a Wells Fargo account --

THE COURT:  Oh.

MR. SAKALO:  -- that's controlled by the lender.

THE COURT:  Okay.

MR. SAKALO:  And from that -- and that happens on a daily basis.  And then once a week that account is moved into suspense.  And so on the Sabadell account that you see, you see transfers out of Sabadell.  That goes out of Sabadell into a Wells Fargo account.

THE COURT:  Right.  But some of them are within the weeks of ---

MR. SAKALO:  Right.  Correct.  That's correct.  And then ---

THE COURT:  So nobody is saying that any money is missing.  They are just -- we don't know whether it's in Sabadell or in Wells Fargo or in ---

Page 297

MR. SAKALO:  In the suspense account, which is also a Wells Fargo account, but it's a separate account.

MR. RUSSIN:  That's correct.

MR. SAKALO:  So we wanted to clarify that.

THE COURT:  Okay.  So what else do we need to do?

MR. RUSSIN:  So we are going to now -- Mr. Sakalo is going to be playing the role of the Berkadia account representative and Mr. James is going to be playing himself.

THE COURT:  I see.  Do we have to swear him in?

MR. SAKALO:  I'm not sure about that.  I swear to answer -- give her answers.

MR. JAMES:  Your Honor, we have a copy for the Court, as well.  May I approach?

THE COURT:  You may.

MR. JAMES:  Your Honor, if we could direct your attention to Page 9 of the transcript, beginning with Line 8 going through Line 25.

THE COURT:  Page --

MR. JAMES:  Nine.

THE COURT:  -- 9.  Just a second.

MR. JAMES:  We've tabbed all the pages that

Page 298

have any highlights on them for ease.

THE COURT: Okay. I see Page 9 starts up here on Page 3, Pages 9 through 12, and they are highlighted in yellow. Is that where we are starting?

MR. JAMES: That's right, Your Honor.

THE COURT: "You were produced?"

MR. JAMES: That's correct, Your Honor.

THE COURT: Okay.

MR. JAMES: And, again, yellow represents debtor's designations, blue is the lender's and green are our joint designations.

THE COURT: Very well.

MR. JAMES: Line 8:

"Q. You were produced as the person most knowledgeable about the information contained in the categories of documents that are requested in Exhibit 8 to this deposition notice; is that correct?"

"A. Yes."

"Q. Do you know how it was determined that you would testify for Berkadia?"

And at this point there is an objection or a comment by Mr. Sakalo.

"MR SAKALO: Let me put on the record, without divulging any attorney/client

Page 299

communications, you can answer."

"A. I'm the person that would have the most servicing knowledge and most familiarity with the loan documents for our company."

"Q. You would have the most familiarity with loan documents in general or loan documents pertaining specifically to the Sagamore loan?"

"A. Loan documents in general, and I have reviewed the Sagamore loan documents."

Moving on to Page 10, beginning at Line 9 and going through Page 11 at Line 8.

"Q. Can you just give us a brief overview of your employment history and your education, please?"

"A. Yes. I have a bachelor's in science from Penn State University. I have taken the real estate license courses, paralegal courses at Penn State, as well. I have worked at predecessors to Berkadia for now thirteen-and-a-half years in my position. So ---"

"Q. Let's talk about that. I know that Berkadia has not always been the master

Case 1:37867-AUC Doc 527 Filed 01/03/13 Page 52 of 141

Page 300

servicer on the subject loan here.  So can you tell us starting thirteen-and-a-half years ago where you were employed and how that led to your current position?"

"A.  Yes.  I work for GMAC Commercial Mortgage, which subsequently became Capmark Finance.  At the time of the Capmark Finance bankruptcy, there was a court decision that allowed Berkadia, which is a joint venture between Leucadia and Berkshire Hathaway, which was -- I'm not familiar with all the provisions, the legal provisions, concerning when we were purchased at the Bankruptcy Court, but I'm now at Berkadia.  So I have been in the same position, same company.  It has changed names a few times."

"Q.  And what is your current position with Berkadia?"

"A.  Vice president in client services."

Moving on to Page 12, Line 7 through 14.

"Q.  You are in the client services department?"

"A.  Yes."

"Q.  What is the purpose of that department?"

Case 1:13-cv-20708-KAM Document 1 Entered on FLSD Docket 02/27/2013 Page 53 of 141
Case 1:07-cv-2... Doc 527 Filed 01/03/13 Page 53 of 141

Page 301

"A.    It's client relations.  We handle portfolio of loans for the borrower, contact for the company, and we work with our functional business units to handle borrower requests, inquiries, any type of transactions or administration of the loans."

Your Honor, we are going to be moving on to Page 45, Lines 8 through 14.  This is not flagged; however, this was just added by the lender.

THE COURT:  Oh, 45.  Okay.

MR. JAMES:  Lines 8 through 14:

"Q.    In determining what to do with the funds that go into that Wells Fargo account, what document do you look toward?"

"A.    It is my understanding that the funds are swept on a weekly basis to the Wells Fargo account.  Our instructions are to have those funds swept weekly from LNR."

Moving on to Page 50, starting at Line 19 and going through Page 51, Line 24:

"Q.    So prior to preparation for deposition, you had no hands-on involvement with the Sagamore loan with respect to cash management; is that correct?"

"A.    The servicing was transferred

from Capmark to LNR, and since then it is --
Berkadia has been acting -- doing the cash
management on behalf of the special servicer.
So since I'm in master servicing client
services, I have not been directly involved."

"Q. Somebody is directly involved in
looking at LNR's instructions and acting
thereon, right?"

"A. The instructions are provided to
our CMBS asset management group, who then --
if it's a cash management instruction, it is
provided to our cash management group to
actually move the funds."

"Q. Does anybody in the cash
management group look toward any loan
documents to determine compliance therewith?"

"A. They are moving the funds in
accordance with LNR's instructions provided
to our CMBS asset management group."

"Q. Just to clarify then, when
anyone from Berkadia gets a request to move
funds from LNR, is there any process for
looking towards loan documents to determine
compliance therewith?"

"A. We take the instructions from LNR.

Page 303

"Q.   Is the answer no?

"A.   No."

"Q.   So whatever the instruction is
from LNR, the only duty or responsibility
at Berkadia then is to act thereon?"

"A.   Yes."

Page 55.   Your Honor, again, this is the
last additional designation by the lender.   Beginning at
Line 1 and going through 56 at Line 10:

"Q. "If you know, the hotel property
collects money and under the terms of this
cash management agreement, what then is done
with that hypothetical thousand dollars?"

"A.   My understanding of the cash
management of this loan, funds that are
deposited in a clearing bank sweep on a
weekly basis to the deposit bank, which is
the Wells Fargo account, and those funds
are swept to suspense on the loan on a
weekly basis."

"Q.   So I just want to go through it
step by step with you so I have a clear
understanding.   Is it your understanding
that the borrower deposits its funds into a
clearing bank account?"

Page 304

"A. It is my understanding that that is what should happen. The funds should be deposited to the clearing bank to be swept to the deposit bank."

"Q. Okay. And the deposit bank is the Wells Fargo account that is currently maintained by Berkadia?"

"A. That is correct.

"Q. You said then from the Wells Fargo it is swept to suspense?"

"A. Yes."

"Q. And what determines that movement of money?"

"A. That is per LNR's instructions to Berkadia."

"Q. So on a weekly basis all the funds -- all of the debtor's funds in a clearing bank are swept in Wells Fargo. That is an automatic sweep or automatic movement per the cash management agreement; is that correct?"

"A. It is my understanding that's what is occurring."

"Q. And every week there are sweeps from that Wells Fargo account to a suspense

account?"

"A.  Yes."

Going now to Page 81, Your Honor, starting at Line 8 and going all the way through to Page 86 at Line 15.

THE COURT:  Okay.  Now we are in blue.  We were primarily -- we started in yellow and then we had some agreed upon stuff, and now we are in the lender's questions.  I see there is some green or joint mixed in there.  But, go ahead.

MR. JAMES:  That's correct, Your Honor.  Your Honor, just to give the Court some context, right now we are referring to some transaction history reports in this deposition, which are attached as Exhibit 9 to the deposition transcript.

THE COURT:  Very well.

MR. RUSSIN:  And, Your Honor has those exhibits.  You have the full exhibit.  You have -- not in that document, but you have a separate binder that has the full depo transcript along with the exhibits if you wish to look at them.

THE COURT:  Very well.

MR. SAKALO:  Your Honor, just if I may, I grabbed my colleague's copy.  If I could just -- we have a clean copy over there, if I can just give it back.

Case 1:13-cv-20708-KAM Document 1 Entered on FLSD Docket 02/27/2013 Page 58 of 141
Case 1:11-37807-AUC Doc 521 Filed 01/03/13 Page 58 of 141

Page 306

THE COURT: Certainly. Whatever you would like.

MR. JAMES: Your Honor, also to give the Court some context, these transaction history reports are the same type of transaction history reports we've discussed at trial here and that have been introduced as Exhibit 15 in evidence.

MR. SAKALO: We have a copy in our exhibit register. I'm just taking it from there.

MR. JAMES: It is your S. It is your Exhibit S, and we are at Page 81.

THE COURT: And Exhibit 15 was the transaction reports on the loan from 7-3-2006 until November 9, 2012; the ones that you made a point of pointing out that there was a late charge there on every month?

MR. JAMES: That's right, Your Honor.

Exhibit 9 of the deposition are the same reports, just not as updated, because we took this deposition in October.

Are you ready?

"Q. Are there certain amounts that are assessed that are not actually credited or debited?"

"A. There are -- our system, although

Page 307

the servicing of the loan was transferred to LNR, our system automatically assesses a late charge on any open receivable that has not been paid by the due date."

"Q. Why does your system trigger an automatic late charge assessment?"

"A. It's on the McCracken system. I'm not in IT, but it is just a function of the system that automatically occurs."

"Q. A late charge is assessed. And how is the amount of the late charge determined?"

"A. The late charges that would be set up on the loan at the time of the securitization when the loan data is populated -- the late charges would be in accordance with the loan documents at that time."

"Q. So information from the loan documents was input into the system. And since the debtor's alleged default, have late charges been assessed on a monthly basis?"

And at this time there's an objection to form by Mr. Sakalo.

"A. We don't -- our system, which is

Case 1:11-37867-AUC Doc 527 Filed 01/03/13 Page 60 of 141

Page 308

not -- we don't necessarily determine -- we don't determine what late charges are outstanding at any given time. That is LNR as the special servicer of the loan. That's their decision to make. Our system just automatically generates them, but LNR is the one who maintains the outstanding balance of any late charges that are due."

"Q. This transaction history report appears to come from a Berkadia-maintained data base. Is that correct?"

"A. As I said previously, it appears to be generated by our loan view system."

"Q. And if you could take a look -- we are looking at dates on this transaction history report, as you explained, from February 2006 through August 2012."

"A. Yes."

"Q. Can you confirm or deny whether late charges -- whether this report reflects assessment of late charges on a monthly basis since the debtor's initial alleged default in August of 2009?"

"A. Yes. As I mentioned previously, our system automatically generates a late charge

Case 1:11-37867-AJC Doc 527 Filed 01/03/13 Page 61 of 141

Page 309

assessed amount, but we don't determine the amounts of late charges that are outstanding. This transaction history is so that LNR can see the transaction, the cash applications and disbursements on the loan. They are the ones that maintain any amounts that are outstanding."

"Q. So LNR determines the amounts that are outstanding and due with respect to late fees?"

"A. Once the loan is transferred to special servicing, yes."

"Q. And is there any reflection in this transaction history report of default interest being assessed?"

"A. That would not be reflected on our system. The loan -- once -- there was no default interest that was reflected on Capmark's system prior to the loan transfer. So any default interest that has accrued would be LNR's decision and determination."

"Q. And this report shows no assessments for default interest?"

"A. Our system doesn't reflect default interest at any point. It doesn't -- it is

not a functionality of this -- of our McCracken system."

"Q. Is the transaction history report able to be altered to include default interest assessments?"

Objection to form by Mr. Sakalo to this question.

"A. I'm not in IT, so I wouldn't be able to say whether they could do that or not. This has been our system -- there is -- since Berkadia has been in existence, this is how our system is reflected."

"Q. Sure, but these aren't -- these are modifiable documents, correct?"

Objection to form by Mr. Sakalo.

"A. No, they are not modifiable. It pools our information from our McCracken system of record."

"Q. Do humans input the information into the McCracken system?"

"A. When we receive instructions to do a cash application, for example, for applying funds to an escrow or disbursing funds, our cashiering group reflects the data entry on McCracken, but this report pulls from

Page 311

that application, so that would not -- this report is not modifiable in that aspect."

"Q. So the cashiering department of Berkadia has the ability to input information into McCracken; is that correct?"

"A. Yes."

"Q. And the information that is input into McCracken is thereafter swept essentially into this report automatically; is that correct?"

"A. At any time if somebody wants to run a transaction history report, if it's a borrower, if the loan is master-serviced or it's a special servicer or a specialty service loan, they can pull the report to extract the transactional history of the loan, and it's from our McCracken application."

"Q. And the transaction history report extracts information from McCracken, which is based on information that is put in from Berkadia's cashiering department; is that correct?"

"A. Any information that is input by cashiering is done via an electronic form that is signed by another department that has

supporting documentation such as LNR's

instruction attached to it as support."

"Q.   LNR may opt to instruct the

cashiering department to input various

figures into this transaction history report?"

"A.   LNR would not give direct

directions to our cashiering department.

LNR submits the request to the CMBS asset

management mailbox and the CMBS asset manager

takes that instruction and puts it into an

electronic form, which is then subsequently

signed by an approver to verify the amounts on

the request match the amounts being submitted on

the form, and then once that is approved, our

cashiering department receives that into the

work flow and does the data entry to input that

data per the electronic form."

"Q.   So there are a few players in this

and hopefully I can track it correctly.   It

starts with LNR.   And they give a request to

who?"

"A.   CMBS asset management."

"Q.   And are you aware of any requests

by LNR to CMBS asset management to include or

to input default interest assessments."

Page 313

"A. None that I'm aware of."

Moving on to Page 87, Lines 7 continuing through Page 88 at Line 6:

"Q. If LNR had submitted a request to CMBS asset management to input default interest assessments into this transaction history report, would you be aware of that?"

Objection to form by Mr. Sakalo.

"A. As I said previously, default interest is not reflected on the transaction history report."

"Q. Did LNR ever submit any requests to assess default interest in the transaction history reports?"

Objection to form by Mr. Sakalo. Asked and answered.

"A. No. I just said default interest cannot be reflected on the transaction history report."

"Q. It cannot? "

"A. It cannot. I'm not in IT. It is not a function of this report. It doesn't reflect it. It doesn't track it in a separate column, as I stated previously."

"Q. The data that goes into McCracken

is put in as a result of what starts with an LNR request, though, correct?"

"A. Yes."

"Q. Are you aware of any LNR requests to input data into McCracken to assess default interest?"

"A. None that I'm aware of."

Page 123 beginning at Line 18 and going through Page 124 at Line 1. And, Your Honor, this is just to give the Court some context of where we are in the deposition.

"Q. Let's go into what has been marked as Exhibit 12. We are looking ---"

THE COURT: It's not "let's go into." It's "let's go to."

MR. JAMES: "Let's go to." Thank you, Your Honor.

"Q. Let's go to what has been marked as Exhibit 12. We are looking at documents that were produced in discovery. They are Bates stamped LNR Production Pages 592 through 655. Do you recognize these documents?"

"A. Yes. I believe -- I'm not sure of the exact month, but these are the same

Page 315

documents -- similar documents I was presented in the prior deposition."

Going to Page 133, Lines 7 through 25:

"Q. Going back to these reports, why don't we go ahead and look at Page 649."

And, Your Honor, just for the Court, Page 649 of this exhibit has also been admitted as Exhibit 16-D at this hearing.

THE COURT: Thank you.

MR. JAMES: "It is a more recent status report. Are you on that page?"

"A. Yes.

"Q. So now we see that the next payment due date has been changed to August 11, 2009, and there is a number for regular payments due. Can you explain where that number comes from again, please?"

"A. Yes. Our McCracken system automatically generates a receivable payment based on the information that was put in at the time the loan was loaded on our system. So that functionality can't be turned off in our system, even though the servicing gets transferred. It is just automatically created. So although it is what is reflected

on Berkadia's system, LNR is the one that, as the servicer, would advise us as to what the payments outstanding were."

"Q. And do you have any understanding of how they calculated that number that is reflected there?"

Moving to Page 134 beginning at Line 4 going through Page 135 at Line 15:

"Q. Do you have any understanding of how LNR calculated that figure that's reflected on this screen?"

Mr. Sakalo objects to form. Mischaracterizes his testimony.

"A. This is not LNR's system. This is Berkadia's system. And, as I stated already, this is just automatically generated by our system. It's a function of the system application. It does not reflect what LNR would state is amounts due until we are advised to update our system. So when the servicing is transferred, these payments are automatically generated and accrue, which is why our system -- we wouldn't -- LNR would be the one to validate what the amounts -- they determine what amounts are due."

Page 317

"Q.  So the 7,828,553 is an automatic figure that comes from the system and is not an instruction by LNR; is that correct?"

"A.  Yes."

"Q.  And it is not something that LNR would rely upon for the amounts due.  They come up with their own calculations.  Is that your understanding?"

"A.  LNR, as special servicer, would advise the master servicer as to any amounts that are due for regular payments, and they may be the same number.  It depends upon whatever they currently have on their system."

"Q.  What is the late charge due under the -- two lines down from there?"

"A.  Late charge due is -- as I stated previously, late charge due is automatically calculated for any receivable that is outstanding, and it's assessed at the amount of what is originally loaded onto our system when we start -- when we start servicing the loan, and we can't turn that functionality off on our system either."

Page 136 beginning at Line 6 and going through Page 137 at Line 3:

Page 318

"Q. And there is an entry for default interest below that?"

"A. That amount would be when Berkadia is advised of default interest that's outstanding, we would add it at that time."

"Q. And so the entry as of September 11, 2012 reflects zero for the default interest?"

"A. There was no default interest prior to the servicing transfer from Capmark to LNR. So until LNR advises, it is a field that is manually input."

"Q. That's a manual input?"

"A. Yes. It does not -- our system does not generate that."

"Q. Are there any other manual inputs on this system?"

"A. Miscellaneous amounts are manually input. Those are for -- as I mentioned previously, there's about a hundred different fee types."

"Q. Sure. So on this particular screenshot we see a miscellaneous amount of $85, and that was manually input into the system?"

"A. That would have been manually

Page 319

input into the system."

THE COURT:  Hold on just a second.  Okay.
Go ahead.

MR. JAMES:  Thank you, Your Honor.  Page 144
at Line 13 -- I'm sorry.  Page 141 at Line 13 through
Page 143 at Line 7:

"Q.  I'm going to direct your attention
back to Exhibit 7, which is the cash management
agreement.  Let me direct your attention to
Page 5 of the cash management agreement, which
is Bates stamped Berkadia 338."

"Under Section 2(c) of the cash
management agreement it dictates that, quote,
the following subaccounts, collectively the
subaccounts, of the cash collateral accounts
shall be maintained on a ledger entry basis.
Do you see that language?"

"A.  Yes."

"Q.  And it goes on to list five
specified named subaccounts?"

"A.  Yes."

"Q.  Do you know whether these
subaccounts are, in fact, maintained?"

"A.  There is -- one of the subaccounts,
the replacement reserve, is maintained.  There

Case 1:11-37867-AUC Doc 527 Filed 01/03/13 Page 72 of 141

Page 320

is currently a replacement reserve account on the loan."

"Q. Where would I see that on the documents that we have looked at today?"

"A. On the current status screen of the McCracken you are not going to see the detail for the reserve escrow names. I did review it before the deposition, and there is a replacement reserve subaccount, as well as a -- there was a loss draft account and there is currently a payment reserve account."

"Q. So of the five listed and specified subaccounts in the cash management agreement, the only one specifically that you are aware of that is maintained is the replacement reserve subaccount; is that correct?"

"A. As of the moment Berkadia does maintain -- there is a replacement reserve subaccount on the loan."

"Q. Is there a monthly debt service subaccount?"

"A. We have not been instructed to set one up."

"Q. So that means no?"

"A. No."

"Q.   Is there a leasing reserve subaccount?"

"A.   No."

"Q.   Is there an operating expense subaccount?"

"A.   No."

"Q.   Is there a borrower remainder subaccount?"

"A.   No."

Page 144, Line 3 through 7:

"Q.   Are you aware of any documents produced to the debtor in discovery in this that reflect the existence and maintenance of that replacement reserve subaccount?"

"A.   No."

Page 144, Line 23 going through Page 146, Line 16:

"Q.   I'm going to read you just about the first half of Section 2(f) of the cash management agreement."

"MR. JAMES:   And, Jay, if you want me to read the entire provision, I would be happy to do that."

"Q.   It starts off, 'The lender shall direct the deposit bank, which direction may

Page 322

be given not more than one time per month, to invest amounts allocated to the subaccounts and permitted investments selected by the lender.  It is the intention of the parties hereto that the entire amounts deposited in the subaccounts, or as much thereof as the lender may reasonably arrange to invest, shall at all times be invested in permitted investments and that the cash collateral accounts; to wit, all subaccounts and the T&I impound account, shall be its so-called zero balance account.'

Do you see that language I just read?"

"A.  Yes."

At this point Mr. Sakalo says:

"Feel free to read the rest of the paragraph if you wish.  You don't need to read it out loud.  I'm telling the witness if she wants, to read the rest."

"THE WITNESS:  Okay."

"Q.  Permitted investments in that section is capitalized and defined on Page 3 of the cash management agreement, and it is defined that it shall mean any investment suitable for the investment of escrows and

Page 323

reserves established under mortgage loans included in a secondary market transaction in which some or all of the certificates issued are rated AAA, or the equivalent rating, by the rating agencies, as the standards therefore are established from time to time, or such investments which are otherwise acceptable to the lender.

Going back to Section 2(f), where was the money in the subaccounts invested?"

"A.  To my knowledge, it has not been invested -- it has not been invested in permitted investments."

"Q.  And that is since -- is that current or throughout the history of the ---"

"A.  Since Berkadia has been servicing, it has not been invested in permitted investments."

MR. JAMES:  Your Honor, we have no further designations to read.

THE COURT:  Very well.

MR. JAMES:  Thank you.

THE COURT:  Thank you.  You may step down.

MR. SAKALO:  Thank you, Judge.

MR. RUSSIN:  Your Honor, just to do a little

Page 324

bit of mopping up on our case, we would ask that the Court take judicial notice of the adversary proceeding ruling that Your Honor entered, ECF Number 401 in the adversary case on the plaintiff's motion for involuntary dismissal or directed verdict on Counts I and II of the amended complaint, and take judicial notice of the -- Your Honor's order denying motion for rehearing in the adversary, as well.

THE COURT: Any objection?

MR. BAENA: No, sir.

THE COURT: Just a moment. Very well.

MR. RUSSIN: In addition Your Honor, we would ask that we move into evidence Exhibit 20, which apparently I neglected to move into evidence. Exhibit 20 is a large pile of documents that show the Sagamore Partners Limited accounts payable aging report selections, showing payments to various expenses, including Harbor Realty for payroll, including Crescent for their management fee and things of that sort.

THE COURT: Any objection?

MR. BAENA: Can I see it?

MR. RUSSIN: Yes.

MR. BAENA: No objection.

THE COURT: It will be admitted without objection.

Page 325

MR. RUSSIN:  Thank you, Your Honor.

(Thereupon, Debtor's Exhibit Number 20 was admitted into evidence.)

MR. RUSSIN:  Your Honor, in addition, we just want to address, we are not -- we take the position that pursuant to Your Honor's ruling in the adversary, that neither default interest or attorneys' fees are due to the lender based on the simple notion that if notice under the loan agreement was faulty, then the subsequent notice and subsequent foreclosure action, which necessitated the filing of the bankruptcy, would also not have been necessary and, therefore, the rights associated with what might otherwise be a proper notice with regard to charging default interest and attorneys' fees, the lender would not be able to charge as a result.  So, therefore, we have not taken the time to go through default interest and attorneys' fees.

In addition, we would argue that it is the lender's obligation to prove that the attorneys' fees they seek are reasonable.  So that burden starts with the lender on that point if Your Honor was to rule that some amount of attorneys' fees might be reasonable.  So I'm just explaining why we are not getting into that issue, because we think it's been dealt with already by Your Honor in the adversary.

Page 326

In addition, Your Honor, we would ask that Your Honor allow us to make a modification to the plan that is beneficial to all. The plan presently provides that the effective date is the, quote, first business day 14 days after the entry of the confirmation order, or the date on which the confirmation order becomes final and non-appealable, whichever is later.

We would like the confirmation order to provide that the effective date may be the quote, the date upon which the confirmation order is entered, or anytime thereafter up to the first business day 14 days after the confirmation of -- after the entry of the confirmation order or the date on which the confirmation order becomes final and non-appealable at the option of the debtor.

The reason for this is that regardless of any appeal that may be filed -- if Your Honor confirms the plan and an appeal is filed, we do not want the hotel to be sitting there in limbo waiting for the appeal to be resolved. And whether the confirmation order is stayed -- the effectiveness of it is stayed is a separate issue -- we want to be able to allow Mr. Taplin, if he wishes, to have his money paid to the creditors, including the lender and all of the effective date payments, and go forward with a plan regardless of the

filing of a notice of appeal. It would be his risk to bear if he chose to do so. He doesn't have to, but we want him to have that option. It certainly helps all of the creditors to receive their money, rather than sitting around waiting for an appeal to be resolved, and so we don't -- we think it's a very beneficial modification to the plan and we would ask that that modification be approved by Your Honor.

THE COURT: Any objection?

MR. BAENA: Yes, sir.

THE COURT: Before we respond, am I to take it that you have rested your case, and this is a motion?

MR. RUSSIN: That is a motion. The only other item we would want to go through, just to make sure that all of the exhibits -- the exhibit register that Your Honor has is the same as everyone else has in terms of what has been admitted and what hasn't.

THE COURT: Well, it should be in the record, but, in any event ---

MR. RUSSIN: We don't have to do that. We just thought it might be helpful. But, yes, Your Honor.

THE COURT: Okay. So the debtor has rested, and the debtor has made a motion to modify a plan and Mr. Baena is going to explain why he objects.

MR. BAENA: Well, Your Honor, the bankruptcy

Case 1:11-37807-AUC Doc 527 Filed 01/03/13 Page 80 of 141

Page 328

rules provide in Rule 3020(e) that an order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise. And, as I understand it, counsel is requesting that you order otherwise, that you not take the road that most judges take, which is to allow that 14-day stay for appeals to be taken and for relief to be obtained.

We don't know yet how you are going to rule on various of the subjects that are implicated by this confirmation. Counsel makes an assumption that you've already ruled on default interest and attorneys' fees. I am not operating under the same assumption. We've raised that before with Your Honor, that you haven't made that ruling and until now you haven't made that ruling. And so we intend to present evidence about our entitlement to those matters, those fees and costs and interest.

THE COURT: What rule are you referring to?

MR. BAENA: 3020(e) as in echo.

THE COURT: Am I looking at the wrong book? My 3020 deals with Chapter 9 -- oh, oh, or Chapter 11.

MR. BAENA: Or Chapter 11.

THE COURT: Okay. All right. Go ahead.

MR. BAENA: And the problem we perceive, Your Honor is that this could well become a plug and play confirmation order. There are things you may agree with

them about and things you may agree with us about, and until we have all determined what it is that you are going to rule on the various points that are implicated by this plan, I think it's premature for you to decide, as well, in advance of your ruling on the order that the order should not be stayed for 14 days. It's just premature. This motion is ordinarily made after the Court rules in favor of confirmation.

MR. RUSSIN: Your Honor, brief response. That may be. We wanted to ask for it during our case before we rested to make sure that we don't waive that opportunity to ask for it.

MR. BAENA: There will be no waiver asserted.

THE COURT: Well, you said that it would benefit everybody. How does it benefit?

MR. RUSSIN: It benefits the lender, because if Mr. Taplin decides to take the risk and not wait for a non-appeal final order and distribute the money and allows the money to leave my trust account and some of it goes to the lender, it benefits the -- all of the administrative expense claimants. It benefits the payment of taxes. It benefits the payment of the FF&E reserve, also benefitting the lender. It benefits the cure amount for the agreements that have been assumed, and it allows the debtor to reach the effective date and

then start to begin making payments to the unsecured creditors. So it benefits everyone.

THE COURT: Well, I see that shortening the time will help move this matter along. However, by shortening it to the time of the entry of an order confirming, you are taking away some time during which the lender may want to take an appeal. So I think the simple thing to do is we will grant in part and deny in part. We will reduce the fourteen days to seven days. So in that respect, we will move it along. In the other respect we will give you seven days, instead of the normal fourteen days if your client decides that they want to go in a different direction.

MR. BAENA: Thank you, Your Honor.

Is that seven business days or seven calendar days?

THE COURT: Well, we are going on seven calendar days these days, at least since the seven-day rule has come into effect.

MR. RUSSIN: Thank you, Your Honor. And, Your Honor, just to mop up on the other modification, we had previously filed a motion to modify converting the insider claims to equity. Your Honor had said that that was beneficial, but I want to make sure that officially I can submit an order to Your Honor to upload granting that

Page 331

motion to modify the plan.

THE COURT: Any problem with that, Mr. Baena?

MR. BAENA: No, Your Honor.

THE COURT: Very well. Then the motion to convert is granted.

MR. RUSSIN: Court Paper 423 was that motion.

THE COURT: 423, and that is without objection. 423 is the number of MSNBC on Comcast Channel Television.

MR. RUSSIN: Which I assume you watch a lot.

THE COURT: All right. Mr. Baena, are you ready to go forward?

MR. BAENA: I am, Your Honor. Your Honor, perhaps we ought to talk about our order of proof for a moment, given the lateness of the day. We intend to call Mr. Brown as our only live witness. We intend to introduce documentary evidence through Mr. Brown. In addition, we are relying on the Berkadia designated testimony that you have already heard, and we will be providing some self-authenticating and otherwise admissible documentation to Your Honor to consider.

Some of the testimony will bear on things like attorneys' fees. I wanted to ask the Court for some guidance, if you wouldn't mind, about how you want to proceed in respect of attorneys' fees? We are prepared

to put on testimony or proffers about the fees incurred. Those proffers or testimony, as the case may be, would be provided by members of my firm who actually handled the matters that engendered the fees. I'm not sure that the Court really wishes to employ that process, or that we need to employ that process, particularly as to the fees that were incurred before Your Honor, which would be in respect of the adversary proceeding and in respect of the bankruptcy itself. You had the opportunity, the unique opportunity to observe what we did and how we did it and to form an opinion as to its reasonableness.

What makes this a particularly difficult subject matter is that the debtor's objection is twofold; a, they say based upon your prior rulings, we are not entitled to attorneys' fees. We vehemently disagree. And, b, by way of their objection to our claim, they did little more than to say our fees are unreasonable. And so they have not identified anything with any specificity that they deem to be unreasonable. Rather, it's this cosmic objection to our fees.

They gave one example, and the only example was the numerous cash collateral hearings that were required, because we only gave use of cash on a monthly basis. It doesn't appear that there is any dispute that the Johnson factors are going to apply to our fees, just

like they apply to any professional that appears before you.  And, of course, it's not ordinarily the case that we have proffers or live testimony, especially when there aren't any specific amounts or entries or activities or the amounts of activities and time that have been identified as being unreasonable, specifically unreasonable.

So, respectfully, I think there has got to be a better path than spending the next several hours putting on evidence about attorneys' fees.  I think that that path has -- is illuminated by two things.  First, one of the collateral issues that's implicated in all of this is if we are entitled to default rate interest and attorneys' fees, when would it be payable to us?  The debtor has taken the position that if we are entitled to anything, which they vehemently deny, it wouldn't be until the maturity date of the note.  We disagree as to default rate interest, but we don't disagree as to attorneys' fees.

So in the case of attorneys' fees, this is not an effective date issue.  You don't have to determine what our fees are in order to determine how much money Mr. Taplin has to come up with right now, or how much money is necessary to be paid on the effective date.

The other thing that illuminates all of this,

I think, is Judge Mark's recent decision in the Sundale case on exceedingly similar facts.  In Sundale there was a secured lender and a debtor who had been engaged in apparently rancorous litigation.  The fees ---

THE COURT:  You wouldn't compare that to this case, would you?

MR. BAENA:  Well, I wouldn't necessarily agree that anything would compare to something that involves Mr. Scutieri, but --

(Laughter.)

MR. BAENA:  -- that's another matter.

Judge Mark called that -- in that case he said the litigation took on a monstrous life of its own. I don't know that that's the case here.  But, certainly, this has been long, protracted and expensive litigation in numerous courts involving numerous parties, some of whom aren't even before this Court.  In that case what Judge Mark did was required the objectors to annotate the bills with what their specific objections were and what they thought that the bill should be reduced by, gave an opportunity to the billing party to provide a response, and then poor Judge Mark waded through all of that and actually made a determination as to what the fees should be.  Incidentally, Judge Mark awarded $3.2 million, I think, in fees against a $5 million secured

claim.

Absent that kind of a process, I think we are just going to be spending a lot of time talking in gleaning generalities about fees.

THE COURT: Well, let me interrupt and say that I agree with you in part. First, we don't need any testimony as to the amount of the fees. That is something that's reserved, I believe, mostly for State Courts.

The key issue regarding the fees is entitlement, and I think the Court needs to make a ruling on the issue of entitlement. And that, just like the issue of default judgment is controlled by the loan agreements and documents, that would no doubt be controlled by either the loan agreements and the note, or possibly just by the note. So I think -- and, as you point out, they don't -- you indicated that fees would not have to be paid on confirmation date -- is that what you said?

MR. BAENA: On the effective date. That is correct.

THE COURT: On the effective date -- then there is no emergency in that regard. And so if the Court rules that fees are not to be awarded, then it is moot. And if the Court rules that there is an

Case 11-37867-AUG Doc 527 Filed 01/03/13 Page 88 of 141

Page 336

entitlement to some or all of the fees or various aspects of the work done, then we can further review, if you wish, and look at specific objections and analyze the fees at that time. So let's not waste time on trying to discuss amounts of fees here today.

MR. BAENA: Okay.

THE COURT: Let's just -- if you wish to comment on entitlement, which I think is the key factor -- because, as I say, if you are not entitled, it doesn't make any difference how much fine work you did --

MR. BAENA: I appreciate that.

THE COURT: -- if you are entitled, then we will have to figure out how much.

MR. BAENA: A couple of points in that regard.

MR. RUSSIN: Before that point, let me just make one comment just to clarify. With regard, though, to the fees that may -- which, of course, we object to it, and if they don't have a right to it, so be it. But if they have a right to some, that they are tacked onto the back. There would be an interest effect on our projections. My understanding from Mr. Baena was that he's acknowledging that it would not impact the projections sufficiently to render our plan not feasible. And I just wanted to make sure that that doesn't come

back in some way to affect the ability to confirm today.

THE COURT: Well, are you telling me that Mr. Baena has consented to the fact that your plan is not feasible?

MR. BAENA: No, no. What I -- what I -- I think we are saying the same thing, but let me say it my way, if you will. What I said was based on their projections it would appear that they will have sufficient cash throughout the term of the remaining term of our loan to pay additional interest in respect of attorneys' fees if all of our fees were awarded. That's what I said, and so there is not a problem with that.

THE COURT: Okay. Is that what he said?

MR. RUSSIN: If he's acknowledging that, then I don't have a problem.

THE COURT: Well, he just said it. I mean, do you agree that that's what we are talking about?

MR. RUSSIN: That's what we are talking about.

THE COURT: Okay. Then let's move on.

MR. BAENA: Okay. So there are two points, Your Honor, in regard to fees and default rate interest. I do wish to make a record by putting certain documents into the record and I intend to do that through my witness and I trust you understand that.

Case 1:37867-AUO Doc 527 Filed 01/03/13 Page 90 of 141

Page 338

The second point is -- a clarification is how you intend to reach a decision on those issues? Are we going to argue that today?

THE COURT: No.

MR. BAENA: Do you want briefs?

THE COURT: I'm going to hear the conclusion of the evidence, and then I'm going to ask you -- in fact, I may as well ask you now. How much time does each side need to prepare an order confirming or an order denying confirmation, and then I will look for your orders and we will move as fast as we can?

MR. BAENA: We don't need a lot of time. This has all been briefed. I'm not looking to hold anybody up. But I will say this, there is a somewhat -- there's some awkwardness to their process. But I presume you are able to navigate through it by virtue of Word documents. You may agree with some and not all of people's arguments.

THE COURT: That's why we have the Chamber's box where we can combine the proposed orders or edit them or do whatever we want with them.

MR. BAENA: Okay. I just want to make the point, it's not an all or nothing proposition.

MR. RUSSIN: But in terms of timing, do you want to address that, Your Honor?

Case 1:1-37807-AUC Doc 527 Filed 01/03/13 Page 91 of 141

Page 339

THE COURT:  Well, how much time would each of you like to have in order to submit proposed orders?

MR. RUSSIN:  I think a week.  I think December 14th we can probably do it.

THE COURT:  Well, I'm going to be out of town on the 13th and 14th.  So --

MR. RUSSIN:  We would take to the --

THE COURT: -- do you want the weekend?

MR. RUSSIN:  -- to that following Monday.

MR. BAENA:  I would just want to know when we could have the transcript?

THE COURT:  Oh, by five o'clock this evening, right?

(Laughter.)

MR. BAENA:  We have the first day's transcript.  So we are just talking about today.

THE COURT:  I would ask you, Madam reporter.

THE COURT REPORTER:  When do you need it?

MR. BAENA:  Well, as soon as possible.

MR. RUSSIN:  Tuesday?

MR. BAENA:  Tuesday.  Is that possible?

THE COURT REPORTER:  Yes.

MR. BAENA:  If we could have -- what is Tuesday?

MR. RUSSIN:  Tuesday is the --

Page 340

MR. BAENA: The 12th.

MR. RUSSIN: No, the 11th.

MR. BAENA: Tuesday is the 11th, and you said what date?

MR. RUSSIN: The 17th would be the Monday.

MR. BAENA: Yeah, we could do it by then.

THE COURT: Do you want to -- well, we are coming up on the holidays. So I'm going to try and get it done during that week.

MR. BAENA: I'm leaving on the 20th, so I would wish to have it done by then, too.

MR. RUSSIN: Your Honor, the only -- the only issue I have is that to the extent that arguments are made in these proposed orders by both sides that are not anticipated or known by the other side, I'm just concerned that we would not have an opportunity to address those arguments to Your Honor. So perhaps we should be given a day or two to submit just a supplemental few page indication to Your Honor if there is a new argument ---

MR. BAENA: An amended order?

MR. RUSSIN: Amended order or something just to address new arguments we are not aware of. For example, I don't know what documents Mr. Baena is going to submit.

THE COURT: Any objection?  Well, why don't we do this then, let's go back onto the 14th instead of the 17th to submit the orders, and then you will have over the weekend to submit any supplement.

MR. RUSSIN:  By the 17th.

THE COURT:  Does that work?

MR. RUSSIN:  That's fine with me.  It's just the weekends are ---

MR. BAENA:  When do we lose you?

THE COURT:  Pardon me?

MR. BAENA:  When do we lose you?

THE COURT:  The 24th is the day I'm leaving for vacation.  So we've got the week of the 17th.  I think I forgot what day of the week ---

MR. RUSSIN:  Monday is the 17th.  So we would have 17, 18, 19, 20 -- the 21st would be that Friday.

MR. BAENA:  If anybody wanted to -- so we are talking -- what day was that?  The 17th?

MR. RUSSIN:  The 17th is a Monday.  The 14th is a Friday.

THE COURT:  The 14th is the seven days.

MR. RUSSIN:  So Friday for the initial order and Monday for the supplement.

THE COURT:  You will amend it over the

weekend after you've seen each others order.

MR. BAENA: All right. And then Your Honor would first have to wade through that material. I'm worried about the seven-day window now. Because we may need a judge, they may need a judge and you may be away.

THE COURT: Well, I'll be -- well, I mean, I will be -- I was away last week and I handled two days of calendar over the phone. Just like I allow you folks to do that, I can do it, too. So if there is something that has to be done, I can do it on the 26th, the 27th or 28th.

MR. BAENA: That's works.

THE COURT: All right. So then 14th for the orders on confirmation, and 17th of December for the supplements.

MR. RUSSIN: Thank you, Your Honor.

THE COURT: Okay. Now, do you want to put on your witness?

MR. BAENA: Yes, I do. I would like to call Mr. Brown.

THE COURT: So you don't have to bring Mr. Brown back another day.

THEREUPON:

EDWARD C. BROWN,

was called as a witness and, after having been first duly

Page 343

sworn, was examined and testified on his oath as follows:

MR. SAKALO:  Judge, may I approach just to put this up?

THE COURT:  All right.  Madam reporter, you may swear the witness.

THE COURT REPORTER:  I did.

THE COURT:  Oh, okay.  We are ready to go.

DIRECT EXAMINATION

BY MR. BAENA:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    Please state your full name for the record.

A.    Edward Christopher Brown.

Q.    And, Mr. Brown, you testified you are the asset manager at LNR with the principal responsibilities for the Sagamore loan, correct?

A.    I did, yes, correct.

Q.    And you continue to be?

A.    I continue to be, yes.

Q.    Okay.  The debtor, at its Exhibit 8, introduced the loan agreement between Sagamore and the secured lender.  Can you go to Exhibit 8 in the white book?

MR. SAKALO:  Judge, if I may just help the witness?

Page 344

THE COURT: Please help him.

MR. SAKALO: Scott, you said Exhibit 8?

MR. BAENA: Eight.

THE COURT: It is behind Tab 8. It's marked Exhibit 4 on 10-26-12.

MR. BAENA: That was in a deposition. That is correct.

THE COURT: Okay.

BY MR. BAENA:

Q. Are you with me, Mr. Brown? I'm afraid that your work space is not going to be ample enough very soon, but we will do our very best.

A. I am with you, yes.

Q. Okay. Now, are you familiar with that loan agreement?

A. Yes, I am.

Q. And do you understand that to be the loan agreement -- the operative loan agreement governing the loan by this lender to Sagamore?

A. Yes, they did March 24, 2006.

Q. And you familiarize yourself with that document?

A. Yes, I do on a regular basis since the loan was transferred, yes.

Q. I would like you to refer to Exhibit A in the

Page 345

black book.  This would be the secured lender's exhibit book, and you will note that it has four tabs behind it. Do you see that?

A.    Yes.

Q.    It's the very first exhibit in our black book.  Are you with me?

A.    Yeah, that's the Sagamore amended and restated ---

Q.    It starts with the note, yes, sir.

A.    Yes.

Q.    And let's just flip through each of those tabs.  The first one is the amended and restated promissory note, correct?

A.    Correct.

Q.    And do you know this to be the note which memorializes the principal amount due to the lender by Sagamore?

A.    Yes, I do.

Q.    The next tab is marked mortgage.  Do you see that?

A.    I've got the wrong tab.  Let me see if I have mortgage.  Okay, I have got mortgage, yeah.

Q.    Okay.  And if you will take a look at that document, do you understand that to be the mortgage which Sagamore gave to the lender as collateral security for

Page 346

the loan?

A.    Yes, I do.

Q.    And on the first page of that mortgage it bears some recording information, doesn't it, at the top?

A.    I see it at the top.  CFN it starts off, yes.

Q.    And is it your understanding that that mortgage was duly recorded?

A.    Yes, it was duly recorded.  It's got the stamps that it was paid, yeah.

Q.    If you will flip to the next tab, which is entitled UCC financing statements.  Do you see that?

A.    Yes.

Q.    And do you recognize -- if you will just look through those please, and tell us if you recognize those to be the financing statements perfecting the secured lender's security interest in certain property as collateral for the Sagamore loan?

A.    Yes, these are the financing statements.

Q.    And you will note that on the front page, the very first page, it says filed 2006, doesn't it?

A.    Yes, filed April 14th.

Q.    And if you flip through the document to the next -- to the page numbered D00025.  Do you see that?

A.    D00025, got it.

Q.    Yes.  It has a filing stamp on it, too, as

Page 347

well, correct?

A. Yes, on Page 5 of 5. There is 3 of 5 and then 4 of 5. On 5 of 5 it has a recording on the last page, yes.

Q. Yes, sir. Indeed if you flip through all of these, they all have recording information, don't they?

A. I'm looking at 00027 -- oh, filed November, yeah. The next one, 00025, filed, yes.

Q. I don't want to rush you, but this is the least interesting testimony you are going to give today, so if you could move it along.

A. Yes, I'm moving it.

Q. Okay. So did you observe filing stamps on all of those documents?

A. I did indeed.

Q. Okay. And was it your understanding that all of those documents were indeed filed?

A. Yes.

MR. BAENA: I would like to introduce Exhibit A, Your Honor, Composite Exhibit A.

THE COURT: Any objection?

MR. RUSSIN: No objection, Your Honor.

THE COURT: Just a moment.

(Thereupon, Lender's Composite Exhibit A was admitted into evidence.)

Page 348

THE COURT: Very well. Proceed.

BY MR. BAENA:

Q.    Now, you testified, did you not, that the master servicer was Capmark back in August of 2009?

A.    Yes.

Q.    And that Capmark transferred the loan, the Sagamore loan, to LNR for special servicing in August of 2009?

A.    Yes, that's correct.

Q.    Flip, if you will, to Exhibit B in our binder, the black binder.

A.    Yes, I have it.

Q.    It's a letter from Mr. Taplin, is it not?

A.    That's correct, yes.

Q.    And it's dated August 10, 2009, correct?

A.    Yes.

Q.    Can you identify that letter?

MR. RUSSIN:  Your Honor, objection. Relevance.

THE COURT:  Response?

MR. BAENA:  Your Honor, we are going to make our record as to why this loan was transferred.

THE COURT:  Pardon me.  Which document are we on?

MR. BAENA:  B, as in boy.

Page 349

THE COURT: B, as in boy. Okay. That's the letter from Martin W. Taplin & Associates?

MR. BAENA: That is correct.

MR. RUSSIN: Why do you want ---

MR. BAENA: And this goes to the imposition of default rate interest.

THE COURT: Isn't this already in evidence?

MR. BAENA: No, sir.

MR. RUSSIN: Your Honor, we don't see how this issue has anything to do with default rate interest. Your Honor, has already considered that issue.

THE COURT: All right. I will overrule the objection and allow the document, and that's B. Just a second.

(Thereupon, Lender's Exhibit B was admitted into evidence.)

BY MR. BAENA:

Q. Can you identify the letter?

A. Yes, I can identify it.

Q. Please do.

A. Yes, I received this -- a copy of this letter.

Q. From who?

A. From the master servicer.

Q. At or about the time the transfer -- the

Page 350

servicing was transferred to LNR?

A. Yes.

Q. Did you understand this letter to have any import on the decision to transfer?

A. Yes. It's very clear from the letter that he's saying he's not in a position to fund the August 2009 payment. The revenues have dropped substantially below even what he had anticipated, and we would appreciate immediately talking with the authorized representative, so we can address this issue. Default is eminent.

Q. And do you know what payment was due or about to become due from Sagamore in August of 2009?

A. Yes, there was a payment due on August the 11th.

Q. And what was that payment for?

MR. RUSSIN: Your Honor, may I have a standing objection to relevancy on these questions?

THE COURT: You may, and it's overruled.

MR. RUSSIN: Thank you, Your Honor.

BY MR. BAENA:

Q. What was the August 11th payment for?

A. That was a scheduled interest payment.

Q. And when you became responsible for the loan by way of the transfer from the master servicer, were you

Case 1:37807-AUC Doc 527 Filed 01/03/13 Page 103 of 141

Page 351

apprised of any grace periods that were applicable to that payment?

A.    From the loan document there were no grace periods.

MR. RUSSIN:  Objection to the -- to the extent that he's going for hearsay evidence, were you apprised?  Apprised by whom?  Apprised in what manner? If he's asking for hearsay evidence, apprised by some other person, then I would object on hearsay grounds. If he was apprised in some other manner, then that should be asked first.

BY MR. BAENA:

Q.    Did you have any understanding of whether there was any grace period that applied to that August 11th payment?

A.    My understanding came from the loan documents and the note.  I think it was 2.04 of the loan document and it was -- or the loan agreement, should I say, and it was also in the note.  I'm not sure, 1.01 in the note.

MR. RUSSIN:  Your Honor, objection.  The document speaks for itself, the loan agreement.  He's asking for a legal conclusion and I would move to strike his testimony.

MR. BAENA:  I asked for his understanding, Your Honor.

Case 1:13-cv-20708-KAM Document 4 Entered on FLSD Docket 02/27/2013 Page 104 of 141

Page 352

THE COURT: I'm not asking for his understanding. Again, as we said before, documents do speak for themselves, and his understanding may or may not be accurate.

MR. BAENA: It's context, though, Your Honor.

BY MR. BAENA:

Q. Until the maturity date of the Sagamore loan, were there any payments required to be made other than interest?

A. Sorry, can you repeat that?

Q. Were there any other regularly scheduled payments due from Sagamore under this loan agreement other than interest?

A. Not that I recall, no.

Q. And do you know whether Sagamore made the August 11th payment?

A. No, they did not make the August payment.

Q. Now, if we can refer to the debtor's Exhibit 11. It's the white book.

MR. SAKALO: It's in the white book.

BY MR. BAENA:

Q. Let me know when you are there.

A. Yes, I'm here.

Q. Okay. That's your letter, correct?

A. Yes, that's my letter dated September 28,

Page 353

2009.

Q.   Okay.  And by the date of that letter, how many regularly scheduled interest payments were not received from Sagamore?

A.   There were two payments not received.

Q.   Were there any attempts by Sagamore in that period of time to cure its failure to make those payments?

MR. RUSSIN:  Your Honor, objection. Relevance.

MR. BAENA:  It's totally relevant.

MR. RUSSIN:  Are we trying the adversary proceeding right now?

THE COURT:  I'm not sure what we are doing, but we'll allow a little latitude to ask these questions. I don't know what this has to do with confirmation.  So I think relevance objections are probably very well founded.  But --

MR. BAENA:  If I can explain it then, Judge.

THE COURT:  -- we'll give counsel every opportunity to present his client's position.

MR. BAENA:  If I can explain, Your Honor.

THE COURT:  Please.

MR. BAENA:  I believe it's entirely relevant. First, we are dealing with an objection to our claim and

Page 354

I'm proving the validity, priority and extent of our liens and claims. There is an objection to our claim that's implicated in this proceeding. That was the trial that Mr. Russin wanted to have before.

THE COURT: But didn't we have that trial?

MR. BAENA: No, sir.

MR. RUSSIN: Your Honor, I disagree.

MR. BAENA: No, sir.

MR. RUSSIN: We did have that.

THE COURT: Well ---

MR. RUSSIN: You had a summary judgment and you started the trial and you made a ruling.

MR. BAENA: You did not make a determination as to the validity, priority and extent of our claims. You did not, Your Honor, with all due respect.

MR. RUSSIN: It's legal argument, Your Honor.

MR. BAENA: What I'm saying is legal argument?

THE COURT: Well, I will overrule the objection and allow him to pursue the line of questioning, although I would agree, Mr. Russin, that it seems to be a stretch on relevance, but maybe it will tie itself up somehow.

BY MR. BAENA:

Q. Was there any offer of cure, any tender made

Page 355

by Sagamore prior to your letter being issued on September 28th?

A.    No, there was not.

Q.    And by September 28th was there a lockbox in place?

A.    No, there was no lockbox in place at that time.

Q.    Did LNR or the lender have any control over the debtor's money?

A.    We had no control at that time.

Q.    Now, what was your purpose in issuing this notice?

A.    The purpose of issuing this notice ---

MR. RUSSIN:  Your Honor, objection.  The notice speaks for itself.  The language speaks for itself.

THE COURT:  Well, I would agree that the language speaks for itself, but ---

MR. RUSSIN:  And relevance.

THE COURT:  He can tell us what his purpose was, which is probably explained in the letter.  But, nevertheless, overruled.

A.    (Continuing)  The purpose of this letter was to advise the debtor that the entire amount was due and, you know, to -- that was the amount that he had to pay

Page 356

us.

BY MR. BAENA:

Q.    When you issued that letter, did you -- was it your understanding that Sagamore had an opportunity to cure?

A.    No, the loan documents didn't give them any opportunity to cure.

Q.    That was your ---

THE COURT:  Strike the answer.  That's his analysis of the loan document.  The document speaks for itself.

BY MR. BAENA:

Q.    That was your view?

A.    That was my view, yes.

THE COURT:  His view.  Fine.  Now, we are starting to waste time.  Let's take a recess for five minutes.

(Thereupon, a recess was taken, after which the following proceedings were had.)

THE COURT:  Okay.  You may proceed.

MR. BAENA:  Thank you, Your Honor.

Your Honor, for the record, I would like to introduce Exhibit B, which was the letter from Mr. Taplin.

THE COURT:  Any objection?

Case 1:37807-AUC Doc 527 Filed 01703/13 Page 109 of 141

Page 357

MR. RUSSIN: Yeah, relevance.

THE COURT: Well, you already offered Exhibit B and it was introduced.

MR. BAENA: It was. Okay. I wanted to make sure it was entered. Okay. Thank you, Judge.

MR. RUSSIN: Don't I get a second opportunity to object?

THE COURT: Sure. You object, it's overruled.

BY MR. BAENA:

Q. All right. Let's move on to Exhibit C in our book.

MR. SAKALO: Chris, it's the black book behind you.

A. Yes, I have Exhibit C.

BY MR. BAENA:

Q. Okay. Are you familiar with that document?

A. Yes, it's interest fees and reserves payable to lender.

Q. Was the information on this document prepared by you or for you?

A. It was prepared by servicing on my instructions, yes.

Q. And did you review the information?

A. Yes, I reviewed the information.

Page 358

Q.    And did you believe it to be correct?

A.    I did, yes.

MR. BAENA:  I would like to offer this exhibit, Your Honor.

THE COURT:  What's the relevancy?

MR. BAENA:  The amount that has to be paid in order to reinstate the loan, Your Honor, under 1124.

MR. RUSSIN:  Your Honor, with our document that was similar to this we used it as a demonstrative aid without having it actually introduced into evidence. We are not necessarily believing that the calculation at five percent on $31.5 million -- on default interest, for example, it's wrong.  We just haven't checked that calculation.

We certainly understand that there is an appraisal fee that they are seeking.  They are asserting legal fees, PricewaterhouseCooper's report reimbursement. We are aware of the numbers on this document, but this document itself, just as our document was not introduced into evidence, ought not be introduced into evidence. It's simply a demonstrative exhibit --

MR. BAENA:  A summary.

MR. RUSSIN:  -- or a summary.

MR. BAENA:  As opposed to a demonstrative, it is a summary and summaries can be introduced into

Page 359

evidence.

THE COURT: I will allow it into evidence over objection, but note that I believe it's completely irrelevant to what we are doing at this stage of the proceedings.

MR. BAENA: Your Honor, it would be helpful to us to understand why you would think that. We are here to confirm a plan.

THE COURT: Well, there's another order that you have on appeal, which has already dealt with all of these issues you seem to be rehashing.

MR. BAENA: I haven't appealed anything, Your Honor.

THE COURT: I thought they -- didn't you file an appeal?

MR. BAENA: I did not file an appeal.

MR. RUSSIN: They did not yet file an appeal.

THE COURT: Oh, I'm sorry.

MR. RUSSIN: They moved for rehearing --

THE COURT: Oh.

MR. RUSSIN: -- of Your Honor's ruling in the adversary --

MR. BAENA: And you denied it.

MR. RUSSIN: -- and you denied it. So I assumed ---

Page 360

THE COURT:  Oh, I'm sorry.  I thought you took an appeal.

MR. BAENA:  I have not taken an appeal.

THE COURT:  Okay.  Well, in that case, it's the law.

(Laughter.)

MR. BAENA:  Judge, this is an 1124 plan, as you understand, they want to reinstate.  We are trying to prove what we believe they have to do to reinstate.

THE COURT:  I understand.  As I say, I've allowed the document, and I merely informed you that perhaps you can somehow convince me that I misperceived something.  But I don't think it's relevant, but I still let you put it in, because I want to give you an opportunity to fully represent your client to the full extent of your powers.

MR. BAENA:  I appreciate that, Judge.  But I must ask for clarification, because you haven't ruled that we are not entitled to default interest and you haven't ruled we are not entitled to attorneys' fees.  You haven't ruled that we are not entitled to fees and costs that were incurred, and so I'm not sure why it wouldn't be relevant.

THE COURT:  Well, what is the relevance?

Page 361

In other words, you are arguing you are entitled to default interest and attorneys' fees and that's the purpose of this. Well, the documents are here. I've already seen them before, but if you want to introduce them into evidence, you may do so.

MR. BAENA: No, I don't think you have seen these documents, Your Honor. You have seen the loan documents.

THE COURT: I have seen the loan documents.

MR. BAENA: I was going to introduce our fee bills. I was going to have a discussion.

Now, Mr. Russin put on an entire piece of testimony about late fees. I have a right to deal with that.

THE COURT: You may put -- go ahead and put it in. As I said, I will allow you to put it in and perhaps in your proposed order you will be able to persuade me that I should be looking at something from a different point of view. But I'm trying to make you aware of how things are impressing me as they come in to help you and to guide you in your presentation. I don't mean to interrupt what you want to do.

MR. BAENA: C has been received into evidence, Your Honor?

THE COURT: It has been received into

Page 362

evidence over objection.

    (Thereupon, Lender's Exhibit C was admitted into evidence.)

BY MR. BAENA:

  Q. If you will look at Exhibit 14 in the debtor's book, please.  You were examined by Mr. Russin about these documents.  Do you recall that?

  A. Yes, I recall that.  Yes.

  Q. And these are mortgage statements prepared by the master servicer, correct?

  A. Yes, they are mortgage statements.

  Q. And she pointed out to your attention that at the bottom the mailing address was LNR, correct?

  A. Yes, that's correct.

  Q. Did you ever send these documents to Sagamore?

  A. No, we did not.

  Q. Do you know whether Berkadia ever sent them to Sagamore?

  A. I assume not, because they have sent them to us.

  Q. Did you ever send a bill -- did LNR ever send a bill to Sagamore for late fees?

  A. We sent from -- if they would request it from us, a payoff, it would have included -- it might have

Page 363

included late fees, default interest.

Q. Did they and did you?

A. At one stage -- I just don't recall when it was -- he asked for a payoff statement and we had supplied it.

Q. Do you recall if that was before or after the filing of the bankruptcy?

A. I believe it would have been before.

Q. Please look at Exhibit 15, the loan history report. How do you physically obtain those reports?

A. These reports are sent to us by the master servicer.

Q. On request?

A. On request, yeah. If we request a transaction activity report, they would send these to us, yes.

Q. After a loan is transferred to LNR's special servicer by Berkadia, does -- after this loan was transferred to LNR by Berkadia, did Sagamore have an opportunity to make a request for those statements from Berkadia?

A. They would have had an opportunity to do it before it was transferred to us. If they wanted it after, they would have had to come to us, yes.

Q. They couldn't get it from Berkadia?

Page 364

A.    Not after.  Not after, no.

Q.    And Exhibit 16 -- 16-A, actually.  The screenshot, Exhibit 16-A, as in alpha.

A.    Here it is.  Got it.

Q.    Do you recall that?

A.    Yes, I recall seeing this before.

Q.    And would Sagamore after the loan was transferred to LNR for special servicing have access to the website from which these screenshots were taken?

A.    No, they would not.

Q.    Did LNR ever cause late fees to be deducted from the suspense account or the lockbox?

A.    No, we did not.

Q.    If you flip to D in LNR's book, the black book.  Are you there?

A.    Yes, D.  It's the Bilzin Sumberg invoice. It says dated November 24, 2009.

Q.    Keep flipping.  Is there just one invoice or numerous invoices?

A.    Oh, there are numerous invoices, Yeah.  I'm just going through.  Yeah, there are numerous invoices here.

Q.    Okay.  Do you know whether that represents the invoices that you received through October 11th that you referenced on Exhibit C as representing the legal

Page 365

fees incurred by LNR?

A.     Yes.   These would be the ones where we would get that amount from, yeah.

Q.     And have all those bills been approved for payment by LNR?

A.     All of these bills have been approved, yes.

MR. BAENA:  Judge, we would offer Composite Exhibit D.

MR. RUSSIN:  Your Honor, our only objection, again, is relevance, because our view of the law is that they don't have a right to attorneys' fees; therefore, they are not relevant to the case.

THE COURT:  Well, I'm not sure whether they have a right to attorneys' fees.  But I will overrule your objection and admit Exhibit D.

(Thereupon, Lender's Exhibit D was admitted into evidence.)

BY MR. BAENA:

Q.     On Exhibit D you refer next to -- C, rather, you refer next to appraisal fees.  Do you see that? Excuse me, PricewaterhouseCooper.

A.     That was on C, right?

Q.     On Exhibit C.

A.     Yes, PricewaterhouseCooper, $73,139, yes.

Q.     Okay.  Go to Tab E, please?

Page 366

A.    Yes, I have Tab E.

Q.    Are those the bills representing the Pricewaterhouse fees?

A.    Yes, these are.

MR. BAENA:  We would offer that, Your Honor.

MR. RUSSIN:  Same objection, Your Honor.

THE COURT:  That's exhibit what?

MR. BAENA:  E, as in echo.

THE COURT:  E admitted over objection.

(Thereupon, Lender's Exhibit E was admitted into evidence.)

BY MR. BAENA:

Q.    The next item on Exhibit C are title expenses in the amount of $1,433.50, right?

A.    That's correct, yes.

Q.    Let me ask you to flip to our Composite F.

A.    Yes, I have it, that which is headed up American Title.  That was ---

Q.    Are those the bills comprising that one line item?

A.    Yes, these are.

MR. BAENA:  We would offer that, Your Honor.

MR. RUSSIN:  Your Honor, again, objection, because it's not relevant, because to the extent the notice was improper, the acceleration was improper, the

Page 367

foreclosure for which the title fees were purchased would therefore be improper and not ---

THE COURT: And I think you may be right, Mr. Russin, but we will admit it over your objection.

MR. RUSSIN: And just to be very frank with everybody, I'm not going to hold anything back, but these title expenses and the bills themselves in Exhibit F, as well as the PWC bills in Exhibit E do not add up to the amounts that are indicated on the Exhibit C. They are less than the amounts indicated on Exhibit C, just to point out that, therefore, Exhibit C is not matching up with the exhibits.

MR. BAENA: We disagree. But that is easy to resolve.

(Thereupon, Lender's Exhibit F was admitted into evidence.)

BY MR. BAENA:

Q. All right. So let's go back to Exhibit 8, which is the loan agreement, and I want to talk to you about management of the hotel.

A. Is that in the white book?

Q. Yes.

A. Yes, I have it.

Q. Now, did you hear Mr. Sazant testify that Tecton was the former qualified manager of the hotel?

Page 368

A.    I know it was the former.  I just don't recall it.  But I know it was the former manager.

Q.    You understand that?

A.    Yes.

Q.    In fact, if we look at Page 9 of the agreement, the loan agreement, Exhibit 8, it defines the manager as Tecton, correct?

A.    Yes, manager shall mean Tecton.

Q.    And at Page 9 there is also a definition for management agreement, and I would like to publish that. "Management agreement shall mean the management agreement to be entered into by and between borrower and the Manager" -- using the capital M -- "pursuant to which the manager is to provide management and other services with respect to the property or if the context requires the replacement management agreement."

Did I read that correctly?

A.    Yes, you did.

MR. RUSSIN:  Your Honor, I'm sorry.  Let me object to the incomplete definition of manager that was elicited from this witness, because it goes beyond the ---

THE COURT:  Well, if you want to read the rest of the agreement that you believe is relevant, you may do so.

MR. RUSSIN: Your Honor, manager is defined entirely as, "Manager shall mean Tecton or any subsidiary approved by lender and controlled by Tecton, or if the context requires a qualified manager who is managing the property in accordance with the terms and provisions of this agreement, provided that the term manager shall not include the existing manager."

THE COURT: Very well.

BY MR. BAENA:

Q. Flip, if you will, to Exhibit H in our book.

MR. SAKALO: The black one.

A. Yes, I have Exhibit H.

BY MR. BAENA:

Q. Take a look at the document and identify it, if you can.

A. A cover letter states, "Enclosed you will find a copy of the executed hotel management agreement in connection with the Sagamore Hotel transaction." And then it follows that the Tecton agreement -- I'm just looking if it's signed, but this is the ---

Q. Do you know that to be the agreement?

A. Yes, this is the agreement with Tecton.

Q. Now, at some point in time the debtor terminated Tecton, correct?

A. That is correct, yes.

Page 370

Q.    Did they do that with your consent?

A.    No.  They didn't come to us for consent.

THE COURT:  Mr. Baena, it's a quarter of 5:00, and I'm going to have to leave here shortly, at about five minutes after 5:00.  Are we going to finish today?

MR. BAENA:  When we were last here, Judge, you said you would go to 6:30 or 7:00.

THE COURT:  Well, I don't remember saying that.  Well, then let's take a recess --

MR. BAENA:  Tell me what you wish me to do, Judge.

THE COURT:  -- and let me see if I can cancel my appointment.

MR. BAENA:  I'm happy to do whatever the Court directs me to do.

THE COURT:  I would like to move forward with this matter.

MR. BAENA:  I don't have very much more for this witness.

THE COURT:  If I said that, then I erred and I made a mistake.  I will try and cancel that appointment and go on, and we will take just another recess and see if I can make that cancellation.

MR. BAENA:  I apologize, Judge.

Page 371

(Thereupon, a recess was taken, after which the following proceedings were had.)

THE COURT: Okay. We will go as late as we have to. I was unable to reach the people I'm meeting, but ---

MR. BAENA: I appreciate that, Judge. I'm going to be very brief. We are doing our very best to make this as quick as possible, Judge.

THE COURT: Well, I don't mean to prevent you from presenting your client's case.

MR. BAENA: May I proceed, Your Honor?

THE COURT: You may.

BY MR. BAENA:

Q. Mr. Brown, if you will flip to Page 13 of Exhibit 8 in the white book --

A. Yes, I have Page 13.

Q. -- there is a definition at the bottom for replacement management agreement. Do you see that?

A. Yes, I see that.

MR. BAENA: Your Honor, I would like to publish the definition.

THE COURT: You may.

BY MR. BAENA:

Q. "Replacement management agreement shall mean collectively, A, either, Romanette i, a management

agreement with a qualified manager substantially in the same form and substance as the management agreement or, Romanette ii, a management agreement with a qualified manager, which management agreement shall be reasonably acceptable to lender in form and substance provided that if the loan has been securitized then with respect to clause Romanette ii, lender at its option may require the borrower obtain confirmation from the applicable rating agencies that such management agreement will not cause a downgrade, withdrawal, a qualification of the then current rating of the securities or any class thereof. And, B, an assignment of management agreement and subordination of management agreement fees substantially in the form of the assignment of management agreement (or of such other form and substance reasonably acceptable to lender) executed and delivered by borrower to lender and such qualified manager at borrower's expense."

Did I read that correctly, sir?

A.    Yes, you did.

Q.    And when this definition refers to things being acceptable to the lender, are you the person that makes those determinations?

A.    Yes.

Q.    Flip then, if you will, to Exhibit 9 in the debtor's book which is the Crescent agreement.

Page 373

A.    Yes, I have that.

Q.    And have you had an opportunity to review that agreement?

A.    I have reviewed it in the past, yes.

Q.    Okay.  And behind it in 9-A is the first amendment to that agreement that Mr. Sazant testified to. You heard that testimony, correct?

A.    Yes, I heard that testimony.

Q.    Had you seen that before today?

A.    No, I had not seen that.

Q.    But you are familiar with the Crescent agreement under Tab 9?

A.    Yes, I'm familiar with that.

Q.    And do you deem that agreement to be an acceptable replacement management agreement?

MR. RUSSIN:  Your Honor, objection. Irrelevant.  The question is out of time.  The question is not whether he deems it today.  The question is whether he deemed it when he received it.

THE COURT:  I will sustain the objection. What he thinks today has nothing to do with what has happened in the past.

BY MR. BAENA:

Q.    Have you ever ---

THE COURT:  If he rejected the agreement,

Page 374

that's one thing. But to review it today is -- I would agree with Mr. Russin, it's out of time.

MR. BAENA: I will restate my question.

BY MR. BAENA:

Q. Have you ever agreed that the Crescent agreement is an acceptable replacement management agreement?

MR. RUSSIN: Objection, Your Honor.

THE COURT: Well, he can answer that. He has or he hasn't.

MR. RUSSIN: Okay. Fair enough.

A. I've never agreed that it was a management agreement, and it is not acceptable. It wasn't acceptable and I knew it wasn't a management agreement in a proper management format in my opinion.

BY MR. BAENA:

Q. How about the Tecton agreement?

A. The Tecton agreement was in the correct format, yes.

Q. Do you deem the Crescent agreement to be the same in form and substance as the Tecton agreement?

A. No. The --

MR. RUSSIN: Your Honor --

A. -- Crescent agreement is a servicing agreement --

Page 375

THE COURT: Pardon me, just a moment.

A. -- not a management agreement.

THE COURT: Just a moment, Mr. Brown. What's the ---

MR. RUSSIN: I would just like a standing objection to this line of questioning. It is not -- I don't think it's relevant for him to be testifying today what his views are of these particular agreements.

THE COURT: I would agree. What his opinion of the agreement today is is not relevant. You asked him if he has ever accepted it, and he said he has not.

MR. BAENA: Okay.

THE COURT: Now, if you want to ask other questions about what has happened prior to today, but today is not the day for him to be evaluating this agreement.

MR. BAENA: I will restate the question.

BY MR. BAENA:

Q. You said you never approved it as a replacement management agreement, correct?

A. That is correct, yes.

Q. And is that because you don't -- you did not believe it to be?

A. I did not believe it to be a management agreement. That is correct.

Page 376

Q.    And why don't you deem it to be?

A.    It's not for several reasons.  It is clearly a servicing agreement, and it contains -- it doesn't -- it's not a full management agreement.  I mean, we -- within LNR we have probably 50 or 60 properties that we draw management agreements.  I have never seen a management agreement like this.

MR. BAENA:  Thank you.  I have no further questions of this witness.

THE COURT:  Very well.  Cross-examination?

MR. RUSSIN:  Yes, Your Honor.  Very briefly.

CROSS-EXAMINATION

BY MR. RUSSIN:

Q.    Mr. Brown, you testified that you received a copy of the Crescent management agreement through various e-mails.  In fact, you received it twice back in December and March of '09, correct?

A.    I recall you asking me about that, and, yes, we did receive it.

Q.    Okay.  And when you received that agreement -- let's take a look at the Tecton -- or the provisions in the loan agreement.  I'm going to ask you to take a look at it again, Exhibit 8, Page 13.

A.    Where are we now?  Where are we going?

Q.    Exhibit 8, Page 13 on the bottom, definition

Case 1:37807-AUC Doc 527 Filed 0703/13 Page 729 of 141 Page 129 of 141

Page 377

of replacement management agreement.

A.    Definition of replacement management agreement.  Yes, I have Page 13.

Q.    Okay.  So you admitted previously you got the agreement, and you agree that the replacement management agreement provision says that a management -- includes a management agreement with a qualified manager, which management agreement shall be reasonably acceptable to lender in form and substance provided that if the loan has been securitized then with respect to this clause and various things.  Okay.  Now, it has to be reasonably acceptable to you, correct?

A.    Correct, yes.

Q.    Okay.  Is there any writing telling the debtor that it's not reasonably acceptable to you?

A.    It wasn't a management agreement, so I didn't feel it was my duty to send it, so it wasn't.

Q.    So you never sent any kind of ---

A.    No, I didn't send anything.

Q.    Okay.  So the debtor has no idea that you believe the management agreement that says management agreement on it, that is with a qualified manager, as you have testified, that you know to be a manager of hotels, number one, wasn't a management agreement, and Number two, that you didn't approve it.  So the debtor has no

idea you are ---

THE COURT: You've got compound questions there, Mr. Russin. Sort them out.

MR. RUSSIN: All right. I will. I'm sorry.

BY MR. RUSSIN:

Q. So you received the agreement, correct?

A. Correct, yes.

Q. You took it upon yourself to make your conclusion, or at least you are testifying today that you took it upon yourself in 2009 to determine that it was not a management agreement, right? Is that what you are saying?

A. And I think I told you I ---

Q. I'm asking yes or no. Is that what you are saying, that in '09 you determined when you got the agreement, it was not a management agreement, correct?

A. I made some investigations and determined it wasn't a management agreement.

Q. Okay.

A. Yes.

Q. But you never told the debtor that your view was that it was not a management agreement, did you?

A. He never came and asked me.

Q. But isn't it up to you to -- when he sent it to you, you had it, why didn't you tell him you didn't

think it was a management agreement?

A.    If you look at what he sent to me, he didn't ask me to approve that, he just sent it to me in an e-mail and never said, well, we seek your approval in line with the paragraph here on Page 13.

Q.    Okay.  But you knew you weren't paying Tecton, because Tecton was gone.  You knew you were paying Crescent $10,000 a month.  You knew you had an agreement from Crescent, which is a hotel management company that you knew well, that says management agreement on it, yet you never thought it was your duty to tell the debtor that it wasn't a management agreement and you didn't approve it?

MR. BAENA:  Objection, Your Honor.  It's argumentative.

THE COURT:  Well, I will let him answer the question, if he may.

A.    The debtor told me that the reason he was using Crescent was for insurance purposes and for other services and this is the agreement that he sent.  And, you know, I didn't have any objection, because it was, in fact, lowering the cost of insurance and giving him some services, but it wasn't a management agreement.

BY MR. RUSSIN:

Q.    Okay.  But he had no idea you felt that way,

Page 380

correct?

A.    He didn't ask me.

Q.    Okay.  He didn't ask you.

Page 13 on the bottom, replacement management agreement definition says, "That lender" -- turning to 14 -- "at its option may require that borrower obtain confirmation from the applicable rating agencies."

You've never asked the borrower to obtain confirmation from the applicable rating agencies, correct?

A.    He didn't need to, because it wasn't a management agreement.

Q.    Okay.  That's your position.  And you never asked for an assignment of the management agreement and subordination of management fees, correct?

A.    That's correct.  Again, it wasn't a management agreement.

MR. RUSSIN:  Okay.  I have no further questions, Your Honor.

THE COURT:  Very well.  Anything in the scope of the cross?

MR. BAENA:  Yes.

REDIRECT EXAMINATION

BY MR. BAENA:

Q.    Did a point in time come where a lawsuit was

Page 381

commenced to foreclose the mortgage that Sagamore had ---

MR. RUSSIN: Your Honor, objection.

THE COURT: Is that within the scope ---

MR. BAENA: Yes, it will be, Your Honor.

MR. RUSSIN: Your Honor, that's beyond my -- that's beyond my cross.

THE COURT: How is it within the scope of the cross?

MR. BAENA: Because, Your Honor, I was going to get to the fact that in November of 2000 -- excuse me. In November of 2010 a motion was made to amend that lawsuit to sue for further relief because of this very fact.

MR. RUSSIN: That's in 2010. That's after the 2009 ---

MR. BAENA: No, the agreement was entered into in October.

THE COURT: Which agreement was entered into in October?

MR. BAENA: The Crescent agreement.

MR. RUSSIN: Right, and you are talking about after -- well after --

MR. BAENA: Exactly.

MR. RUSSIN: -- the Crescent agreement --

MR. BAENA: Exactly.

Page 382

MR. RUSSIN: -- was sent to this witness. Well after.

THE COURT: Well --

MR. RUSSIN: It is irrelevant.

THE COURT: -- it probably is, but ask your question. I'll overrule the objection. Go ahead.

MR. BAENA: Your Honor, I have no further questions. I will just offer the certified copies of the pleadings that were filed in the State Court and they are certified.

THE COURT: Very well. Are they in your book or ---

MR. BAENA: They are in my book.

THE COURT: And what exhibits are they?

MR. BAENA: It's Composite Exhibit I and J.

THE COURT: Mr. Russin, any objection?

MR. RUSSIN: Well, this is the first -- I don't think that we were aware that they were going to seek to be introduced. My only concern is that to the extent there are other documents that contradict these documents in the State Court matter, because they are not a complete reflection of what occurred, we would reserve the right to supplement the record to make sure that Your Honor has a complete picture of what occurred in that case.

Page 383

THE COURT: Well, you may review these documents and you will have until Tuesday to expand this exhibit by other certified copies from that case.

MR. RUSSIN: Okay. We also -- we also object to relevance.

THE COURT: Well, there may or may not be a relevance factor, but we are going to take a look at it. And since Mr. Baena has introduced them and we are accepting them over your objection, we will allow you until five o'clock Tuesday to submit any other certified documents from that case.

MR. RUSSIN: It may be difficult to get certification by Tuesday, but we will ---

MR. BAENA: We will accommodate. We didn't assume they would, but he may assume that we will accommodate them without certified copies if we can determine from our files that those were filed papers.

THE COURT: Fair enough.

MR. RUSSIN: Fair enough.

THE COURT: And if you want to -- when you see what he puts in it, if you want to add anything to it, you may.

MR. BAENA: I appreciate that, Judge.

THE COURT: All right. What else?

MR. SAKALO: Your Honor, just one question

for the record. We actually have the original certified copies here, the one certified copy. Does the Court need to receive that? There are photocopies in each of the exhibit binders.

THE COURT: Well, if there are photocopies and you have the certified copies, any question, Mr. Russin, if they have got the seal on them?

MR. RUSSIN: No.

THE COURT: All right. Then they will be accepted.

MR. RUSSIN: Your Honor, if I may ask what precise exhibits are being admitted?

THE COURT: Composite I and J.

MR. RUSSIN: Thank you.

MR. BAENA: That is correct.

(Thereupon, Lender's Composite Exhibit I and Exhibit J are admitted into evidence.)

THE COURT: Okay. What else?

MR. BAENA: That's it.

THE COURT: So then you rest?

MR. BAENA: Yes.

THE COURT: Anything further, Mr. Russin?

MR. RUSSIN: Well, if I can just have a couple of minutes, Your Honor.

THE COURT: One minute.

Page 385

MR. RUSSIN:  We have nothing further, Your Honor.

THE COURT:  All right.  We've already talked about -- well, first of all, you have got this additional item.  Okay.  We know when you have got to put your stuff in and your supplemental stuff.  You have also got this special deal about Exhibits I and J from the State Court case, which you can supplement, and Mr. Baena can further supplement.

Anything else we have to do?

MR. RUSSIN:  Well, the only other thing pending would be the fee applications which, of course, go to how much money we need to confirm.  I don't think there is any -- I don't think there are any objections that have been filed to the fee applications.

THE COURT:  Your fee applications?

MR. RUSSIN:  Yes, or fee applications by counsel for the debtor, nor do I believe it's particularly relevant that objections would be filed, since the money being used to pay those fee applications are coming from Mr. Taplin's funds that are in my trust account from his personally, so it doesn't affect ---

THE COURT:  Well, does Mr. Baena have copies of those?

MR. BAENA:  Oh, we've been served with ---

Page 386

MR. RUSSIN: They have all been filed.

THE COURT: Well, if you wish then, we will consider them as part of the order and on your representation that they are not coming out of the lender's money, there should be no objection to them on that basis. The only question would be if they are appropriately awarded fees and I presume they are. I haven't looked at the applications, but the Court will study them and they can be included in the order.

MR. RUSSIN: Thank you.

MR. BAENA: Two points, Judge.

THE COURT: Yes.

MR. BAENA: I presume that by his statement counsel is apprising all of us that the payment of these fees will not impair the debtor's ability to pay whatever else you may determine they have to pay to confirm their plan.

THE COURT: Well, of course. I mean, I presume that they would rather just take the money and not pay you anything.

MR. BAENA: I'm sure they would.

THE COURT: But the system doesn't work that way and I think Mr. Russin knows that.

MR. BAENA: Okay. And, secondly, there were interim applications by certain professionals,

Page 387

principally Mr. Russin's firm, that did elicit objections that were made and they were dealt with on an interim basis preserving their right to get past those objections on a final application.

THE COURT:  Well ---

MR. BAENA:  So I don't think we need to make those objections again.

THE COURT:  No, you don't have to make them again, but if Mr. Russin puts them in the order, you can address them in your supplement.

MR. BAENA:  That's what I will do.

THE COURT:  Okay.

MR. RUSSIN:  And I assume you do not want closing argument.  You will take them in the papers.

THE COURT:  They will be in the papers, yes.

MR. RUSSIN:  Thank you, Your Honor.

THE COURT:  Okay.

MR. RUSSIN:  Thank you for your ---

THE COURT:  And I'm sorry for this confusion. I didn't mean to rush you, but thank you anyhow.  I thank both counsel for a highly professional and civil presentation of their respective client's positions. There's some interesting points here, which the Court will review and upon receipt of the orders, and will try and get an order out to you at the earliest possible

time.

MR. BAENA: Your Honor, I just have one request that we be allowed to file our proposed findings and conclusions, otherwise there is no -- there is no paper trail of the losing party.

THE COURT: All right. Then each of you may make a notice of filing of your proposed findings and conclusions. But, in addition, to sending --

MR. BAENA: Send them to the Chambers box.

THE COURT: -- Send them to the Chambers box, so I can work with them.

MR. BAENA: Thank you, Your Honor.

THE COURT: Okay.

MR. RUSSIN: Have a pleasant evening, Your Honor.

MR. BAENA: Thank you, Judge.

THE COURT: Thank you all. Sorry for the little confusion.

(Thereupon, the hearing was concluded.)

Page 389

CERTIFICATION

STATE OF FLORIDA        :

COUNTY OF MIAMI-DADE   :

        I, Karen B. Patlak, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were taken before me at the date and place as stated in the caption hereto on Page 249; that the foregoing computer-aided transcription is a true record of my stenographic notes taken at said proceedings.

        WITNESS my hand this 10th day of December, 2012.

_____

KAREN B. PATLAK

Court Reporter and Notary Public

in and for the State of Florida at Large

Commission #DD956369

January 27, 2014