UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 13-20708-CIV-ROSENBAUM

In re:

SAGAMORE PARTNERS, LTD.,
BANKRUPTCY APPEALS.

_____/

---

### BRIEF OF SAGAMORE PARTNERS, LTD.

**On Appeal from the United States Bankruptcy Court
for the Southern District of Florida**

---

Peter D. Russin
Florida Bar No. 765902
prussin@melandrussin.com
Zachary N. James
Florida Bar No. 893641
zjames@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
200 South Biscayne Blvd., Ste. 3200
Miami, Florida  33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Attorneys for Sagamore Partners, Ltd.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ..................................................................................... iv

I.      STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ................................... 1

II.     STATEMENT OF THE ISSUES AND STANDARD OF APPELLATE REVIEW ............ 2

    A.    Statement of Issues Raised By Sagamore ................................................. 2

        1.    Rule 54(b) Opinion and Adversary Judgment .............................................. 2

        2.    Confirmation Order Cross-Appeal ................................................................ 2

    B.    Standard of Appellate Review..................................................................... 3

        1.    Generally ....................................................................................................... 3

        2.    Standard of Appellate Review for Issues Raised By Sagamore .................... 3

        3.    The JPMCC Related Parties Misconstrue the Standard of Appellate Review
              Applicable To Their Appeals.......................................................................... 4

III.    STATEMENT REGARDING ORAL ARGUMENT......................................................... 6

IV.     STATEMENT OF THE CASE AND FACTS................................................................... 6

    A.    The Adversary Proceeding and the Directed Verdict Order ........................... 8

    B.    The Confirmation Hearing on Sagamore's Plan of Reorganization ............... 9

    C.    The Disclosure Statement Order ..................................................................... 9

V.      ARGUMENT............................................................................................................. 10

    A.    The Bankruptcy Court Correctly Ruled that the Notice of Default Sent By LNR To
          Sagamore Did Not Comply With The Requirements Of The Loan Agreement...................... 12

    B.    The Bankruptcy Court Correctly Ruled That JPMCC Is Not Entitled To Default Rate
          Interest, Attorneys' Fees and Costs As A Result Of Its Failure to Provide Proper Notice ...... 18

    C.    The JPMCC Related Parties Failed To Timely Appeal The Directed Verdict Order .... 21

    D.    The Bankruptcy Court Correctly Ruled that JPMCC Elected to Charge Late Fees and
          Not Default Interest Under the Loan Agreement.................................................................... 24

    E.    Default Rate Interest Is Not Required Under the Reinstatement Statute ....................... 30

        1.    The Bankruptcy Court Erred in Failing to Address Sagamore's Statutory
              Construction Arguments ................................................................................ 31

        2.    Under 11 U.S.C. § 1124(2)(A), Sagamore is Not Required to Pay JPMCC Default
              Rate Interest as Part of the Cure .................................................................. 33

3.    Section 1123(d) Does Not Apply to Reinstatement Plans and Does Not Otherwise Alter the Outcome ........................................................................................... 35

4.    The Bankruptcy Court Erred in Considering Equitable Factors Suggested by JPMCC Favoring Payment of Default Interest, Attorneys' Fees and Costs ....................................... 36

F.    The Bankruptcy Court Correctly Ruled that Sagamore Is Being Managed In Accordance With the Loan Agreement ..................................................................................... 39

G.    The Bankruptcy Court Correctly Ruled That Sagamore Met Its Burden In Establishing That Its Plan Is Feasible Pursuant to 11 U.S.C. § 1129(a)(11) ................................................ 41

H.    JPMCC Errs In Its Description of an Oversecured Lender's Right to Default Interest Generally ......................................................................................................... 45

1.    Section 506(b) and the Reinstatement Statute ............................................................ 45

2.    Default Interest is Not Interest at all, but Rather an Unreasonable Charge or Penalty ........................................................................................................................47

VI.   CONCLUSION ........................................................................................... 49

CERTIFICATE OF SERVICE ............................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Commodore Holdings, Inc. v. Exxon Mobil Corp.,* 331 F.3d 1257, 1259 (11th Cir. 2003) ......... 22

*Fla. Partners Corp. v. Southeast Co. (In re Southeast Co.),* 868 F.2d 335, 340 (9th Cir. 1989) . 29, 34, 38

*Frost v. Regions Bank*, 15 So. 3d 905, 906-07 (Fla. 4th DCA 2009) ........................................... 19

*Great Western Bank & Trust v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply)*, 850 F.2d 1338 (9th Cir. 1988) .......................................................................... passim

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160 (5th Cir. 1993) ............................................................................................ 42

*Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props., Inc.),* 338 B.R. 450 (Bankr. D. Colo. 2005) ....................................................................................................................... 35, 36

*In re 1 Ashbury Court Partners, L.L.C.*, No. 11-10131, 2011 WL 4712010 (Bankr. D. Kan. 2011) ............................................................................................................................... 35, 36

*In re 1095 Commonwealth Ave. Corp.*, 204 B.R. 284, 304-05 (Bankr. D. Mass. 1997) .............. 28

*In re 139-141 Owners Corp.,* 306 B.R. 763 (Bankr. S.D.N.Y. 2004) .................................... 37, 38

*In re AE Hotel Venture*, 321 B.R. 209 (Bankr. N.D. Ill. 2005) ...................................... 28, 47, 48

*In re Bergman*, 585 F.2d 1171, 1179 (2d Cir.1978) ..................................................................... 42

*In re Cliftondale Oaks, LLC*, 357 B.R. 883 (Bankr. N.D. Ga. 2006) ............................................ 28

*In re Club Assocs.,* 951 F.2d 1223, 1228 (11th Cir.1992) ............................................................... 3

*In re Colvin*, 57 B.R. 299, 302-03 (Bankr. D. Utah 1986) ........................................................... 29

*In re Consolidated Props. Ltd. P'ship*, 152 B.R. 452, 455 (Bankr. D. Md. 1993) ...................... 47

*In re Cottonwood Corners Phase V, LLC*, Case No. 11-11-12663, 2012 WL 566426, *11-12 (Bankr. D. N.M. Feb. 17, 2012) .............................................................................................. 38

*In re Countrywood Investment Group, Ltd.*, 117 B.R. 338 (Bankr. M.D. Tenn. 1990) .......... 34, 38

*In re Crystal Props., Ltd., L.P.*, 268 F.3d 743, 749-53 (9th Cir. 2001) ....................................... 27

*In re Danny Thomas Props. II, Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001)") ...................... 42

*In re Dixon*, 228 B.R. 166, 177 (W.D. Va. 1998) ....................................................................... 28

*In re DSBC Investments, L.L.C.*, Case No. 09-BK-03146, 2009 WL 2998940, *4 (Bankr. D. Az. 2009) ................................................................................................................................. passim

*In re DWS Investments, Inc.*, 121 B.R. 845, 849 (Bankr. C.D.Cal. 1990) .................................. 48

iv

*In re Englander*, 95 F.3d 1028, 1030 (11th Cir. 1996) ................................................... 26

*In re Forest Hills Associates,* 40 B.R. 410, 415-17 (Bankr. S.D.N.Y. 1984).............................. 34

*In re General Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011) .............. 21, 37, 38, 39

*In re Harvest Oaks Drive Assocs., LLC,* No. 10-03145, 2011 WL 124495 (Bankr. E.D.N.C. Jan. 14, 2011) ........................................................................................................ 26

*In re Hoffman,* 52 B.R. 212 (Bankr. D.N.D. 1985) ........................................................ 44

*In re Int'l Admin. Servs.*, 408 F.3d 689, 698 (11th Cir. 2005)................................... 3, 30

*In re JLJ Inc.,* 988 F.2d 1112, 1116 (11th Cir.1993)................................................... 3, 5

*In re Johnson*, 184 B.R. 570, 572 (Bankr. D. Minn. 1995) ..................................... 45, 46

*In re Lichtin/Wade, LLC*, No. 12-00845, 2012 WL 3260287, *3-4, (Bankr. E.D.N.C. Aug. 8, 2012) ................................................................................................................ 27

*In re Linda Vista Cinemas, L.L.C,* 442 B.R. 724 (Bankr. D. Ariz. 2010) ..................................... 43

*In re Madison Hotel Assoc.*, 749 F.2d 410, 420-21 (7th Cir. 1984) ............................... 34

*In re Marill Alarm Systems, Inc.*, 81 B.R. 119, 124 n. 10 (S.D. Fla. 1987).......................... 26, 40

*In re Martin Bros. Toolmakers, Inc.*, 796 F.2d 1435, 1437 (11th Cir. 1986) ...................... 22

*In re Matter of Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1169 (5th Cir. 1993) ............................ 44

*In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937 (Bankr. S.D. Fla. 1992)........................................ 41

*In re Moody Nat'l SHS Houston S, LLC*, 426 B.R. 667, 677 (Bankr. S.D. Tex. 2010).... 29, 35, 36

*In re New Midland Plaza Assocs.,* 247 B.R. 877 (Bankr. S.D. Fla. 2000) ..................................... 44

*In re Orlando Tennis World Dev. Co., Inc.*, 34 B.R. 558, 560-61 (Bankr. M.D. Fla. 1983)........ 34

*In re Phoenix Bus. Park Ltd. P'ship*, 257 B.R. 517, 522-23 (Bankr. D. Az. 2001) ... 29, 34, 36, 38

*In re Route One West Windsor, Ltd. P'ship*, 225 B.R. 76, 92 (Bankr. D.N.J. 1998) ................... 28

*In re Schatz*, 426 B.R. 24, 27 (Bankr. D. N.H. 2009) ............................................... 34, 38

*In re Singer Island Hotel,* 95 B.R. 845 (Bankr. S.D. Fla. 1989)...................................... 34, 37, 38

*In re Sublett,* 895 F.2d 1381, 1384 (11th Cir. 1990)...................................................... 4, 5, 18

*In re Sweet,* 369 B.R. 644, 652 (Bankr. D. Colo. 2007) ......................................... 26, 36

*In re Sylmar Plaza, L.P.*, 314 F.3d 1070 (9th Cir. 2002)................................................ 34

*In re Taddeo*, 685 F.2d 24, 28-29 (2d Cir. 1982)................................................ 31, 33

*In re Udhus*, 218 B.R. 513, 518 (9th Cir. BAP 1998) ............................................. 34, 38

*In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) ..................................... 28

*In re WSG Dulles, L.P.* No. 12-11149-BFK, 2013 WL 64759 (Bankr. E.D. Va. Jan. 4, 2013) .. 13, ....................................................................................................................14

*In re Young Broadcasting, Inc.*, 430 B.R. at 128 (Bankr. S.D.N.Y. 2010) ................................. 42

*In re Zamani*, 390 B.R. 680 (Bankr. N.D. Ca. 2008)......................................................... 34, 36, 38

*Irving Tanning Co. v. American Classic Inc.*, 736 F. Supp. 161, 164-65 (N.D. Ill. 1990)..... 19, 21

*Judy v. MSMC Venture, LLC*, 100 So.3d 1287, 1289 (Fla. 2d DCA 2012)................................. 19

*Konsulian v. Busey Bank, N.A.*, 61 So. 3d 1283, 1285 (Fla. 2d DCA 2011) ............................... 19

*Laurencio v. Deutsche Bank Nat. Trust Co.*, 65 So. 3d 1190, 1192 (Fla. 2d DCA 2011)........... 19

*Lykes Bros, Inc. v. United States Army Corps of Engr's*, 64 F.3d 630, 634 (11th Cir. 1995)......... 3

*Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983)..................................................... 26

*Preblich v. Battley*, 181 F.3d 1048 (9th Cir. 1999)...................................................................... 23

*Prime Motors Inns, Inc. v. First Fidelity Bank N.A. New Jersey (In re Prime Motor Inns, Inc.)*, 123 B.R. 104 (Bankr. S.D. Fla. 1990) ....................................................................... 37

*Sanchez-Villalba v. Herkert*, No. 12-23199-CIV, 2013 WL 537496, *3 (S.D. Fla. Feb. 12, 2013) ........................................................................................................ 3, 5, 26, 40

*Schaefer v. First Nat'l Bank of Lincolnwood*, 465 F. 2d 234 (7th Cir. 1972) ............................. 23

*Stoner-Caroga Corp., Inc. v. U.S.*, 3 Cl. Ct. 92, 95 (Cl. Ct. 1983)............................................. 19

*U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989)...................................................... 45

*U.S. v. Smith*, 186 F.R.D. 505, 506 (N.D. Ind. 1999) ................................................................. 23

*U.S. v. TM Bldg. Products, Ltd.*, 231 B.R. 364, 372 (S.D. Fla. 1998)................................... 42, 45

*Wroblewski v. Am. Home Mortg. Servicing, Inc.*, 68 So. 3d 431 (Fla. 5th DCA 2011) .............. 19

## Other Authorities

11 U.S.C. §1129(a)(11)............................................................................................................ 12, 41

11 U.S.C. §1129(a)(7)..................................................................................................................... 36

11 U.S.C. §365(b)(1)(A)................................................................................................................. 30

11 U.S.C. §365(b)(2) ................................................................................................................ 30, 48

11 U.S.C. §1123(d) ................................................................................................................. passim

11 U.S.C. §1124(2) ................................................................................................................. passim

11 U.S.C. §1129(b) .................................................................................................................. 35, 36

11 U.S.C. §506(b)................................................................................................................... passim

28 U.S.C. § 158(a)(1)....................................................................................................................... 1

**Rules**

Fed. R. Bankr. P. 7054 ................................................................................................ 2

Fed. R. Bankr. P. 8002 .............................................................................................. 23

Fed. R. Civ. P. 1 ........................................................................................................ 21

Fed. R. Civ. P. 52(a)(1) ............................................................................................ 22

Fed. R. Civ. P. 54(b) ........................................................................................... passim

S.D. Fla. L.R. 87.4(f) .................................................................................................. 6

# I.   STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

Sagamore Partners, Ltd. ("**Sagamore**") agrees with JPMCC[1] that the Confirmation Order[2] is a final order, and this Court has appellate jurisdiction over the appeal and cross-appeal of the Confirmation Order under 28 U.S.C. § 158(a)(1).  However, to the extent the JPMCC Related Parties[3] attempt to challenge the findings of the Bankruptcy Court in the Directed Verdict Order, which was entered in the Adversary Proceeding, through their appeal of the Confirmation Order, which was entered in the Main Case, this Court does not have appellate jurisdiction.

As for the Adversary Judgment,[4] while Sagamore asserts that the Bankruptcy Court made certain procedural errors surrounding the entry of the Adversary Judgment, Sagamore agrees that the Adversary Judgment is purportedly a final judgment and, thus, this Court has jurisdiction over the appeal and cross-appeal under 28 U.S.C. § 158(a)(1).

Finally, Sagamore appeals from the Bankruptcy Court's *Memorandum Opinion and Order Granting Defendants' Emergency Motion for Entry of Final Judgment on Counts I and II of Amended Complaint Pursuant to Fed. R. Civ. P. 54(b)* (the "**Rule 54(b) Opinion**")[5] entered in the Adversary Proceeding.  In the Rule 54(b) Opinion, the Bankruptcy Court certified the Directed Verdict Order as final and appealable.  The Rule 54(b) Opinion is a final order over which this Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

---

[1] For ease of reference, unless indicated otherwise, all undefined capitalized terms shall have the same meanings ascribed to them in the *Consolidated Opening Brief of Appellants/Cross-Appellees* [ECF No. 15] (the "**Opening Brief**").  Please note that references to the record will be in the form of "ECF No. ___."  References to docket entries in the main bankruptcy case will be preceded by "Main Case," and references to docket entries in the adversary proceeding will be preceded by "Adversary Proceeding."

[2] Main Case ECF No. 521.

[3] "JPMCC Related Parties" shall have the same meaning ascribed to that term in the Court's *Order Consolidating Cases and Setting Briefing Schedule* [ECF No. 12].  Of the JPMCC Related Parties, only JPMCC filed pleadings and a Proof of Claim in the Main Case.  Thus, references by Sagamore to JPMCC concern issues raised by JPMCC in the Main Case.  References by Sagamore to the JPMCC Related Parties concern matters raised in the Adversary Proceeding or that involve all of the defined JPMCC Related Parties.

[4] Adversary Proceeding ECF No. 431.

[5] Adversary Proceeding ECF No. 430.

## II.  STATEMENT OF THE ISSUES AND STANDARD OF APPELLATE REVIEW

### A.      Statement of Issues Raised By Sagamore

#### 1.  Rule 54(b) Opinion and Adversary Judgment

In its appeal of the Rule 54(b) Opinion and cross-appeal of the Adversary Judgment, Sagamore raises the following issues:

1.      Whether the Bankruptcy Court erred by certifying the Order Granting in Part and Denying in Part Plaintiff's Motion for Involuntary Dismissal/Directed Verdict on Counts I and II of the Amended Complaint [Adversary Proceeding ECF No. 401] (the "Directed Verdict Order") as final pursuant to Fed. R. Civ. P. 54(b), made applicable pursuant to Fed. R. Bankr. P. 7054?

2.      Whether the Bankruptcy Court erred  by determining that the JPMCC Related Parties timely filed their motion to certify the Directed Verdict Order as final pursuant to Fed. R. Civ. P. 54(b), made applicable pursuant to Fed. R. Bankr. P. 7054?

#### 2.  Confirmation Order Cross-Appeal

Sagamore cross-appeals from the Confirmation Order solely to preserve its right to seek review of the *Memorandum Order Sustaining Objection of JPMCC 2006-LDP7 Miami Beach Lodging, LLC to Sagamore Partners, Ltd's Disclosure Statement (the "Disclosure Statement Order")*[6] entered on July 10, 2012, more than four months prior to the Confirmation Hearing and five months prior to the Bankruptcy Court's entry of the Confirmation Order.  In the event that this Court affirms the Confirmation Order and/or otherwise determines that Sagamore is not obligated to pay JPMCC Default Rate interest, attorneys' fees and costs, then the Court need not reach the issues presented in the Confirmation Order cross-appeal as those issues would be rendered moot.

In its cross-appeal of the Confirmation Order, Sagamore raises the following issues:

1.      Whether the Bankruptcy Court erred in the Disclosure Statement Order by determining that 11 U.S.C. §1124(2) requires a Chapter 11 debtor to pay a secured creditor interest at the contractual default rate in order to reinstate a loan under a plan of reorganization?

---

[6]Main Case ECF No. 213.  Sagamore timely filed its *Motion for Leave to Appeal From Interlocutory Order* [Main Case ECF No. 229] ("**Motion for Leave to Appeal**") and Notice of Appeal [Main Case ECF No. 230] of the Disclosure Statement Order on July 24, 2012.  JPMCC filed its *Opposition Response to Debtor's Motion for Leave to Appeal From Interlocutory Order* [Main Case ECF No. 244] on August 7, 2012.  On March 11, 2013, the Honorable Kenneth A. Marra entered the *Order Denying Motion for Leave to Appeal* [Case No. 12-mc-23195-KAM, ECF No. 5], determining that Sagamore would have to wait until entry of a final appealable order before challenging the Disclosure Statement Order.

2.       Whether the Bankruptcy Court erred in the Disclosure Statement Order by determining that 11 U.S.C. §1123(d) requires a Chapter 11 debtor to pay a secured creditor interest at the contractual default rate when a loan is reinstated pursuant to 11 U.S.C. § 1124(2) under a plan of reorganization?

3.       Whether the Bankruptcy Court: (a) erred in the Disclosure Statement Order by considering equitable factors favoring payment to the objecting creditor of interest at the contractual default rate, attorneys' fees and other costs under 11 U.S.C. §1124(2); and (b) if not, whether the Bankruptcy Court erred in the Disclosure Statement Order by not having adjudicated or considered equitable factors that militated against the objecting creditor's entitlement to such payments?

### B.       Standard of Appellate Review

#### 1.   Generally

A district court functions as an appellate court when it reviews final judgments and orders of bankruptcy courts.[7]   Factual findings are reviewed under the limited and deferential clearly erroneous standard.[8]   Such findings are not clearly erroneous unless "this court, after reviewing all of the evidence, [is] left with the definite and firm conviction that a mistake has been committed."[9] Legal conclusions are reviewed *de novo*.[10]

#### 2.   Standard of Appellate Review for Issues Raised By Sagamore

With respect to Sagamore's cross-appeal of the Adversary Judgment and its appeal of the Rule 54(b) Opinion, Sagamore challenges only the Bankruptcy Court's legal application of Rule 54(b), which the JPMCC Related Parties assert ultimately permitted them to "revive" appellate jurisdiction over the Directed Verdict Order.   Thus, the issues raised by Sagamore concern legal conclusions subject to *de novo* review.[11]

The issues presented in Sagamore's cross-appeal of the Confirmation Order challenge the Bankruptcy Court's legal conclusions with respect to a debtor's obligations generally in a reinstatement plan of reorganization pursuant to Section 1124(2) of the Bankruptcy Code.

---

[7]  *Sanchez-Villalba v. Herkert*, No. 12-23199-CIV, 2013 WL 537496, *3 (S.D. Fla. Feb. 12, 2013) (citing *In re JLJ Inc.,* 988 F.2d 1112, 1116 (11th Cir.1993)).

[8]  *Id.* (citing, among other authorities, *In re Club Assocs.,* 951 F.2d 1223, 1228 (11th Cir.1992)).

[9]  *In re Int'l Admin. Servs.*, 408 F.3d 689, 698 (11th Cir. 2005) (citing *Lykes Bros, Inc. v. United States Army Corps of Engr's*, 64 F.3d 630, 634 (11th Cir. 1995)).

[10]  *Sanchez-Villalba*, 2013 WL 537496, at *3 (citing *Club Assocs.,* 951 F.2d at 1228–29).

[11]  *Club Assocs.*, 951 F.2d at 1228-29.

Specifically, the issues pertain to whether a chapter 11 debtor is statutorily required to pay a secured creditor interest at the contractual default rate in order to reinstate a loan.  Thus, these legal determinations are entirely distinct and separate from any factual findings made in this case following the Adversary Proceeding trial and Confirmation Hearing, which were conducted months later, and such legal determinations are subject to *de novo* review.[12]

### 3. The JPMCC Related Parties Misconstrue the Standard of Appellate Review Applicable To Their Appeals

Each issue posited by the JPMCC Related Parties stems from findings by the Bankruptcy Court following the Adversary Proceeding trial and the evidentiary Confirmation Hearing. Curiously, the JPMCC Related Parties submit that *de novo* review applies to *all* of the issues presented by them in their various appeals, when the issues squarely challenge the Bankruptcy Court's factual findings.

In the Adversary Judgment appeal, the JPMCC Related Parties challenge whether the Loan Agreement required notice of Sagamore's failure to make a regularly scheduled payment and an opportunity to cure such a default, and whether JPMCC failed to provide such notice and opportunity to cure.[13]  Note that the Bankruptcy Court made this finding in the Directed Verdict Order, not the Adversary Judgment.  And because the JPMCC Related Parties failed to timely appeal from the Directed Verdict Order, as discussed *infra,* their belated challenge to that order fails.  In any event, while the interpretation of a loan instrument is generally "a legal determination subject to *de novo* review if the contractual language is unambiguous," the Bankruptcy Court's factual determinations concerning JPMCC's failure to provide proper notice are factual findings and are subject to the "clearly erroneous" standard of review.[14]

As to the Confirmation Order, JPMCC again challenges the Bankruptcy Court's finding that the Loan Agreement required notice of Sagamore's failure to make a regularly scheduled payment and of an opportunity to cure such a default.  This Court should reject JPMCC's challenge because it is using the appeal from the Confirmation Order to improperly challenge findings made only in the Directed Verdict Order.  Indeed, the Bankruptcy Court noted in the

---

[12] *Id.*
[13] Opening Brief at 2.
[14] *In re Sublett,* 895 F.2d 1381, 1384 (11th Cir. 1990).

4

Confirmation Order that its findings concerning the Loan Agreement notice requirements were decided separately in the Directed Verdict Order.[15]

JPMCC also appeals the finding that as a result of its failure to properly provide notice and opportunity to cure, JPMCC is not entitled to Default Rate interest, attorneys' fees and other costs.   Sagamore disagrees with JPMCC's assertion that *de novo* review applies because JPMCC's challenge is based on the factual findings underlying the Bankruptcy Court's decision. Further, where the language of a loan instrument is ambiguous, as found by the Bankruptcy Court here,[16] and requires the lower court to consider extrinsic evidence, the lower court's determinations are findings of fact subject only to the "clearly erroneous" standard of review.[17]

JPMCC further disingenuously attempts to create *de novo* review with respect to the second (relating to its election to assess late fees and not Default Rate interest), third (relating to management of the hotel), fourth (also relating to management of the hotel) and fifth (relating to feasibility of Sagamore's plan of reorganization) issues it raises in connection with the Confirmation Order, without citing to any authority for its position.   For instance, following a lengthy discussion of the evidence presented at the Confirmation Hearing, the Bankruptcy Court determined as a matter of fact that JPMCC opted to charge late fees instead of Default Rate interest for each month since the alleged initial monetary default.[18]   JPMCC acknowledges the law that prohibits a lender from collecting both late fees and default interest, yet JPMCC attempts to manufacture *de novo* review on what are clearly factual findings.   The same is true with respect to the remaining issues, which pertain to management of the hotel and feasibility of Sagamore's Plan,[19] all of which were the subject of evidence and testimony presented at the Confirmation Hearing.   District courts may not make independent factual findings on appeal;[20] yet that is precisely the relief requested by JPMCC.

---

[15] Confirmation Order at 8.
[16] Directed Verdict Order at 7.
[17] *Sublett*, 895 F.2d at 1383-84.
[18] Confirmation Order at 13-15.
[19] Confirmation Hearing Ex. 1.
[20] *JLJ Inc.*, 988 F.2d at 1116; *Sublett*, 895 F.2d at 1384; *Sanchez-Villalba*, 2013 WL 537496, *3.

### III. STATEMENT REGARDING ORAL ARGUMENT

Sagamore believes that oral argument would assist the parties and the Court to further clarify and simplify the issues. Sagamore accordingly respectfully requests oral argument in this Consolidated Action[21] in accordance with S.D. Fla. L.R. 87.4(f).

### IV. STATEMENT OF THE CASE AND FACTS[22]

This appeal is extraordinary in that JPMCC seeks reversal of a ruling that reinstated the precise terms of its existing Loan, including 100% of its principal balance of $31,500,000 and a cash payment of 100% of its Note Rate interest and late fees, aggregating more than $4.9 million. Dissatisfied with a 100% recovery, JPMCC prosecutes this appeal to extract a windfall of more than $8.2 million[23] comprising Default Rate interest and attorneys' fees, based on a plainly defective Notice of Default. At its core, despite the obfuscation of the JPMCC Related Parties on appeal, this case is simple. LNR, as special servicer to JPMCC, sent a Notice of Default (which included a ten-day notice to cure) to Sagamore in violation of Section 10.6 of the Loan Agreement, which clearly and unambiguously required LNR to send the Notice of Default to Sagamore's legal counsel. When LNR opted to provide notice, it was bound to do so in accordance with the Loan Agreement. It failed to do so. LNR's failure to comply with the "Notice" provisions of the Loan Agreement rendered the Notice of Default ineffective until corrected, and LNR has not corrected the deficiencies to date.

As a result of LNR's improper Notice of Default, LNR's right to accelerate the subject loan never arose, rendering its subsequent Acceleration Letter (as defined *infra*) premature and

---

[21] "Consolidated Action" shall have the same meaning ascribed to the term in the Court's *Order Consolidating Cases and Setting Briefing Schedule* [ECF No. 12].

[22] Sagamore disagrees with much of the JPMCC Related Parties' gratuitous descriptions in its *Statement of Facts Relevant to Issues on Appeal.* Opening Brief § IV. Rather than responding to each instance of puffery, Sagamore will let the record and the law speak for themselves. Note also that Sagamore has raised various issues relating to title defects in both the Adversary Proceeding and Main Case. These issues relate to JPMCC's alleged lien on the subject property and its alleged standing to enforce or invoke any of the remedies under the operative Loan Documents. These issues remain pending and have not been finally adjudicated by the Bankruptcy Court to date. Indeed, Sagamore has not yet presented its evidence on these issues. *See* Directed Verdict Order at 5-6. Because the substantive issues relating to title and standing are not germane to the present appeal, Sagamore will not belabor the point, other than to expressly reassert its position that JPMCC is not the proper holder of the Loan Documents, and reserve its rights to continue to litigate and defend its position in respect of these title-related issues.

[23] *See* Opening Brief at 10.

ineffective.  Without a proper Notice of Default, no "Event of Default" under the Loan Agreement was ever triggered.  Therefore, the Default Rate interest provision may not be invoked, and the attorneys' fees asserted for pursuing a default improperly and all that followed are simply not compensable.

Five days after issuing the improper Acceleration Letter, JPMCC initiated the Lockbox Account,[24] directing Sagamore's bank to sweep all of Sagamore's funds into the Lockbox Account.[25]  Sagamore was not permitted access to any of the funds in the Lockbox Account from that point on.  As a result, since November 2009 and through the Effective Date of the Plan more than three years later, LNR swept one-hundred percent of the revenue generated by Sagamore into the Lockbox Account under the exclusive control of LNR as the special servicer.[26]  Thus, LNR controlled Sagamore's cash and operations through the Lockbox Account, and Sagamore was forced to request funds required for its operations each week from LNR.[27]  Again, this process stemmed as a result of JPMCC's improvidently and defectively issued Notice of Default.

In the end, Sagamore confirmed its Plan under Section 1124 of the Bankruptcy Code.  Pursuant thereto and in reliance thereon, Sagamore has reinstated the subject loan by way of Martin W. Taplin, Sagamore's principal, funding in excess of $5 million, in addition to application of the funds in the Lockbox Account.  Sagamore paid JPMCC more than $4.9 million in accrued Note Rate interest and late fees, replenished the FF&E Reserve by more than $450,000, infused more than $400,000 into Sagamore for working capital, paid approximately $195,000 in cure amounts for assumed executory contracts, paid more than $1.4 million in administrative claims, and obligated itself to make regularly scheduled payments to unsecured creditors at 100 cents on the dollar plus interest.[28]

---

[24] "Lockbox Account" shall have the meaning ascribed to this term in the Confirmation Order.

[25] *See Amended Disclosure Statement* [Main Case ECF No. 217] at 12.

[26] *See* Confirmation Order at 7, fn. 8; *see also* 11/15/12 Confirmation Hearing Tr. 131:1-14, 233:15-18.  JPMCC even asserted that it had the exclusive rights to control the Lockbox Account funds on the Effective Date.  *Objection by JPMCC 2006-LDP7 Miami Beach Lodging, LLC to Confirmation of Debtor's Amended Plan of Reorganization* [Main Case ECF No. 391], at p. 10 ¶ 24 ("Secured Lender must be allowed to apply the funds in the Lockbox Account to the Loan in the manner of its choosing on the Effective Date").

[27] *See Amended Disclosure Statement* [Main Case ECF No. 217] at 12.

[28] *See Notice of Effective Date* [Main Case ECF No. 536]; Confirmation Order at 31-32; Confirmation Hearing Ex. 70 (working capital); Plan at 12 (unsecured creditors).

### A.      The Adversary Proceeding and the Directed Verdict Order

Sagamore will not repeat the JPMCC Related Parties' recitation of the procedural history here, other than to alert the Court to certain material omissions or inaccuracies, and to provide the Court with the course of the proceedings relating to the appeal of the Rule 54(b) Opinion.

Sagamore's Adversary Complaint[29] asserted twelve causes of action.  Counts I and II of the Adversary Complaint were bifurcated from the remaining counts[30] and came on for trial on October 31, 2012.  JPMCC, as the purported secured lender, was directed to first present its evidence to establish its *prima facie* case demonstrating the extent and validity of its claims against Sagamore.  At the conclusion of JPMCC's case-in-chief, and before presenting its own defenses, Sagamore moved for "involuntary dismissal" of JPMCC's claims, offering several alternative grounds for relief.  The Bankruptcy Court ultimately concluded that JPMCC failed to provide an adequate Notice of Default and entered the Direct Verdict Order in favor of Sagamore.

As determined by the Bankruptcy Court, the Notice of Default sent by JPMCC to Sagamore on September 28, 2009 failed to comply with Section 10.6 of the Loan Agreement[31] because, among other reasons, it was not sent to Sagamore's legal counsel as required.  The JPMCC Related Parties attempt to muddle this fact by defining the subsequent November 19, 2009 acceleration letter as the "November Default Notice."  Instead, as correctly found by the Bankruptcy Court, the November 19, 2009 letter was a notice of acceleration (the "***Acceleration Letter***"), rather than a default notice.[32]  Indeed, as recently as two days prior to the Adversary Proceeding trial, the JPMCC Related Parties defined the November 19, 2009 letter as the "Notice of Acceleration,"[33] and, in his testimony at the Adversary Proceeding trial, LNR's only witness described the letter as the "notice of acceleration".[34]  As noted by the Bankruptcy Court, "Because the [September 28, 2009 Notice of Default] was defective and ineffective, the subsequent attempted acceleration [vis-à-vis the Acceleration Letter] of [Sagamore's] obligations

---

[29] "Adversary Complaint" refers to Sagamore's *Amended Complaint to Determine the Validity, Priority, and Extent of Liens; for Temporary Restraining Order and Injunctive Relief; and for Other Relief and Damages* [Adversary Proceeding ECF No. 28].

[30] *Order Granting, in Part, Plaintiff's Motion for Bifurcation of Trial and Memorandum in Support Thereof* [Adversary Proceeding ECF No. 339].

[31] Confirmation Hearing Ex. 8; *see also* Opening Brief, Appendix Part A.

[32] Directed Verdict Order at 5.

[33] *Declaration of Edward Christopher Brown* [Adversary Proceeding ECF No. 366], ¶ 21.

[34] 10/31/12 Adversary Proceeding Trial Tr. 75:17-19.

under the Loan Documents was improper.  That is, because JPMCC's Default Notice was issued improperly, JPMCC's right to accelerate the indebtedness never arose."[35]  These are findings of fact in terms of determining the intent of each letter, which findings can only be reversed under the "clearly erroneous" standard.

**B.      The Confirmation Hearing on Sagamore's Plan of Reorganization**

JPMCC asserts that it waived its claim to late fees in paragraph 49 of a pleading filed a mere two days prior to the Confirmation Hearing.[36]  JPMCC relies on the purported but qualified "waiver" language buried in this pleading on the eve of the Confirmation Hearing in a last-minute attempt to avoid the consequences of its purposeful choice to demand late fees every month for the three years prior to the Confirmation Hearing.  Based on the evidence, the Bankruptcy Court properly concluded, as a matter of fact, that JPMCC chose to charge late fees and failed to prove its intent to charge Default Rate interest.[37]  Again, these are findings of fact which can only be reversed under the "clearly erroneous" standard.

**C.      The Disclosure Statement Order**

With respect to the Disclosure Statement Order that is the subject of Sagamore's cross-appeal in the Main Case, Sagamore notes that the Disclosure Statement Order was entered in July 2012, several months before the trial in the Adversary Proceeding and the Confirmation Hearing in the Main Case, and was not the product of an evidentiary hearing.  Through the Disclosure Statement Order, the Bankruptcy Court was merely ruling on a legal statutory construction issue regarding the application of Sections 1123 and 1124(2) of the Bankruptcy Code to a reinstatement plan of reorganization.  While the Bankruptcy Court agreed generally with JPMCC's legal interpretation and application of Sections 1123 and 1124(2), it did so long before it heard testimony or reviewed any evidence in these matters.  In its Disclosure Statement Order, the Bankruptcy Court alluded to the fact that evidence would be forthcoming, and specifically held that Sagamore would not owe JPMCC Default Rate interest if Sagamore could "establish in its action against JPMCC that any default may be excused, or that default interest is not otherwise due in accordance with the underlying   agreement and/or applicable non-

---

[35] Confirmation Order at 11.
[36] Opening Brief at 10, fn. 41.
[37] Confirmation Order at 11-15.

bankruptcy law,"[38] which is exactly what Sagamore later established, as reflected in the Directed Verdict Order and the Confirmation Order.

## V.  ARGUMENT

JPMCC refuses to accept that once LNR, its special servicer, opted to provide Sagamore with a Notice of Default, including a ten-day opportunity to cure, it was required to provide the notice in the contractually required manner.  Whether the Notice of Default was required or merely permitted under the Loan Documents is of no matter.  Section 10.6 applies equally to both "required" and "permitted" notices, and because the Notice of Default was, at a minimum, permitted under the Loan Agreement, Section 10.6 controls and was breached by JPMCC. JPMCC does not dispute that the Notice of Default was permitted under the Loan Agreement.[39] Nor does JPMCC dispute that LNR failed to send the Notice of Default to Sagamore's counsel, Greenberg Traurig, as required by Section 10.6 of the Loan Agreement.  Once LNR opted to send this permitted notice, it is beyond dispute that it was obligated to do so in accordance with the Loan Agreement.

As already found by the Bankruptcy Court,[40] the Notice of Default did not comply with the Loan Agreement due to its failure to provide notice to Sagamore's counsel as required under the "Notices" provisions at Section 10.6.  JPMCC attempts to argue that because the Loan Agreement purportedly did not "require" a Notice of Default, its failure to comply with the Loan Agreement's notice provisions is not relevant.[41]  The Bankruptcy Court logically and correctly found otherwise.  Any "permitted" notice sent by the lender pursuant to the Loan Agreement must comply with Section 10.6, and to argue otherwise is belied by the plain language of Section 10.6.

In addition, the Bankruptcy Court's findings in the Directed Verdict Order with respect to JPMCC's failure to issue a proper Notice of Default are not subject to review, as the Related JPMCC Parties did not file a timely appeal.  On November 12, 2012, the JPMCC Related Parties

---

[38] Disclosure Statement Order at 10.

[39] *See, e.g., Response by JPMCC 2006-LDP7 Miami Beach Lodging, LLC to Debtor's Objection to Claim 20-2* [Main Case ECF No. 400] (the "**Claim Objection Response**"), ¶23 ("By its terms, the September 28, 2009 Notice was permitted by Section 8.1(b) of the Loan Agreement as it constituted an 'action' that Lender deemed advisable to protect and enforce its rights against the Debtor.").

[40] Directed Verdict Order at 6.

[41] Opening Brief at 17-19.

filed their *Emergency Motion for Reconsideration of the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Involuntary Dismissal/Directed Verdict as to Counts I and II of the Amended Complaint* (the "***Motion for Reconsideration***").[42] The Directed Verdict Order was final no later than November 16, 2012, when the Bankruptcy Court entered its Order denying the Motion for Reconsideration.[43]   Thus, the fourteen-day window to appeal the Directed Verdict Order pursuant to Fed. R. Bankr. P. 8002(a) commenced and expired in November 2012 with no appeal having been filed.  In any event, the Bankruptcy Court's findings of fact in this regard may not be reversed unless found by this Court to be clearly erroneous.

Moreover, JPMCC's efforts to collect Default Rate interest from Sagamore fail because JPMCC opted to seek late fees each month since Sagamore's initial alleged default, not Default Rate interest.  Its attempt two days prior to the Confirmation Hearing to revise history and attempt to waive late fees in an effort to collect Default Rate interest does not erase its affirmative act in assessing late fees monthly for three years prior, as the evidence presented at the Confirmation Hearing proved and as the Bankruptcy Court found.

Sagamore cross-appeals the Confirmation Order only to preserve its rights to challenge the  Disclosure Statement Order, which was entered months before the Confirmation Hearing.  In the Disclosure Statement Order, the Bankruptcy Court rejected the vast majority of cases interpreting 11 U.S.C. § 1124(2) (the "***Reinstatement Statute***").  Instead, the Bankruptcy Court adopted the minority view and held that, in order for a chapter 11 bankruptcy debtor to cure a loan in a reinstatement plan of reorganization, the debtor must provide for payment of amounts due under the applicable loan documents including, if applicable, default interest.   The Bankruptcy Court did not address Sagamore's statutory construction arguments, and instead accepted *in toto* the reasoning of one other bankruptcy court in ruling that the Reinstatement Statute is merely definitional and does not provide substantive requirements to reinstate.  The Bankruptcy Court fundamentally misread the Bankruptcy Code in finding that 11 U.S.C. § 1123(d), which references other Bankruptcy Code sections but not section 1124, applies in the context of a reinstatement plan filed under section 1124.  The Bankruptcy Court also erred in considering equitable factors suggested by JPMCC favoring payment of Default Rate interest,

---

[42] Adversary Proceeding ECF No. 404.
[43] Adversary Proceeding ECF No. 411.

attorneys' fees and other costs, while refusing to consider any of the facts offered by Sagamore that militated against the imposition of these penalties.

Finally, JPMCC raises other ancillary arguments in its Opening Brief with respect to the Confirmation Order, relating to its assertion that it is impaired under section 1124 and that the Plan is not feasible under section 1129(a)(11).  JPMCC argues that the Bankruptcy Court erred in finding that (1) Sagamore is compliant with the Loan Agreement with respect to management of the hotel, and (2) the Plan is feasible.  As more fully discussed below, these are factual determinations which can only be reversed under the "clearly erroneous" standard.  In any event, under any standard, the Bankruptcy Court correctly overruled these objections at the Confirmation Hearing, holding that Sagamore is being managed in accordance with the Loan Agreement and that Sagamore met its burden in respect of feasibility.  As the Bankruptcy Court keenly observed, JPMCC "provided a defective Default Notice, did not notify the Debtor of any objection it may have had to [] the manager of the hotel … and seems now to only raise these issues for the purpose of blocking confirmation."[44]

## A. The Bankruptcy Court Correctly Ruled that the Notice of Default Sent By LNR To Sagamore Did Not Comply With The Requirements Of The Loan Agreement

Following Sagamore's induced default in August 2009,[45] LNR sent a Notice of Default to Sagamore on September 28, 2009.[46]  The Notice of Default was executed by Edward Christopher Brown ("***Brown***"), Director of Hospitality of LNR, the special servicer of the Loan and the sole manager of JPMCC.  Brown was also the sole witness presented by the JPMCC Related Parties at the trial in the Adversary Proceeding, and by JPMCC at the Confirmation Hearing.

JPMCC attempts to convince the Court that the Notice of Default was not required by the Loan Agreement and, as such, it matters not whether it complied with the Loan Agreement's notice provisions.[47]  JPMCC's complicated and incomplete recitation of the Loan Agreement

---

[44] Confirmation Order at 20.
[45] The facts surrounding Sagamore's induced default are the subject of the second part of the bifurcated trial on the Adversary Complaint in the Adversary Proceeding, which has not yet occurred.  *See Order Granting, in Part, Plaintiff's Motion for Bifurcation of Trial and Memorandum in Support Thereof* [Adversary Proceeding ECF No. 339].  As these issues are not germane to the present appeal, Sagamore will devote its attention here to only the facts and law relevant to the issues under consideration in this Consolidated Action.
[46] *See* Directed Verdict Order at 4.
[47] Opening Brief at 17-19.

provisions relating to required notices confuses the issues.  Ultimately, it matters not whether JPMCC was required to send the Notice of Default, or merely permitted to send the Notice of Default.[48]  The unassailable fact is that LNR sent the Notice of Default.  Assuming *arguendo* that the Notice of Default was not *per se* required, JPMCC was, at the very least, *permitted* to send it under the Loan Agreement and chose to do so.  Section 10.6 of the Loan Agreement controls because that section explicitly applies to both "required" and "permitted" notices.[49]  Thus, the relevant inquiries here are (1) whether the Bankruptcy Court properly held that the Notice of Default failed to comply with the Loan Agreement, and (2) the legal implications for JPMCC as a result of such failure.

JPMCC concedes that the Notice of Default was permitted under the Loan Agreement.[50]  Indeed, Brown testified that the Notice of Default was an important letter.[51]  And because the Notice of Default is indisputably a "permitted" notice, LNR was required to draft and deliver it in compliance with Section 10.6 of the Loan Agreement, which explicitly applies to all required or permitted notices.[52]  Thus, JPMCC misses the point by basing its argument on whether the Notice of Default was required.[53]  In that vein, JPMCC's reliance on a bankruptcy decision out of Virginia is completely misguided.[54]  In *In re WSG Dulles, L.P.* ,[55] unlike here, the

---

[48] The Bankruptcy Court heard the same argument from JPMCC and rejected it, finding that the Loan Agreement does in fact require written notice of default.  Directed Verdict Order at 6.  In any event, it would be a fruitless exercise to remand to the Bankruptcy Court to make further findings with respect to whether the Notice of Default was required, permitted, or both.  The "Notices" provision at Section 10.6 of the Loan Agreement applies equally to required and permitted notices.  And because, as discussed *infra*, JPMCC does not dispute that the Notice of Default is, at the very least, a permitted notice under the Loan Agreement, there can be no dispute that Section 10.6 applies.  Thus, irrespective of whether the Notice of Default was required or permitted, the legal effects of issuing a defective notice are the same.

[49] Further, it is of no significance that the Loan Agreement contains a "Waiver of Notice" clause. Loan Agreement § 10.11.  LNR sent the Notice of Default, and once it did so, it was bound to do so correctly pursuant to the "Notices" provision, § 10.6, which applies to both "required or permitted" notices sent under the Loan Agreement.  Loan Agreement § 10.6.

[50] *See, e.g.,* Claim Objection Response [Main Case ECF No. 400] ¶23 ("By its terms, the September 28, 2009 Notice was permitted by Section 8.1(b) of the Loan Agreement.").

[51] 10/31/12 Adversary Proceeding Trial 68:7-10.

[52] Loan Agreement (page 90), § 10.6.

[53] Opening Brief at 17-19.

[54] Opening Brief at 19.

[55] No. 12-11149-BFK, 2013 WL 64759 (Bankr. E.D. Va. Jan. 4, 2013).

13

notice provisions of the applicable loan documents did not apply to "permitted" notices.[56]  The notice provisions in *WSG Dulles* pertained only to required notices, and the issue of whether the subject notice was required was dispositive.  Contrarily, here the Loan Agreement expressly provides that the notice requirements apply to both required *and* permitted notices; thus, so long as the Notice of Default was at least *permitted*, which JPMCC agrees it was, then Section 10.6's notice requirements apply in full.

It is beyond dispute that LNR failed to comply with the notice requirements contained in Section 10.6, which provides:

> All notices, consents, approvals and requests **required or permitted** hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent . . .

<div style="margin-left:2em">

If to Borrower:  Sagamore Partners, Ltd.
       1177 Kane Concourse
       Bay Harbor Islands, Florida 33154
       Attention: Martin Taplin
       Facsimile No. (305) 864-5744

With a copy to:  Greenberg Traurig, LLP
       200 Park Avenue
       New York, New York 10166
       Attention: Alan Pleskow, Esq.
       Facsimile No. (212) 801-6400 . . .[57]

</div>

JPMCC failed to establish that the Notice of Default was sent to Greenberg Traurig, counsel for Sagamore, as required under Section 10.6 of the Loan Agreement.[58]  The Notice of Default itself contains no reference to it having been sent to Greenberg Traurig,[59] and Brown was unable to testify to the Notice of Default having been properly sent to Sagamore's counsel.[60]  JPMCC does not suggest otherwise in its Opening Brief.  Additionally, the Notice of Default sent to Sagamore was issued to the wrong address.[61]

---

[56] *See* Case No. 12-11149-BFK, U.S. Bankruptcy Court for the E.D. Va., ECF No. 111-2 (Promissory Note), ¶ 18 (p. 7); *compare with* Loan Agreement § 10.6 (p. 90) ("All notices … required *or permitted*) (emphasis added).
[57] Loan Agreement § 10.6 (emphasis added).
[58] Directed Verdict Order at 5.
[59] Confirmation Hearing Ex. 11; *see also* Opening Brief, Appendix Part E.
[60] 10/31/12 Adversary Proceeding Trial Tr. 68:22-72:13; *see also* Directed Verdict Order at 5.
[61] Directed Verdict Order at 7.

JPMCC attempts to minimize its failure to properly notify Greenberg Traurig as "neither material nor prejudicial."[62]   As the Bankruptcy Court poignantly observed in the Directed Verdict Order, "Notice to Sagamore's attorneys, Greenberg Traurig, was essential and specifically made a term of the contract between the parties.  As Mr. Brown testified, the notice of default is very important."[63]   It is quite remarkable that JPMCC is able to so easily dismiss this error as immaterial.  As argued by Sagamore's counsel at the Adversary Proceeding trial, attorneys serve as gatekeepers, and providing Sagamore's attorneys with the Notice of Default would have allowed Sagamore to obtain legal advice on the ramifications of default and failure to cure within the ten days prescribed by the Notice of Default.[64]   JPMCC's arguments are internally inconsistent.  It preaches strict compliance with the Loan Agreement, but asserts that its own non-compliance is inconsequential.  Regardless, no evidence as to whether notifying Greenberg Traurig was "neither material nor prejudicial" was presented at trial, and the only evidence presented was Brown's testimony that the Notice of Default was important, leading to the inescapable conclusion that compliance with the Loan Agreement's notice requirements was in fact "material" and failure to do so "prejudicial."  The Bankruptcy Court's finding of fact in this regard was correct and certainly cannot be considered clearly erroneous.

JPMCC also makes much of the Imminent Default Letter, asserting that it triggered the various events leading to these appeals.[65]   JPMCC fails to recite that prior to sending the Imminent Default Letter, on two separate occasions in July 2009, Martin Taplin, the principal of Sagamore, met with representatives from LNR, the special servicer for the Loan.[66]   As asserted by Sagamore, LNR opportunistically induced Sagamore to not make monthly payments on its Loan, despite Sagamore being prepared and able to make said payments, with the ulterior motive of dragging Sagamore into special servicing and foreclosure.[67]   Only following these meetings did Taplin agree to a "strategic" default suggested by LNR, and therefore sent the Imminent

---

[62] Opening Brief at 20.
[63] Directed Verdict Order at 7.
[64] 10/31/12 Adversary Proceeding Trial Tr. 163:20-164:2.
[65] Opening Brief at 5.
[66] Adversary Complaint [Adversary Proceeding ECF No. 28], ¶¶ 59-70.  The JPMCC Related Parties do not dispute these meetings.  *See Declaration of Edward Christopher Brown* [Adversary Proceeding ECF No. 378], ¶¶ 19-20 (describing the meetings in July 2009 between Taplin and LNR).
[67] Adversary Complaint ¶¶ 57-78.

Default Letter.  In any event, the Imminent Default Letter and the events leading to Sagamore sending the same are ultimately irrelevant to the issues in these appeals, as they do not excuse the defects in the Notice of Default[68] issued by LNR, as found by the Bankruptcy Court.

In a last-ditch attempt to mollify the legal effects of its defective Notice of Default, JPMCC urges this Court to accept the proposition that the Notice of Default was an acceleration letter, a concept devoid of credibility, and that the Acceleration Letter[69] sent two months later somehow rehabilitated the defective Notice of Default.[70]  JPMCC argues that the Notice of Default merely accelerated the Loan and did not provide Sagamore an opportunity to cure.  This argument flies in the face of the Notice of Default itself, and the evidence and testimony presented at the Adversary Proceeding trial.  In addition, JPMCC's claim now that there was no right to cure[71] is equally belied by the Loan Agreement, the language contained in the Notice of Default itself, and Brown's testimony at the trial of the Adversary Proceeding just weeks prior to the Confirmation Hearing.

During the trial in the Adversary Proceeding, Brown –JPMCC's representative – stated that the Notice of Default was an important document[72] and that it specifically contained a right to cure:[73]

> 23   Q. Sir, did LNR send a notice of default and right to
> 24   cure to Sagamore Partners?
> 25   A. Yes.
>
> 1   Q. And when did it do so, sir?
> 2   A. That was -- the notice, I believe, was in August,
> 3   where it gave them 10 days to cure.

Again referencing the Notice of Default, Brown stated:[74]

> 21   Q. Sir, the exhibit before you is the exhibit that you
> 22   say is the 10-day cure notice, correct?
> 23   A. That is correct.

And further:[75]

---

[68] Confirmation Hearing Ex. 11; *see also* Opening Brief at Appendix Part E.
[69] Confirmation Hearing Ex. 12; *see also* Opening Brief, Appendix Part F.
[70] Opening Brief at 20.
[71] Opening Brief at 21-23.
[72] 10/31/12 Adversary Proceeding Trial Tr. 68:7-10.
[73] *Id.* at 64:23 – 65:3.
[74] *Id.* at 66:21-23.
[75] *Id.* at 149:2-10; 151:13-18.

> 2   Q.  Was it based on that clause that the ten day
> 3   notice was sent?
> 4   A.  I'm not sure which clause.  All I know is that
> 5   we gave them ten days in that --
> 6   Q.  And if --
> 7       MR. KREITZER:  Let him answer, please.
> 8       THE WITNESS:  Yeah.  In that letter that we
> 9   sent, the default notice, we gave him ten days, I'm not
> 10  sure -- I don't recall which clause we used.

> 13  Q.  Sir, when the letter providing -- the
> 14  Mr. Triana letter providing the ten day notification,
> 15  was it your intention to notify the borrower that it
> 16  could cure any claim of default?
> 17  A.  Yes.  The letter speaks for itself.  It does
> 18  say that if he calls us up to get what's needed, yes.

JPMCC attempts to disavow its own witness' testimony, disingenuously claiming that Brown rehabilitated himself on re-direct.[76]  That is simply not the case.  Brown *never* denied that the Notice of Default included a right to cure, or that he intended the Notice of Default to include a right to cure.  A reading of the cited testimony on Brown's re-direct evidences nothing more than the JPMCC Related Parties' attorney's obvious attempt to distance himself from Brown's earlier damaging testimony, by merely having Brown read out various provisions of the Loan Agreement relating to elections of remedies.[77]   Sagamore does not dispute that JPMCC had various available optional remedies, and the evidence proves that JPMCC opted to send a permitted Notice of Default with a ten-day cure period, but did so incorrectly.

Recognizing the glaring weaknesses of its argument as a result of its own witness's testimony, JPMCC asks this Court to ignore Brown's testimony entirely, just one sentence after citing it, claiming that Brown's testimony "may not be used to vary or contradict the unambiguous language of the Loan Agreement."[78]  But Brown's testimony did not vary the terms of the Loan Agreement.  On the contrary, it aided the Bankruptcy Court's understanding of the plain language of the Notice of Default and the cure period provided therein.[79]

---

[76] Opening Brief at 22-23.

[77] 10/31/12 Adversary Proceeding Trial Tr. 134:20-138:9.

[78] Opening Brief at 23.

[79] In any event, the Bankruptcy Court explicitly found ambiguities and inconsistencies in the Loan Agreement concerning notice requirements.  Directed Verdict Order at 7.  Where the language of a loan agreement is ambiguous, a court may consider extrinsic evidence, and the

LNR issued the Notice of Default which provided Sagamore with ten days to cure the default that did not constitute an acceleration letter.  Brown, the author of the Notice of Default, said so himself under oath in the Bankruptcy Court, and the Bankruptcy Court found "his testimony was credible and believable."[80]   In addition, if the Notice of Default were an acceleration letter, then the November 19, 2009 Acceleration Letter would have been superfluous, as one cannot accelerate a loan twice.  Further, the Loan Agreement requires that an acceleration letter contain a statement "declaring the Debt to be immediately due and payable."[81]  In fact, the Acceleration Letter specifically provided, "Lender has elected to, and hereby does, accelerate the obligation of Borrower to repay the Loan, and hereby declares the entire principal amount, all interest accrued and all other amounts outstanding under the Loan and Loan Documents to be immediately due and payable."[82]   The Notice of Default lacked such a declaration, and gave Sagamore the right "within 10 days of receipt of this letter" to cure and "pay all amounts due under the Loan," which at that time amounted to two payments that were due in August and September 2009.[83]

### B.    The Bankruptcy Court Correctly Ruled That JPMCC Is Not Entitled To Default Rate Interest, Attorneys' Fees and Costs As A Result Of Its Failure to Provide Proper Notice

JPMCC's right to accelerate was contingent on Sagamore's right to cure, expressly provided in the Notice of Default.  As noted by the Bankruptcy Court, "Because the Default Notice was defective and ineffective, the subsequent attempted acceleration of Sagamore's obligations under the Loan Documents was improper.  That is, because the Secured Lender's Default Notice was issued improperly, the Secured Lender's right to accelerate the indebtedness never arose."[84]

Put simply, if the trigger of default was never properly pulled, it is improper for JPMCC to claim it is impaired and seek Default Rate interest and attorneys' fees and costs as a condition for reinstatement of the loan.  As noted by the Bankruptcy Court, JPMCC's failure to comply

---

Bankruptcy Court's subsequent determinations are subject only to "clearly erroneous" review. *Sublett*, 895 F.2d at 1384 (internal citations omitted).

[80] Directed Verdict Order at 4.

[81] Loan Agreement § 8.1(b).

[82] Acceleration Letter at 1.

[83] Notice of Default at 1.

[84] Confirmation Order at 11.

with the Loan Agreement's notice provisions is a material breach of contract.[85]  In several real estate foreclosure cases, Florida courts have denied relief to mortgagees that failed to provide mortgagors with adequate notice of and a right to cure a default prior to its acceleration of the debt pursuant to the applicable loan documents.[86]  The failure to provide proper notice pursuant to the Loan Documents appropriately precludes JPMCC from recovering an inordinate penalty of approximately $8.2 million in Default Rate interest and attorneys' fees as a "reward" related to such alleged default.[87]

JPMCC now argues that Default Rate interest, attorneys' fees, and other costs began accruing immediately upon Sagamore's first missed payment,[88] utterly ignoring the legal ramifications of sending a Notice of Default in violation of Section 10.6.  Under Section 8.1(a)(i) of the Loan Agreement, an "Event of Default" occurs:

> If (A) Borrower fails to (1) make a regularly scheduled payment with respect to any portion of the Debt *when due*, or (2) make any regularly scheduled monthly deposit into a Reserve when due; or (B) make any other payments *within ten (10) days after receipt of written notice* or invoice therefore . . .[89]

JPMCC elected to issue the Notice of Default.  As found by the Bankruptcy Court, the Loan Agreement itself clearly provides JPMCC with options as to exactly how it will respond to an event of default, and what it *may* do, at its option to remedy such alleged default:

---

[85] Confirmation Order at 8.

[86] *See, e.g.*, *Konsulian v. Busey Bank, N.A.*, 61 So. 3d 1283, 1285 (Fla. 2d DCA 2011) ("[N]othing … indicates that Busey gave Konsulian the notice which the mortgage required."); *Judy v. MSMC Venture, LLC*, 100 So.3d 1287, 1289 (Fla. 2d DCA 2012) ("Although MSMC argues that it provided the Judys with proper notice of default, the notices failed to specify the breach. Instead, the notices generally alleged that the Judys committed a breach.  And failure to specify the default as required by the mortgage terms requires reversal because MSMC did not meet its burden in refuting the Judys' affirmative defense of insufficient notice of default."); *Laurencio v. Deutsche Bank Nat. Trust Co.*, 65 So. 3d 1190, 1192 (Fla. 2d DCA 2011) (same); *Frost v. Regions Bank*, 15 So. 3d 905, 906-07 (Fla. 4th DCA 2009) (same); *Wroblewski v. Am. Home Mortg. Servicing, Inc.*, 68 So. 3d 431 (Fla. 5th DCA 2011) (same).  *See also Stoner-Caroga Corp., Inc. v. U.S.*, 3 Cl. Ct. 92, 95 (Cl. Ct. 1983) (failure to provide proper notice of default is a breach of contract).

[87] *See e.g., Irving Tanning Co. v. American Classic Inc*., 736 F. Supp. 161, 164-65 (N.D. Ill. 1990) (holding that creditor's failure to provide notice of debtor's default within period required or by method required under guaranty, precluded creditor's recovery).

[88] Opening Brief at 23-24.

[89] Loan Agreement § 8.1(a)(i) (emphasis added).

> Remedies.  Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower at law or in equity **may be exercised by Lender** at any time and from time to time …[90]

Brown agreed that JPMCC had options upon Sagamore's default:[91]

> 14     Q. Okay.  So, you have options as to what types of
> 15 remedies you wish to employ when there's an event of default,
> 16 correct?
> 17     A. Let me just re-read this.  Yes, it's saying we have
> 18 different remedies which we can use.
> 19     Q. At your option, correct?
> 20     A. Yes.

By electing to issue a Notice of Default with an opportunity to cure, any payment due to JPMCC was due under Section 8.1(a)(i) prior to the expiration of the ten-day cure period provided in the Notice of Default.  The Notice of Default was defective because, among other things, it was never sent to Sagamore's counsel, in violation of Section 10.6.  Thus, there can be no Event of Default unless and until the cure period expires, and the cure period cannot expire until the defects in the Notice of Default are remedied and the cure period expires without cure. The Bankruptcy Court provided JPMCC an opportunity to issue a proper default notice to Sagamore with ten days from receipt of said notice in which to cure, but JPMCC chose not to do so.[92]  An "Event of Default" is required to trigger liability for Default Rate interest or other fees and costs.  Since no "Event of Default" occurred, JPMCC cannot impose liability for Default Rate interest or other fees and costs.

As concluded by the Bankruptcy Court, the Notice of Default remains defective, and all that flowed from the defective Notice of Default is improper, including JPMCC's Acceleration Letter, its subsequent foreclosure action, and its efforts to charge Default Rate interest, attorneys' fees, and other costs emanating from the fundamentally flawed Notice of Default.[93]  Because of JPMCC's failure to correct the defective Notice of Default, the ten-day grace period JPMCC

---

[90] Loan Agreement § 8.1(d) (emphasis added).
[91] 11/15/12 Confirmation Hearing Tr. 191:14-20.
[92] Confirmation Order at 10.
[93] Confirmation Order at 10.

provided did not expire.  As such, a Default, "but for the giving of notice or passage of time, or both, which would be an Event of Default," has not occurred.[94]  The Loan Agreement is clear that the Default Rate does not apply until there is an Event of Default.[95]

Without citing to a single case, JPMCC insists that the Bankruptcy Court erred in denying its attorneys' fees, including for issues surrounding "arguments that ultimately prove unsuccessful."[96]  It is "inherently unreasonable" to incur fees that are not cost-justified either by the economics of the situation or as necessary to preserve the particular party's interest in light of the legal issues involved.[97]  In any event, by demanding exorbitant fees in excess of $2.7 million and counting,[98] JPMCC seeks to obtain a windfall at the expense of Sagamore.  As noted by the bankruptcy court in *General Growth*,[99] where there has been creditor misconduct, denying default rate interest may be appropriate.  Rewarding JPMCC's misconduct with millions of dollars in default interest and fees would create an utterly inequitable result.

Nevertheless, JPMCC relies on a general fees provision of the Note in its continued efforts to squeeze millions of dollars out of Sagamore, utterly ignoring the logical consequences of its own failure to abide by the clear mandates of the Loan Agreement prior to engaging in a three-year battle to foreclose upon Sagamore's property.  As a result of its own breach of the notice provisions of the Loan Agreement, the Bankruptcy Court correctly held that JPMCC has no right to Default Rate interest or attorneys' fees and costs generated over the course of this case.[100]

### C.     The JPMCC Related Parties Failed To Timely Appeal The Directed Verdict Order

The JPMCC Related Parties are improperly trying to use their appeals from the Confirmation Order and Adversary Judgment to challenge issues addressed by the Directed Verdict Order because they failed to timely appeal the Directed Verdict Order.  The Bankruptcy Court granted Sagamore's motion for a directed verdict/involuntary dismissal on October 31,

---

[94] Confirmation Order at 10; *see also* Loan Agreement (p. 4) § 1.1 (Definition of "Default").

[95] Loan Agreement § 2.2.4 (Default Rate).

[96] Opening Brief at 31.

[97] *In re DSBC Investments, L.L.C.*, Case No. 09-BK-03146, 2009 WL 2998940, *4 (Bankr. D. Az. 2009).

[98] *See* Fed. R. Civ. P. 1 (The federal rules are meant to secure the "just, speedy, *and inexpensive* determination of every action and proceeding) (emphasis added).

[99] *In re General Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011).

[100] *See, e.g., Irving Tanning Co. v. American Classic, Inc.*, 736 F.Supp. 161 (N.D. Ill. 1990).

2012, after expressly finding, pursuant to Fed. R. Civ. P. 52(a)(1), that Sagamore had not received an appropriate Notice of Default.  The Directed Verdict Order was thereafter entered on November 8, 2012.  The JPMCC Related Parties filed their Motion for Reconsideration on November 12, 2012, which was denied by order entered on November 16, 2012.

At the hearing on the Rule 54(b) Motion, the Bankruptcy Court indicated that "at the time (referring to the Bankruptcy Court's denial of the Motion for Reconsideration) I thought that the [Directed Verdict] order was a final judgment and could have been appealed."[101]  At the same time, though, the Bankruptcy Court commented that its "policy has always been [to] be very liberal on granting the right to review my decisions."[102]  Ultimately, the Bankruptcy Court, with good intentions, attempted to confer appellate jurisdiction even though it agreed that the Directed Verdict Order was final in November 2012, in order to give JPMCC the opportunity to cure its failure to timely appeal.  Despite its best intentions, however, the Bankruptcy Court simply cannot create appellate jurisdiction where none exists.

Both the Court and, evidently, the JPMCC Related Parties believed that the October 31, 2012, Directed Verdict Order was a "final" order.  In their Rule 54(b) Motion, the JPMCC Related Parties characterized the Directed Verdict Order, subsequent denial of their Motion for Reconsideration, and resulting consequences thereof as "leav[ing] no doubt that the Court has finally decided the issues raised by Counts I and II of the Amended Complaint.  Indeed, the Court indicated its belief that JPMCC had already taken an appeal."[103]

Generally, a final decision is one which "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."[104]  In bankruptcy cases, though, "[t]he statutory requirement of finality is a flexible concept, grounded in the practicalities of the situation."[105]  A bankruptcy case is "an aggregation of controversies, many of which would constitute individual lawsuits had a bankruptcy petition never been filed." *Id.* at 1437.  Thus, "finality of bankruptcy orders cannot be limited to the last order concluding the bankruptcy case

---

[101] 1/4/13 Rule 54(b) Motion Hrg. Tr. 16:2-4.
[102] *Id.* at 19:22-23.
[103] Rule 54(b) Motion at 6.
[104] *Commodore Holdings, Inc. v. Exxon Mobil Corp.,* 331 F.3d 1257, 1259 (11th Cir. 2003) (internal citation omitted).
[105] *In re Martin Bros. Toolmakers, Inc.*, 796 F.2d 1435, 1437 (11th Cir. 1986).

as a whole." *Id.* The Directed Verdict Order was final in that it determined the issue of proper notice and affected substantial rights of the parties.[106]

In bankruptcy proceedings, an appeal must be taken within fourteen days of the order under review, or in this matter, by November 30, 2012, fourteen days after the Motion for Reconsideration was denied.[107]   No notice of appeal was filed by that date.  Failure to seek timely review results in a waiver of the right to appellate review.[108]   Rule 54(b) relief cannot revive an opportunity for review that is time-barred.

Moreover, the JPMCC Related Parties failed to file their Rule 54(b) Motion until December 27, 2012, nearly two months after entry of the Directed Verdict Order.  Courts have held that it is an abuse of discretion for a court to grant a motion for a Rule 54(b) order "when the motion is filed more than thirty days after the entry of the adjudication to which it relates."[109] As noted by one court:

> Although Rule 54(b) states no time limit in which to request a final judgment, it is, 'an abuse of discretion for a district judge to grant a motion for a Rule 54(b) order when the motion is filed more than thirty days after the entry of the adjudication to which it relates.'[110]

The JPMCC Related Parties made a mistake.  They filed a Motion for Reconsideration of a final order, and then sat back instead of appealing upon denial of their Motion for Reconsideration.  In an attempt to remedy their error, several months later they requested a "final judgment" solely to avoid the consequences of failing to appeal the Directed Verdict Order in a timely manner.  The JPMCC Related Parties could have requested a separate judgment from which to appeal either when the Directed Verdict Order was entered or when the Motion for Reconsideration was denied.  Having done nothing, the JPMCC Related Parties should not be entitled to avoid the consequences of their inaction.

---

[106] *See, e.g., Preblich v. Battley*, 181 F.3d 1048 (9th Cir. 1999) ("An order from a Bankruptcy Court denying a claim of exemption finally determines the discrete matter to which it was addressed, determines and seriously affects substantial rights and can 'cause irreparable harm if the losing party must wait until bankruptcy proceedings terminate before appealing.'") (internal citation omitted).

[107] Fed. R. Bankr. P. 8002.

[108] *See Preblich v. Battley,* 181 F.3d at 1056 ("Failure to file within the time limits divests the appellate court of jurisdiction. . . [A]ppeal [] must be taken within the time allowed under the bankruptcy rules or the right to appeal will be waived.") (internal citation omitted).

[109] *Schaefer v. First Nat'l Bank of Lincolnwood*, 465 F. 2d 234 (7th Cir. 1972).

[110] *U.S. v. Smith*, 186 F.R.D. 505, 506 (N.D. Ind. 1999) (quoting *Schaefer,* 465 F.2d at 236).

**D.      The Bankruptcy Court Correctly Ruled that JPMCC Elected to Charge Late Fees and Not Default Interest Under the Loan Agreement**

Following several days of testimony and presentation of evidence, the Bankruptcy Court determined as a matter of fact that JPMCC affirmatively elected to charge Sagamore late fees and elected not to charge Default Rate interest following Sagamore's monetary default.[111]  The Bankruptcy Court made this factual determination as a result of the following evidence, among other items:

- The Notice of Default did not demand Default Rate interest;[112]

- The Acceleration Letter did not demand Default Rate interest;[113]

- The foreclosure complaint[114] filed by JPMCC against Sagamore in the related state court action did not demand Default Rate interest;[115]

- Each monthly debt service invoice sent from January 2010 through December 2011[116] specifically assessed late fees each month, but not Default Rate interest.[117] The record at the Confirmation Hearing reflects that JPMCC never sought to alter the statements to remove late fees and add Default Rate interest, although it was clearly in its power, through its special servicer, to do so;[118]

- The Transaction History Reports[119] produced in discovery by LNR, the special servicer of the Loan, reflect each transaction and assessment in respect of the subject Loan from 2006 through November 2012.  The Transaction History Reports clearly reflect a monthly assessment of late fees each and every month

---

[111] Confirmation Order at 11-16.
[112] *Id.* at 13.
[113] *Id.*
[114] Confirmation Hearing Ex. I.
[115] Confirmation Order at 13.
[116] Confirmation Hearing Ex. 14, 14A.  JPMCC argues that these statements were not sent to Sagamore.  Opening Brief at 26.  However, the statements are addressed "Sagamore Partners, Ltd., c/o LNR Partners, Inc.," showing JPMCC's intent that the statements be prepared for Sagamore.  Moreover, Brown testified that he did provide payoff information to Sagamore. 12/7/12 Confirmation Hearing Tr. 363:3-5.
[117] Confirmation Order at 13.
[118] *See, e.g.,* 11/15/12 Confirmation Hearing Tr. 210:19 – 214:17.
[119] Confirmation Hearing Ex. 15.

since the initial default, and no assessments whatsoever for Default Rate interest during this entire time period;[120] and

- Records from Berkadia Commercial Mortgage ("**Berkadia**"), the master servicer of the subject Loan, introduced at the Confirmation Hearing reflected ongoing assessments of late charges but not Default Rate interest charges.[121]   At the Confirmation Hearing, Sagamore introduced Berkadia records between April and September 2012, screenshots described by Berkadia's representative as "current status screens."[122]   Each of the "current status screens" reflects what LNR deems is owed by Sagamore, and each document reflects late fees.[123] There is also a specific line-item for default interest, and in each of these "current status screens," the amount of Default Rate interest noted as owing is zero.[124]   The Bankruptcy Court noted that the testimony revealed that LNR could have instructed Berkadia to manually input desired amounts into these databases to include Default Rate interest.[125]   The testimony by Berkadia's representative clearly demonstrates that while certain fields were manually input, LNR opted to leave the Default Rate interest field at a zero balance over the entire duration of Sagamore's monetary default.[126]

Moreover, the Bankruptcy Court considered the testimony of Christie Corallo, the designated representative of Berkadia.  Upon inquiry into the Transaction History Reports in connection with the Loan, Ms. Corallo testified that although LNR had the power to do so,[127] it never requested that any Default Rate interest assessments be applied to Sagamore's Loan or that any late charges be removed.  As described by Ms. Corallo:[128]

---

[120] Confirmation Order at 14.
[121] Confirmation Hearing Ex. 16(A)-(D).
[122] *See, e.g.,* 12/7/12 Confirmation Hearing Tr. 320:5.
[123] Confirmation Hearing Ex. 16(A)-(D).
[124] *Id.  See also* 12/7/12 Confirmation Hearing Tr. 318:1-11.
[125] Confirmation Order at 14-15.
[126] 12/7/12 Confirmation Hearing Tr. 318:1 – 319:1.
[127] *Id.* at 302:14 – 303:6.
[128] *Id.* at 312:18 – 313:1.

> 18       "Q. So there are a few players in this
> 19   and hopefully I can track it correctly. It
> 20   starts with LNR. And they give a request to
> 21   who?"
> 22       "A. CMBS asset management."
> 23       "Q. And are you aware of any requests
> 24   by LNR to CMBS asset management to include or
> 25   to input default interest assessments."
>
> 1       "A. None that I'm aware of."

Ms. Corallo further testified:[129]

> 25       "Q. The data that goes into McCracken
>
> Page 314
>
> 1   is put in as a result of what starts with an
> 2   LNR request, though, correct?"
> 3       "A. Yes."
> 4       "Q. Are you aware of any LNR requests
> 5   to input data into McCracken to assess default
> 6   interest?"
> 7       "A. None that I'm aware of."

In the same manner it seeks to rehabilitate the unfavorable testimony of its own witness Brown, JPMCC now attempts to discredit Corallo, even though Berkadia is one of the JPMCC Related Parties in these consolidated appeals.[130]

The evidence adduced at the Confirmation Hearing proves that JPMCC affirmatively chose to charge late fees, which by definition in the Loan Agreement are intended "to defray the expense incurred by Lender in handling and processing [] delinquent payment and to compensate Lender for the loss of the use of such delinquent payment."[131]  As noted above, the operative Loan Documents provide the Lender with discretion in its election of remedy,[132] and while the Lender "may" act, it is estopped from doing so retroactively.[133]  These remedies are not self-

---

[129] *Id.* at 313:25 – 314:7.  *See also id.* at 308:19 – 309:7; 311:18 – 312:17.

[130] In any event, evaluating the credibility of witnesses falls within the trial court's exclusive purview.  *Sanchez-Villalba*, 2013 WL 537496, *7 (citing *In re Marill Alarm Systems, Inc.*, 81 B.R. 119, 124 n. 10 (S.D. Fla. 1987)); *In re Englander*, 95 F.3d 1028, 1030 (11th Cir. 1996); *see also Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony.").

[131] Loan Agreement § 2.3.5.

[132] *See* Loan Agreement § 8.1(d).

[133] *See In re Harvest Oaks Drive Assocs., LLC,* No. 10-03145, 2011 WL 124495 (Bankr. E.D.N.C. Jan. 14, 2011).  *See also In re Sweet,* 369 B.R. 644, 652 (Bankr. D. Colo. 2007)

actuating but, rather, require JPMCC to select and exercise its chosen remedy, including the imposition of Default Rate interest.  This is consistent not only with the Loan Agreement, but also with sound and common business practices.  Not every "default" in every situation warrants the exercise of the most draconian of possible remedies.  The case law is clear that where, as here, the remedies upon default are optional, the creditor must prove that it affirmatively expressed an intent to charge Default Rate interest.[134]  Here, JPMCC retroactively seeks Default Rate interest even though, as a result of its choice to charge late fees, it is not entitled to both.

The claim for Default Rate interest first surfaced in JPMCC's Proof of Claim,[135] which was filed in February 2012, approximately two-and-a-half years after Sagamore's initial alleged default and after JPMCC had consistently assessed late fees and not Default Rate interest during that same time period.  JPMCC now argues that it included late fees in its Proof of Claim merely to include all conceivable claims that might have any application depending on the outcome of the reorganization.[136]  Upon review of the language of the Proof of Claim itself, though, it is clear that the Proof of Claim unequivocally asserts an absolute right to late fees.  Brown admitted the same in his testimony:[137]

```
10    Q. Now, those are the amounts due.  They're not the
11  amounts that might be due.  They're not the amounts that could
12  be due.  This is what you believe the amounts due were as of
13  the filing of this proof of claim, correct?
14      A. Yes.  This is the total amounts due, yes, including
15  the prepayment, premium.  Everything is included in there.
16    Q. Okay.  Right.  Including late fees for $235,194.83,
17  correct?
18      A. Yes.  Correct.
```

---

(rejecting retroactive application of default interest and finding "[t]here was no evidence [the creditor] had ever expressed an intention to exercise its discretion to charge default interest.  In fact all of the evidence presented to the Court establishes [the creditor] neither intended to nor actually imposed default interest against the Debtor.").

[134] *See e.g., In re Lichtin/Wade, LLC*, No. 12-00845, 2012 WL 3260287, *3-4, (Bankr. E.D.N.C. Aug. 8, 2012) (affirmative action on part of secured lender to invoke remedy is required); *In re Crystal Props., Ltd., L.P.*, 268 F.3d 743, 749-53 (9th Cir. 2001) (accord).

[135]  Main Case Proof of Claim No. 20-2.

[136] Opening Brief at 26.

[137] 11/15/12 Confirmation Hearing Tr. 200:10-18.

JPMCC's affirmative claim for late fees precludes it from recovering Default Rate interest.[138]  In *AE Hotel Venture*, the Bankruptcy Court addressed this dilemma, noting that the creditor's claim "raises the spectre of this double recovery … [and the creditor] has not waived its right to a late charge as some creditors do."[139]  The court noted that since the late fees were included in the secured claim (like here) and because there was no objection to the late charge portion of the secured claim, the late charges would be added.  *Id.*  The court, in turn, denied the creditor's request for default interest.  *Id.* at 217.  Similarly, Sagamore did not object to late fees and in fact paid all accrued late fees on the Effective Date of the Plan.[140]

Sagamore raised JPMCC's attempted double recovery in its *Objection to Claim No. 20-2* [Main Case ECF No. 280] (the "**Claim Objection**"), filed the month prior to the Confirmation Hearing.  In its response to the Claim Objection, JPMCC stated that Florida "state law provide[s] for the recovery by Lender of default rate interest *and* late fees."[141]  Now, however, JPMCC changes course, as it must, and concedes that it is prohibited from collecting both late charges and Default Rate interest.[142]  Nevertheless, stung by the case law set forth in the Claim Objection and recognizing that its attempts to collect both Default Rate interest and late fees was legally impermissible, JPMCC's Claim Objection Response, filed a mere ten days prior to the Confirmation Hearing on November 5, 2012, asserted for the *first time* in the more than three years since the default that JPMCC only sought late fees for periods where default interest is not

---

[138] *See In re AE Hotel Venture*, 321 B.R. 209, 216 (Bankr. N.D. Ill. 2005) ("[W]hen a creditor will be paid late charges, the creditor cannot also claim default interest."); *In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) ("The decisional law is uniform that oversecured creditors may receive payment of either default interest or late charges, but not both."); *In re Dixon*, 228 B.R. 166, 177 (W.D. Va. 1998) (same); *In re 1095 Commonwealth Ave. Corp.*, 204 B.R. 284, 304-05 (Bankr. D. Mass. 1997) (denying request for both late fees and default interest, notwithstanding the fact that the debtor was solvent, noting that "[b]oth the late charge and the default rate of interest are intended to compensate the lender for the increased costs of administration caused by the borrower's failure to make payments as and when it is due."); *In re Cliftondale Oaks, LLC*, 357 B.R. 883 (Bankr. N.D. Ga. 2006) (solvent debtor not required to pay both late fees and default interest); *In re Route One West Windsor, Ltd. P'ship*, 225 B.R. 76, 92 (Bankr. D.N.J. 1998) (secured creditor not entitled to default interest and late charges, notwithstanding that double payment would only impact recovery of an inside creditor).

[139] *AE Hotel Venture*, 321 B.R. at 216.

[140] *See Notice of Effective Date* [Main Case ECF No. 536]; Confirmation Order at 31-32.

[141] Claim Objection Response [Main Case ECF No. 400], ¶ 49 (emphasis added).

[142] *See* Opening Brief at 26.

allowed.[143]   But even the very next day, on November 6, 2012, in its responses to Sagamore's interrogatories, JPMCC continued to insist upon being paid late fees without limitation.[144]

Having apparently determined that it continued to make a mistake by affirmatively seeking late fees and not Default Rate interest, JPMCC now disingenuously and falsely claims *de novo* review applies to what was clearly a factual determination.[145]   JPMCC does not get a "do-over."[146]   Thus, even if JPMCC had sent a proper notice of default (which it did not), there remains the fact that JPMCC had never, prior to the commencement of this bankruptcy case, taken affirmative action to charge Default Rate interest.[147]   And the overwhelming evidence and testimony adduced at the Confirmation Hearing supports the Bankruptcy Court's findings that JPMCC affirmatively chose to charge and assess late fees and not Default Rate interest every month since Sagamore's initial monetary default and through the Confirmation Hearing.  In any

---

[143] Claim Objection Response ¶ 49.

[144]  *See* Confirmation Hearing Ex. 3 (*JPMCC 2006-LDP7 Miami Beach Lodging, LLC's Amended Responses and Objections to Debtor's First Set of Interrogatories*), at Ex. A, fn. 4.

[145] Opening Brief at 3.

[146] In the same vein, JPMCC now argues for the first time that as a matter of law, it could not opt for late fees in lieu of Default Rate interest.  Opening Brief at 28.  To the dismay of JPMCC, it cannot rewind the clock and change the undeniable fact that it *did* affirmatively opt for late fees, as each piece of uncontroverted evidence reflects.

[147] JPMCC also argues in its Opening Brief in the section dealing with its election to charge late fees that Default Rate interest must be paid on the Effective Date, an issue not decided by the Bankruptcy Court.  Opening Brief at 29-30.  Inasmuch as JPMCC is not entitled to collect any Default Rate interest, Sagamore respectfully submits that this issue need not be resolved by the Court in this case, just as the Bankruptcy Court did not speak on this issue.  Still, the notion that, in order to reinstate a loan and cure alleged defaults, certain fees and costs need not be paid on the effective date of a plan, but rather may be added to the principal on the underlying note, is widely accepted by many courts.  *See In re Phoenix Bus. Park Ltd. P'ship*, 257 B.R. 517, 522-23 (Bankr. D. Az. 2001) (adding reasonable costs, including foreclosure notice fees and court costs, limited to the expenses that were a direct result of acceleration and not in any manner a penalty arising from the default, to the principal on the note, and ordering that such costs were not payable immediately under the debtor's reinstatement plan); *Fla. Partners Corp. v. Southeast Co. (In re Southeast Co.),* 868 F.2d 335, 340 (9th Cir. 1989) (adding attorneys' fees to the principal of the note); *In re Colvin*, 57 B.R. 299, 302-03 (Bankr. D. Utah 1986) (reasonable allowable fees and costs "are added to the value of the creditor's allowed secured claim," despite specific provision of trust deed agreement calling for payment of attorneys' fees as a precondition of reinstatement); *In re Moody Nat'l SHS Houston S, LLC*, 426 B.R. 667, 677 (Bankr. S.D. Tex. 2010) ("[N]othing in § 1124 requires that payments be made any sooner than otherwise required under the parties' contracts").  JPMCC's arguments to the contrary are belied by its concession in its Opening Brief that "allowable fees and costs can be capitalized and need not be paid prior to the Effective Date of the Amended Plan."  Opening Brief at 32.

event, the matter of whether JPMCC elected to charge late fees is undoubtedly a factual question, subject to reversal only if this Court is "left with the definite and firm conviction that a mistake has been committed."[148]

### E.    Default Rate Interest Is Not Required Under the Reinstatement Statute

Although rendered moot by the Directed Verdict Order and the Confirmation Order, the Bankruptcy Court erred in entering the Disclosure Statement Order in July 2012, several months prior to hearing any evidence in the Adversary Proceeding trial or Confirmation Hearing.  The court held in the Disclosure Statement Order that the Reinstatement Statute merely defines the standards for unimpaired status and does not provide the substantive means by which a debtor may cure and nullify its alleged default.  The court adopted JPMCC's argument, which primarily relied upon one outlier case.

Section 1124(2) permits de-acceleration and reinstatement of a lender's accelerated claim so long as the debtor:

> (2)    *notwithstanding any contractual provision* or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default –
>> (A) Cures any such default that occurred before or after the commencement of the case under [Title 11], other than a default of a kind specified in section 365(b)(2) of [Title 11] or of a kind that section 365(b)(2) expressly does not require to be cured;
>> (B)   Reinstates the maturity of such claim or interest as such maturity existed before such default;
>> (C)    Compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>> (D)   If such claim or such interest arises from the failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than Sagamore or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
>> (E)   Does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.[149]

"Congress carved out a small exception to impairment in § 1124(2) providing that curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby

---

[148] *In re Int'l Admin. Servs.*, 408 F.3d 689, 698 (11th Cir. 2005) (internal citation omitted).
[149] 11 U.S.C. § 1124(2) (emphasis added).

'impair' a creditor's claim."[150]   The Reinstatement Statute thus negates the effect of "any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default."[151]   By invoking the Reinstatement Statute, Sagamore's Plan provided for de-acceleration of the debt and reinstatement of the subject Loan.

The Reinstatement Statute, like sundry other Code provisions, bestows upon a debtor certain rights, so long as the debtor complies with certain conditions that Congress has determined fairly balances the interests of debtors and creditors.   Thus, "notwithstanding any contractual provision" that states otherwise, Sagamore may de-accelerate the indebtedness and reinstate the Loan.   11 U.S.C. § 1124(2).   But in order to invoke the protections provided by the Reinstatement Statute, Congress has mandated that Sagamore must comply with the significant monetary and non-monetary conditions laid out in the statute.

### 1.   The Bankruptcy Court Erred in Failing to Address Sagamore's Statutory Construction Arguments

Sagamore has consistently maintained that   the   substantive   means   to   reinstate   are expressly laid out in the Reinstatement Statute, and that the five requirements set forth therein are instructive, not definitional.   As part of its argument, Sagamore presented a thorough deconstruction of the statute itself.[152]   Markedly absent from the Disclosure Statement Order, however, is any mention or analysis whatsoever of Sagamore's arguments.   The reality is that the Reinstatement Statute by its very language is designed to return the parties to their respective pre-default positions in the most equitable manner possible.   By carefully examining the Reinstatement Statute itself, it is clear that Congress has established a substantive means by which to reinstate that keeps in mind the equitable nature of the bankruptcy process.

The Reinstatement Statute begins by expressly removing any consideration of contractual provisions or other laws in determining a debtor's right to de-accelerate and reinstate a loan.   On its face, the statute provides that a debtor may de-accelerate "notwithstanding any contractual provision or applicable law," including contractual clauses or laws that permit "accelerated payment … after the occurrence of a default."   But the Reinstatement Statute includes certain

---

[150] *In re Taddeo*, 685 F.2d 24, 28-29 (2d Cir. 1982).
[151] 11 U.S.C. § 1124(2).
[152] 5/22/12 Disclosure Statement Hearing Tr. 28:3-38:9.

responsibilities of the debtor to return the parties to their pre-default status and fairly balances the rights of creditors.  Thus, as opposed to a merely definitional and informational statute, the Reinstatement Statute provides a debtor the right to reinstate, and specific requirements for doing so.

First, section 1124(2)(A) requires that the debtor must "cure any such default that occurred before or after the commencement of the case," aside from certain specified exceptions. Thus, a debtor cannot simply rewind the clock to return to its pre-default state; rather it must cure the default and pay all accrued and uncollected monetary defaults.

Second, the debtor may reinstate the maturity of the subject loan, but only "as such maturity existed before" the default.  11 U.S.C. § 1124(2)(B).  Hence, a debtor is permitted to reinstate its loan, but not on its own terms.  In fairness to the creditor, and to preserve the expectations of the parties pre-default, a debtor may not unilaterally extend the maturity date, but must preserve the maturity date as it existed before any alleged default.

Third, under section 1124(2)(C), a debtor must compensate a claimholder for certain actual damages incurred as a result of the creditor's reasonable reliance on the underlying agreement or applicable law.  So while Congress explicitly excluded the underlying contractual provisions and other laws from the means by which to cure, it provided that debtors must reimburse their creditors for actual reasonable reliance damages.  This makes sense since the goal of the Reinstatement Statute is to return the parties to their *pre-default* state.

Fourth, section 1124(2)(D) provides that in order to reinstate, the debtor must compensate the creditor for any "actual pecuniary losses" incurred by the creditor from the debtor's failure to perform certain nonmonetary obligations.  Yet again, the Reinstatement Statute strikes a balance and requires reimbursement for actual losses sustained as a result of breach of the underlying agreement.  The result is that upon the effective date of the reinstatement plan, the parties are put in the same position as the day before any alleged default.

Finally, section 1124(2)(E) instructs that the plan must "not otherwise alter the legal, equitable, or contractual rights" of the creditor.  That is because the goal of the Reinstatement Statute is to preserve the expectations of the parties, as they existed before any default or chapter 11 proceedings.  By proscribing any contractual modifications, the creditor can be assured that upon the debtor's cure and reinstatement, the parties will return to their respective pre-default positions, and the creditor will have the rights it bargained for following confirmation.

Contrary to the Bankruptcy Court's findings, upon careful review of the Reinstatement Statute, it is clear that the statute provides substantive rights and responsibilities by which to cure and reinstate a defaulted loan. The Reinstatement Statute is not merely definitional. Rather, it practically reads like an instruction manual, specifically explaining to debtors that they have the right to reinstate, but only subject to the delineated specific requirements set forth therein.

### 2. Under 11 U.S.C. § 1124(2)(A), Sagamore is Not Required to Pay JPMCC Default Rate Interest as Part of the Cure

The determination of whether default interest and late fees are required generally under a reinstatement plan falls under 11 U.S.C. § 1124(2)(A), which provides that a debtor must "cure" its defaults in order to reinstate. As discussed, the Reinstatement Statute provides explicit guidance and instruction on the means by which a debtor is permitted to reinstate a loan. The majority of courts that have analyzed the Reinstatement Statute, both within and outside of this district, have concluded that default interest and late fees are not required in order to cure.

The Ninth Circuit squarely addressed the question of whether contractual default rate interest is a necessary component of a cure under the Reinstatement Statute in *Entz-White*.[153] In answering in the negative, the Ninth Circuit carefully examined the Reinstatement Statute and its legislative intent, and concluded that "by curing the default, [the debtor] is entitled to avoid all consequences of the default – including higher post-default interest rates."[154] The Court held that "[i]t is clear that the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest." *Id.* The Court cited the Second Circuit's decision in *In re Taddeo*[155] for the proposition that, while undefined by the Code itself, "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." *Id.* at 1340.

The Ninth Circuit took into consideration the fundamental purpose and intent of the Reinstatement Statute, noting that to cure is "to remedy or rectify the default and restore matters to the *status quo ante*." *Id.* (internal citation omitted). Thus, to permit a creditor to obtain default rate interest "would have completely eliminated the benefits of cure… The more natural

---

[153] *Great Western Bank & Trust v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply)*, 850 F.2d 1338 (9th Cir. 1988).
[154] *Id.* at 1342.
[155] 685 F.2d 24, 26-27 (2d Cir. 1982).

reading of sections 506 and 1124 is that the interest awarded should be at the market rate or at the pre-default rate provided for in the contract." *Id.* at 1343 (internal citation omitted). "Section 1124(2) promotes the economic efficiency of reorganization by allowing the Chapter 11 debtor to reinstate the original terms of an accelerated long-term loan at this lower interest rate."[156]

In *In re Singer Island Hotel,* .,[157] the Bankruptcy Court in this district squarely addressed this question in a nearly identical factual scenario as that presented here. *Singer Island* involved a payment default on a loan relating to a hotel. As here, the secured creditor in *Singer Island* objected to the debtor's plan and argued that it was entitled to be paid default interest. *Id.* at 847. Chief Judge Britton adopted *Entz-White* and found that the debtor "is *not* required to pay … default rate of interest."[158] In fact, following *Entz-White*, the majority of courts have adopted the Ninth Circuit's holding and have recognized that a plan under the Reinstatement Statute permits debtors to nullify all consequences of default, including avoidance of default penalties such as higher interest.[159]

---

[156] *In re Madison Hotel Assoc.*, 749 F.2d 410, 420-21 (7th Cir. 1984) (internal citations omitted).

[157] 95 B.R. 845 (Bankr. S.D. Fla. 1989).

[158] *Id.* at 848 (citing *In re Forest Hills Associates,* 40 B.R. 410, 415-17 (Bankr. S.D.N.Y. 1984) (neither cure nor damages under chapter 11 include default interest or compounded interest); *In re Orlando Tennis World Dev. Co., Inc.*, 34 B.R. 558, 560-61 (Bankr. M.D. Fla. 1983) (neither cure nor damages under chapter 11 include default interest)).

[159] *See In re Phoenix Bus. Park Ltd. P'ship*, 257 B.R. 517, 522 (Bankr. D. Az. 2001) ("*Entz-White* remains good law . . . and [] therefore, a debtor need pay interest only at the contract rate, and not the default rate"); *In re* Zamani, 390 B.R. 680 (Bankr. N.D. Ca. 2008) (nullification of the effects of the default includes not only the reversal of the acceleration of a note, but also the reversal of any obligation to pay default interest and late charges); *In re Sylmar Plaza, L.P.*, 314 F.3d 1070 (9th Cir. 2002) ("It is clear that the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, *including avoidance of default penalties such as higher interest*.") (quoting *Entz-White*, 850 F.2d at 1342) (emphasis in original); *In re Udhus*, 218 B.R. 513, 518 (9th Cir. BAP 1998) (finding that the Bankruptcy Court correctly followed *Entz-White*, and the loan was cured by a plan that "returned the status of the parties to the same relationship under the loan that existed prior to the default"); *In re Schatz*, 426 B.R. 24, 27 (Bankr. D. N.H. 2009) ("Under § 1124(2), applying the default interest rate is unnecessary because upon the effective date of the plan, the creditor is repaid for its loss during the default period."); *DSBC Investments, L.L.C.*, 2009 WL 2998940 (rejecting over-secured creditor's claim that it is entitled to default interest in a reinstatement plan); *Fla. Partners Corp.*, 868 F.2d at 338 (recognizing *Entz-White* and noting that the creditor was "incorrect in claiming that a cure of default under section 1124(2) cannot include the setting aside of a default interest rate"); *In re Countrywood Investment Group, Ltd.*, 117 B.R. 338 (Bankr. M.D. Tenn. 1990) ("This court

### 3. Section 1123(d) Does Not Apply to Reinstatement Plans and Does Not Otherwise Alter the Outcome

In support of its holding, the Bankruptcy Court relied on a single Texas bankruptcy court decision[160] that focused on language in section 1123(d) of the Bankruptcy Code, which provides:.

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

The bankruptcy court in *Moody* misinterpreted the wording and intent of the relevant Code provisions. The language in section 1123(d) is in direct contravention with various other sections of the Bankruptcy Code, including the Reinstatement Statute, which specifically *excludes* consideration of "any contractual provision" in detailing the requirements for a debtor to de-accelerate and cure defaults. To address the patent inconsistencies with various other sections of the Bankruptcy Code, 11 U.S.C. § 1123(d) specifically references other sections of the Code, noting that the listed provisions are trumped by the language in section 1123(d). However, section 1123(d) makes absolutely no reference to section 1124, the Reinstatement Statute.

By design, because section 1123(d) references other sections of the Bankruptcy Code but makes no reference to section 1124, section 1123(d) has no application in the context of a reinstatement plan. JPMCC highlights this very point in its Opening Brief. Specifically, JPMCC quotes section 1123(d)'s language that provides that the amount of a cure generally is determined *notwithstanding section 506(b)*.[161] Thus, argues JPMCC, section 1123(d) supplants section 506(b). *Id.* The corollary to this is also true. Notably absent from section 1123(d) is any mention of section 1124, leading to the logical conclusion that the Reinstatement Statute is not supplanted by 1123(d). Therefore, section 1123(d) does not apply.

---

adopts the view of the Ninth Circuit in *In re Entz-White Lumber & Supply, Inc.*). *But see In re Moody National SHS Houston H, LLC*, 426 B.R. 667 (Bankr. S.D. Tex. 2010); *Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props., Inc.)*, 338 B.R. 450 (Bankr. D. Colo. 2005); *In re 1 Ashbury Court Partners, L.L.C.*, No. 11-10131, 2011 WL 4712010 (Bankr. D. Kan. 2011).

[160] *In re Moody National SHS Houston H, LLC*, 426 B.R. 667 (Bankr. S.D. Tex. 2010).

[161] Opening Brief at 14.

It must be presumed that Congress purposely did not include section 1124, the Reinstatement Statute, in the provisions listed in section 1123(d).  Nonetheless, the Bankruptcy Court found that 11 U.S.C. § 1123(d) provides the substantive means by which to cure, and since section 1123(d) references the underlying agreement, JPMCC may collect the Default Rate interest to the extent required in the Loan Agreement.[162]  Sagamore notes that this finding has been rejected by most bankruptcy courts.[163]

While section 1123(d) discusses the concept of cure, it does not do so in the particular context of a reinstatement plan.  In the face of 1123(d)'s specific references to 506(b), 1129(a)(7), and 1129(b), the absence of 1124(2) was clearly intentional.  This is because, as discussed above, the Reinstatement Statute itself sets forth the substantive requirements to cure.  This makes sense, because if the Loan Documents controlled the definition of "cure" under a reinstatement plan, then the Reinstatement Statute would be rendered superfluous.  In other words, if Congress intended the underlying agreements to dictate the means by which to cure, then it would not have provided the specific requirements for cure in the Reinstatement Statute, which oftentimes will contradict the terms of loan agreements.  This analysis is absent from the reasoning in *Moody* and the Bankruptcy Court's decision below.

### 4. The Bankruptcy Court Erred in Considering Equitable Factors Suggested by JPMCC Favoring Payment of Default Interest, Attorneys' Fees and Costs

In the Disclosure Statement Order, the Bankruptcy Court held that unless Default Rate interest is not otherwise due under the Loan Agreement, JPMCC is "entitled to default interest given that (a) it is not disputed that the Secured Lender is amply oversecured, (b) the Debtor is solvent, and (c) general unsecured creditors will be paid in full, with interest under the Plan

---

[162] As discussed above, the Bankruptcy Court carved out an exception to the extent Sagamore could establish that default interest is not otherwise due in accordance with the underlying agreement and/or applicable non-bankruptcy law.  *See* Disclosure Statement Order at 10.

[163] *Phoenix Bus. Park Ltd. P'ship*, 257 B.R. 517 (rejecting creditor's argument that *Entz-White* was legislatively overruled by the addition of section 1123(d)); *Zamani*, 390 B.R. at 685 ("Contrary to the bank's argument, the 1994 amendments to the Bankruptcy Code do not over-rule the binding precedent set forth in *Entz-White*."); *Sweet*, 369 B.R. at 650 ("[I]t does not appear there is any basis for arguing that § 1123(d) abrogates the *Entz-White* line of cases."); *DSBC*, 2009 WL 2998940, *2 (Bankr. D. Az. Sept. 11, 2009) ("[T]here have been no changes in the law since the 1988 decision which would dilute or change *Entz-White's* holding.").  *But see Moody*, 426 B.R. at 674-76; *Hepner*, 338 B.R. at 461; *1 Ashbury Court Partners*, 2011 WL 4712010, *4.

regardless of whether the Debtor is required to pay default interest to the Secured Lender."[164] These conclusions are indisputably based on equitable factors considered by the Bankruptcy Court.  It is true that a select few minority cases have adopted an equitable considerations standard, in lieu of a *per se* bar, in determining whether a secured lender is entitled to default rate interest and late fees under the Reinstatement Statute.[165]  And in those cases, of the many factors weighed by the Court are the over-secured status of the lender and the plan treatment toward unsecured creditors.  However, this approach has not been adopted by any Circuit Court, it represents the minority view, and it contradicts the explicit standard espoused by the statute and by courts in this district.[166]  Further, JPMCC has repeatedly noted itself that "Eleventh Circuit and Florida law combine to prevent a Bankruptcy Court from even considering such 'equitable considerations.'"[167]

The Bankruptcy Court imposed the Default Rate interest and fees based on factors that were all suggested by JPMCC.  Although Sagamore submitted its own arguments as to why JPMCC is not equitably entitled to Default Rate interest and fees, the Bankruptcy Court indicated that it was "putting aside the allegations in the Adversary Proceeding,"[168] which in large part outlines the facts required for a complete understanding of the equities of the respective parties.

With respect to the Bankruptcy Court's consideration of JPMCC's over-secured status, it should be noted that the Reinstatement Statute does not on its face, or by way of implication, prescribe disparate treatment between over-secured and under-secured creditors.  Had Congress intended that section 1124(2) distinguish between the two classes of creditors, it must be presumed that it would have done so when it enacted the statute or in its subsequent

---

[164] Disclosure Statement Order at 10.

[165] *See In re 139-141 Owners Corp.*, 306 B.R. 763 (Bankr. S.D.N.Y. 2004), *aff'd in part, vacated in part, remanded by In re 139-141 Owners Corp.*, 313 B.R. 364 (S.D.N.Y. 2004); *Gen. Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011).

[166] *See Singer Island*, 95 B.R. 845; *Prime Motors Inns, Inc. v. First Fidelity Bank N.A. New Jersey (In re Prime Motor Inns, Inc.)*, 123 B.R. 104 (Bankr. S.D. Fla. 1990), *rev'd on other grounds*, 130 B.R. 610 (S.D. Fla. 1991).

[167] *See Reply by JPMCC 2006-LDP7 Miami Beach Lodging, LLC to Sagamore Partners, Ltd's Response to Objection by JPMCC 2006-LDP7Miami Beach Lodging, LLC to Debtor's Disclosure Statement Solely as to the Interpretation and Application of 11 U.S.C. §§ 1123 and 1124 Concerning the Application of Default Interest and Late Fees in the Context of the Debtor's Reinstatement Plan of Reorganization* [Main Case ECF No. 168], at 13-14, ¶25.

[168] Disclosure Statement Order at 3.

amendments. In the cases holding that default interest and other charges are not required in a reinstatement plan, the cases are clear that whether the lender was over-secured had no bearing whatsoever. In fact, in most of the cases, including the seminal *Entz-White* and *Singer Island Hotel* decisions, the courts were addressing the Reinstatement Statute in the context of over-secured creditors.[169]

Courts that have considered equitable considerations take into account various factors, including: (i) whether there has been creditor misconduct; (ii); whether the default interest rate constitutes a penalty; and (iii) whether the application of the default interest rate would impair the debtor's fresh start.[170] In *In re 139-141 Owners Corp.,* the court noted that, in determining whether to impose default rate interest, it would consider favorably that a debtor filed its petition to reorganize, to protect the rights of its unsecured creditors, or to forestall a foreclosure sale.[171] Further, recently in *Cottonwood Corners*, the court considered the debtor's allegations relating to the secured creditor's bad faith and alleged breach of its duty of good faith and fair dealing.[172]

Here, Sagamore filed to cure its defaults, reorganize, and forestall foreclosure of the subject property, all of which weigh in favor of Sagamore. Additionally, Sagamore made monthly interest payments calculated at the contract rate of 6.54%, based on the outstanding principal amount of the Loan, as further adequate protection throughout the course of the bankruptcy case.

Moreover, as fully laid out in Sagamore's Adversary Complaint, each of the factors delineated by the Courts in *139-141* and *General Growth* clearly weigh in favor of Sagamore and against the imposition of Default Rate interest and other fees. Sagamore filed in order to avoid foreclosure by JPMCC, which stemmed from LNR's wrongful conduct in duping Sagamore into a default and dragging Sagamore into special servicing to extort fees from Sagamore and wrest control over the Property. Ultimately, LNR established a shell entity, JPMCC, to foreclose on the Loan. The Adversary Complaint describes how LNR used Sagamore's fraudulently-induced voluntary default as license to deal oppressively and in bad faith with Sagamore, including

---

[169] *Singer Island*, 95 B.R. 845; *Entz-White*, 850 F.2d 1338; *DSBC*, 2009 WL 2998940; *Schatz*, 426 B.R. at 27; *Zamani*, 390 B.R. 680; *Phoenix*, 257 B.R. 517; *Udhus*, 218 B.R. at 518; *Countrywood*, 117 B.R. 338; *Fla. Partners Corp.*, 868 F.2d at 338.
[170] *Gen. Growth*, 451 B.R. at 328.
[171] *139-141 Owners,* 306 B.R. at 773.
[172] *In re Cottonwood Corners Phase V, LLC*, Case No. 11-11-12663, 2012 WL 566426, *11-12 (Bankr. D. N.M. Feb. 17, 2012).

depriving Sagamore of strategic opportunities and substantial revenues, all in furtherance of its efforts to enrich itself and obtain control over the Property.

As noted by the Court in *General Growth*, one of the factors militating in favor of denying a secured creditor default interest is when that creditor has engaged in misconduct. Rewarding JPMCC's misconduct with millions of dollars in Default Rate interest and fees would create an utterly inequitable result. The Bankruptcy Court erred when it inexplicably only considered the factors suggested by JPMCC and "put[] aside the allegations in the Adversary Proceeding."[173]

### F.   The Bankruptcy Court Correctly Ruled that Sagamore Is Being Managed In Accordance With the Loan Agreement

JPMCC knows full well that Sagamore has been, and will continue to be, managed by a Qualified Manager.  The specious nature of this particular objection is revealed by the evidence adduced at the Confirmation Hearing, the testimony by JPMCC's own witness, and JPMCC's blatant efforts to transform this clearly factual issue into a legal issue subject to *de novo* review in order to try to have its entire case reheard before this Court.

The uncontroverted testimony at the Confirmation Hearing was that Sagamore is being managed by Crescent Hotels & Resorts, LLC ("***Crescent***").[174]  JPMCC concedes that Crescent is a Qualified Manager as required under the Loan Agreement.[175]  Prior to its engagement with Crescent, Sagamore was managed by Tecton.  However, Tecton was removed in 2009 and replaced by Crescent.[176]  JPMCC, through LNR, received a copy of the Crescent Agreement in 2009,[177] and paid from the funds it controlled in the Lockbox Account the requisitions for Crescent's management services prior to and throughout the bankruptcy proceedings.[178]  Most telling is that the Loan Agreement clearly provides JPMCC with the option to cause Sagamore to terminate management;[179] however, JPMCC never sought to exercise such rights for the three years leading up to the Confirmation Hearing.[180]

---

[173] Disclosure Statement Order at 3.

[174] Confirmation Order at 17.  *See also* Confirmation Hearing Ex. 9 and 9A.

[175] Opening Brief at 33.

[176] *Id.*

[177] Confirmation Hearing Ex. 19; *see also* 12/7/12 Confirmation Hearing Tr. 376:14-19.

[178] *See* Confirmation Hearing Ex. 20.

[179]  Loan Agreement § 5.1.26(c).

[180] *See* 11/15/12 Confirmation Hearing Tr. 237:17-20.

JPMCC now asserts it refrained from seeking to terminate Crescent until Sagamore filed its plan of reorganization because it somehow believed that the operative document entitled "Management Agreement"[181] was not a management agreement at all.  In a transparent effort to bolster this incredible assertion, JPMCC remarks that its witness "credibly testified" on this point.[182]   Nevertheless, the plain language of the Crescent Agreement identifies it is a "Management Agreement," and the lengthy list of management services Crescent is required to provide throughout the agreement confirm it as such.[183]   And unsurprisingly, the Bankruptcy Court hearing the testimony on this point disagreed with JPMCC.[184]

Now, more than three years into Crescent's service as Qualified Manager, JPMCC complains that the Crescent Agreement is not a satisfactory Replacement Management Agreement (as defined in the Loan Agreement) because it is not in the same form and substance as the agreement with Tecton.[185]  The absurdity of JPMCC's argument is highlighted by the fact that JPMCC did not enter the Tecton agreement into evidence at the Confirmation Hearing,[186] thus denying the Bankruptcy Court any opportunity to even consider its flawed argument.

At the very conclusion of the Confirmation Hearing, JPMCC entered into evidence certain pleadings from the ongoing state-court litigation between JPMCC and Martin W. Taplin on his guaranty.  JPMCC did not ask any questions of any witnesses in connection with these exhibits and waited to introduce them until after the parties completed their respective presentations and testimony was concluded.[187]   JPMCC now attempts to use these exhibits in support of its assertion that Sagamore is in fact the acting manager of the Property, not Crescent.[188]   While the Bankruptcy Court admitted these state-court pleadings, the mere unverified allegations by a guarantor's prior state-court counsel from several years ago in "guaranty" litigation did not persuade the Bankruptcy Court that Crescent is not the current manager of the Property, nor should it have any bearing here.  Rather, all of the evidence

---

[181] Confirmation Hearing Ex. 9 and 9A.
[182] Opening Brief at 34.
[183] Confirmation Hearing Ex. 9.
[184] Evaluating the credibility of witnesses falls within the trial court's exclusive purview. *Sanchez-Villalba*, 2013 WL 537496, *7 (citing *Marill*, 81 B.R. at 124 n. 10).
[185] Opening Brief at 33.
[186] *See JPMCC's Exhibit Register* [Main Case ECF No. 550] at 2 (Exhibit H, Tecton Management Agreement, Not Introduced).
[187] 12/7/12 Confirmation Hearing Tr. 382:7-383:3.
[188] Opening Brief at 34.

presented at the Confirmation Hearing confirms that Crescent, not Sagamore or its affiliates, is the manager of the Property.

With respect to Sagamore affiliates, the Bankruptcy Court found that in addition to the management functions performed by Crescent, certain "back-of-the-house" functions have been handled by Harbour Realty Advisors, Inc. ("**HRA**"), an affiliate of Sagamore, and JPMCC has been aware of this arrangement for at least three years as well.[189]   As with Crescent, JPMCC never attempted to exercise any of its rights under the Loan Agreement to remove HRA as a purported manager.   JPMCC's arguments about HRA's role with Sagamore are belied by its silence on this subject prior to Sagamore's filing of its Plan.  Moreover, JPMCC utterly misreads the Loan Agreement.   In the event that HRA was serving as manager, contrary to JPMCC's assertions otherwise, as an affiliate of Sagamore, HRA is explicitly *accepted* as a potential manager under the Loan Agreement.[190]  It is also telling that LNR refused to approve requisitions for HRA's fees but approved requisitions for Crescent's fees,[191] which indicates LNR's belief that Crescent is managing the Property, especially in light of LNR's failure to assert its right to require a change in management.[192]  The corollary to this is also true.  If JPMCC believed that Sagamore or HRA was the Manager, and not Crescent, one wonders why JPMCC took no action to remove Sagamore and/or HRA under the same Loan Agreement provision allowing it to do so.

Ultimately, these are indisputably (despite JPMCC's assertions otherwise) factual determinations made on a key issue that was subject to hours of testimony and are only subject to review under the "clearly erroneous" standard.

### G.   The Bankruptcy Court Correctly Ruled That Sagamore Met Its Burden In Establishing That Its Plan Is Feasible Pursuant to 11 U.S.C. § 1129(a)(11)

JPMCC asserts that Sagamore must prove by "clear and convincing evidence" that the Plan is feasible under 11 U.S.C. §1129(a)(11).[193]   Consistent with its ever-changing positions,

---

[189] Confirmation Order at 19.

[190]  Loan Agreement § 1.1, Definition of "Qualified Manger" ("may be an Affiliate of Borrower").

[191] *See* Confirmation Hearing Ex. 20.

[192] *See* 11/15/12 Confirmation Hearing Tr. 237:17-24.

[193]  Opening Brief at 35.  JPMCC cites to *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937 (Bankr. S.D. Fla. 1992), a Judge Cristol case, in putative support for this proposition.  However, *Miami Ctr. Assocs.* involved an analysis of "cramdown" under the Bankruptcy Code and at no point called for a "clear and convincing evidence" standard in respect of feasibility.

JPMCC previously cited "preponderance of the evidence" as the relevant standard.[194]   In any event, the Bankruptcy Court held that Sagamore met its burden under either standard.[195]

In determining the feasibility of a reorganization plan, a court must determine whether the plan offers a *reasonable prospect of success*.[196]   A debtor need not prove with absolute certainty that it will complete the payments under the plan.[197]   "The test is whether the things which are to be done after confirmation can be done as a practical matter."[198]   The mere prospect of financial uncertainty will not render a plan unfeasible or otherwise preclude confirmation.[199]

JPMCC claims the Plan is not feasible because Sagamore cannot demonstrate that it can repay the Loan on the Maturity Date.[200]   But in his testimony, Taplin offered three viable options for retiring the debt at maturity, including refinancing (and funding any shortfalls), seeking a partner or joint venture partner, or selling the hotel if needed.[201]   JPMCC offers no authority to support its suggestion that Sagamore should have a commitment letter for refinancing or "establish bidding procedures,"[202] three years prior to maturity, which of course is completely unrealistic.

As noted by the Bankruptcy Court, JPMCC does not dispute that the value of the Property substantially exceeds $31.5 million.[203]   The debt will not increase between the Effective Date and maturity, since interest is being paid and principal will remain constant.   JPMCC does not assert that the value of the Property will decrease during this period.   Therefore, at maturity

---

[194]   *See Objection by JPMCC 2006-LDP7 Miami Beach Lodging, LLC to Confirmation of Debtor's Amended Plan of Reorganization* [Main Case ECF No. 391], at ¶ 27 ("Feasibility, like the other essential elements of confirmation, must be proven by Sagamore by a preponderance of the evidence.   *In re Young Broadcasting, Inc.*, 430 B.R. at 128 (Bankr. S.D.N.Y. 2010) (citing *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160 (5th Cir. 1993); *In re Danny Thomas Props. II, Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001)").

[195]   Confirmation Order at 21.

[196]   *U.S. v. TM Bldg. Products, Ltd.*, 231 B.R. 364, 372 (S.D. Fla. 1998).

[197]   *Id.* at 372-73.

[198]   *Id.* at 373 (citing *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir.1978)).

[199]   *Id.*

[200]   Opening Brief at 36.

[201]   11/15/12 Confirmation Hearing Tr. 166:9 – 169:8.

[202]   Opening Brief at 37.

[203]   *See* 11/15/12 Confirmation Hearing Tr. 229:7 – 231:7 (Brown testifying that the Property is worth at least $45 million).

the Property will be worth substantially more than the debt.[204]   And upon sale, the proceeds will be more than sufficient to pay the debt.

JPMCC disingenuously asserts that Taplin refused to provide JPMCC with evidence of his financial condition to show how he would fund any shortfalls.[205]   To be clear, JPMCC sought in discovery sensitive documents from Taplin, including information on Taplin's life insurance policies and safe deposit boxes,[206] not to confirm Sagamore's ability to repay the Loan on the Maturity Date, but solely for proof that Taplin could fund $5 million as proposed under Sagamore's Plan.[207]   Nevertheless, Taplin immediately offered to provide the Bankruptcy Court with financial records to prove his ability to fund his obligations under the Plan.[208]   And in any event, Taplin did indeed personally provide the more than $5 million required to fund the Plan, which was disbursed on the Effective Date.[209]

JPMCC's citation[210] to *In re Linda Vista Cinemas, L.L.C.*[211] misses the mark.  In fact, the Bankruptcy Court in *Linda Vista Cinemas* found the subject plan there to be feasible and expressly recognized that the "prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required."[212]   JPMCC quotes an excerpt from the case but conveniently omits the very next line, which indicates that the witness testimony "was credible and the current performance and future projections show that the Plan is feasible."[213]   The same was found by the Bankruptcy Court here.  As noted by the Bankruptcy Court, Sagamore's projections[214] "are conservatively based on historical actual performance and

---

[204] *See* Confirmation Order at 23.
[205] Opening Brief at 36.
[206] *See Debtor's (1) Response to JPMCC 2006-LDP7 Miami Beach Lodging, LLC's Motion to Compel Debtor to Produce Documents; and (2) Motion For In Camera Inspection of Financial Records of Debtor's Principal, Martin W. Taplin* [Main Case ECF No. 226], at 4, 6.
[207] *Id.* at 6.
[208] *Id.* at 1-4, 6-7.
[209] *See* Confirmation Order at 21-22.
[210] Opening Brief at 37.
[211] 442 B.R. 724 (Bankr. D. Ariz. 2010).
[212] *Id.* at 737.
[213] *Id.* at 738.
[214] Confirmation Hearing Ex. 70.

appear reasonable and achievable."[215]   Moreover, JPMCC did not present any evidence to contest the accuracy of the projections.[216]

The other case cited by JPMCC is also easily distinguishable.  In *In re Hoffman*,[217] the cramdown plan failed because it "substantially" varied the terms of the original agreements.  For example, the plan sought to consolidate loans, extend loan terms and release the secured creditor's lien.[218]   Such substantial changes are clearly not at issue in this case, which merely reinstates the indebtedness with JPMCC on the same terms set forth in the Loan Documents.

JPMCC cites to a Judge Paul Hyman decision in support for the burden of proof in respect of feasibility.[219]   However, in that decision, Judge Hyman commented on the viability of JPMCC's feasibility arguments:

> It is reasonable to assume that the property itself will provide the source for the balloon payment.  There is no evidence that the property will decline in value.  Therefore, when the balloon is due, either the property will be sold, which will provide the balloon, or refinancing will be possible….[220]

Whether the cash flow of Sagamore will enable Sagamore to refinance the Loan at maturity in 2016 is of no moment.  As Judge Hyman ruled in *New Midland Plaza*:

> Debtor's property substantially exceeds the aggregate amount of all claims.  There are no unaccounted for claims.  [Creditor] presented no evidence, and the Court is aware of none, indicating a downturn in the market conditions is foreseeable.  Therefore considering all the evidence presented, the Court finds that the Plan is feasible.[221]

Here too, there is no evidence that the subject property will decline in value, and the parties agree that the Property's value far exceeds the debt.  As such, upon the Maturity Date, any one of Taplin's proffered strategies are viable options to satisfy the Loan.  Again, these are factual findings subject to the "clearly erroneous" standard.  In any event, Sagamore met and

---

[215] Confirmation Order at 3.
[216] *Id.*
[217] 52 B.R. 212 (Bankr. D.N.D. 1985).
[218] *Id.* at 217.
[219] Opening Brief at 35-36 (citing *In re New Midland Plaza Assocs.,* 247 B.R. 877 (Bankr. S.D. Fla. 2000)).
[220] *New Midland Plaza Associates,* 247 B.R. at 886-87 (quoting *In re Matter of Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1169 (5th Cir. 1993)).
[221] *Id.* at 887.

exceeded its obligations to establish feasibility of its Plan in establishing reasonable prospect of success,[222] and the Bankruptcy Court's findings in this regard should be affirmed.

### H.     JPMCC Errs In Its Description of an Oversecured Lender's Right to Default Interest Generally

JPMCC articulates general propositions concerning an oversecured lender's rights to Default Rate interest,[223] most of which are entirely inapposite to the issues presented in these consolidated appeals.  For instance, JPMCC devotes two entire sections of its brief to an analysis of Section 506(b) of the Bankruptcy Code,[224] which code provision is not even mentioned in any order that is on appeal to this Court.  Further, JPMCC completely ignores the application of Default Rate interest here in the context of (1) a reinstatement plan of reorganization, and (2) a lender's failure to comply with the notice provisions of the underlying loan documents.  To the extent Sagamore is required to address all arguments presented in the Opening Brief, no matter how irrelevant to the issues presented, and to the extent JPMCC errs in its recitation of the law generally with respect to its entitlements to Default Rate interest, Sagamore responds.

### 1.  Section 506(b) and the Reinstatement Statute

11 U.S.C. § 506(b) sets forth the general parameters for an oversecured creditor's entitlement to post-petition interest, fees, costs, and charges:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

While section 506(b) grants JPMCC the right to receive post-petition interest,[225] it does not specify the applicable rate,[226] and it certainly does not, in itself, support JPMCC's assertion of rights to Default Rate interest, particularly in the context of a plan of reorganization filed pursuant to the Reinstatement Statute.  Sagamore does not contest JPMCC's right to receive

---

[222] *TM Bldg. Products, Ltd.*, 231 B.R. at 372.

[223] Opening Brief at 13-16.

[224] *Id.* at 14-15.

[225] *See, e.g., U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989).

[226] *See, e.g., In re Johnson*, 184 B.R. 570, 572 (Bankr. D. Minn. 1995) (in discussing section 506(b), "Neither this section nor the legislative history, however, indicate what the interest rate shall be") (internal citation omitted).

post-petition interest at the original contract rate set forth in the Note.  As such, as of the Effective Date, Sagamore is fully current on its monthly debt service payments. Notwithstanding any other arguments presented herein, though, JPMCC is not entitled to Default Rate interest under the standards espoused by the majority of courts.

As discussed in greater detail above, Sagamore's plan of reorganization was filed pursuant to the Reinstatement Statute, which negates the effect of "any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default."  11 U.S.C. § 1124(2).

In *In re Johnson*,[227] the Bankruptcy Court recognized case authority for the proposition that a fully secured creditor's right to default interest is generally determined under 11 U.S.C. § 506(b) based on equitable considerations, noting that there is generally "a presumption in favor of the parties agreed interest rate subject to rebuttal based upon equitable considerations."  After listing some of the factors generally considered by Bankruptcy Courts, the court noted that if it were confined to such an analysis, it "would find that allowance of the default rate is not inequitable," given the small difference between the default and nondefault rates, and the fact that other creditors would not be adversely affected by the imposition of default rate.  *Id.* However, because the debtor there was curing the default by payment in full, the court held that such an equitable analysis was not necessary. *Id.* at 574.  The court noted that when a plan cures a default and "restores the parties to the *status quo ante*, a different and even more significant factor is introduced into the equitable equation.  That is, does the cure of a default under a plan have any impact on the allowable interest rate under § 506(b)?" *Id.*

The court in *Johnson* found that "Courts addressing the entitlement of interest at a default versus nondefault rate under § 506(b) have held that, by analogy to § 1124(2), when a debtor satisfies all elements of § 1124(2), the debtor has cured the default, and therefore need not pay the default rate of interest." *Id.* (internal citations omitted).  The court measured "cure" as of the petition date.  So long as the parties were returned to the *status quo ante* as of the petition date, then, all consequences of the default were deemed nullified, and the secured creditor could not then seek post-petition interest at the default rate.  *Id.* at 574-75.

Sagamore's confirmed Plan resulted in full payment to JPMCC of all contract rate interest and late fees, which by definition returned the parties to the *status quo ante* as of the

---

[227] 184 B.R. 570, 573 (Bankr. D. Minn. 1995).

Petition Date.  Thus, as the consequences of default were nullified by Sagamore's cure, JPMCC has no basis to assert any rights to Default Rate interest.

### 2. Default Interest is Not Interest at all, but Rather an Unreasonable Charge or Penalty

While section 506(b) on its face does not require that imposed interest be subjected to a reasonableness standard, it explicitly requires that any and all charges be reasonable.  11 U.S.C. § 506(b).  Here, despite the label placed upon it, JPMCC's claim for Default Rate "interest" is not a claim for interest at all, but rather a claim for a charge, and JPMCC cannot establish that the charge is reasonable under 11 U.S.C. § 506(b).[228]

In *In re AE Hotel Venture*,[229] the special servicer for the trustee of a securitization trust filed a secured proof of claim in the debtor's case, involving a Chicago hotel.  As here, the underlying loan documents in *AE Hotel* added certain charges in the event of a default, including late fees and default interest.[230]

The court in *AE Hotel* rejected the creditor's claim for default interest.  Like here, the subject loan documents in *AE Hotel* called for a 5% default rate increase over the note's original contract rate in the event of default.  *AE Hotel*, 321 B.R. at 213.  The court noted at the outset that – despite the nomenclature employed – the claim was not for interest at all, but rather for a charge.[231]  The court referenced the uncontroversial tenet that "interest compensates for the delay in receiving money owed: 'the loss of the time value of money.'"  *Id.* at 215 (internal citations and quotation omitted).  The creditor in *AE Hotel*, like here, bargained for the interest rate it

---

[228]  The JPMCC Related Parties mistakenly assert that Sagamore has not argued the unenforceability of Default Rate interest.  Opening Brief at 17, fn. 69.  This is incorrect.  In fact, Sagamore has consistently maintained that Default Rate interest in this case constitutes an unenforceable, unreasonable charge or penalty.  *See Debtor's (1) Objection to Claim No. 20-2 Filed by JPMCC 2006-LDP7 Miami Beach Lodging, LLC; and (2) Motion to Set Preliminary Hearing on Objection to Claim in Advance of Confirmation Hearing* [Main Case ECF No. 280], at 16 ("Default interest is not interest at all, but rather an unreasonable charge or penalty.").

[229]  321 B.R. 209 (Bankr. N.D. Ill. 2005).

[230]  *See* Loan Agreement § 2.2.4 (Default Rate) and § 2.3.5 (Late Fees).  The Loan Agreement defines "Default Rate" as "a rate per annum equal to the lesser of (a) the Maximum Legal Rate, and (b) five percent (5%) above the Interest Rate."  Loan Agreement § 1.1 (Definitions).

[231]  Other courts have reached the same conclusion.  *See In re Consolidated Props. Ltd. P'ship*, 152 B.R. 452, 455 (Bankr. D. Md. 1993) ("A default rate of interest that reflects a reasonable attempt to compensate a creditor for extra costs incurred after default is more in the nature of additional 'fees, costs, or charges provided for under the agreement' than mere 'interest on such claim', which is not tied to an underlying agreement by § 506(b).")

believed would compensate for the loss of the time value when it contracted with the debtor for the ordinary contract rate of interest.  Thus, the difference between the original rate and the default rate "could not have been meant to perform the usual function of interest.  The time value of [the creditor's] money, after all, did not magically increase by 5% once [the debtor] defaulted."[232]  *Id.*

Because default interest is intended to reimburse for the associated costs following a default, the *AE Hotel* court found that it is not a true interest at all, but rather a "charge" under section 506(b).  *Id.*  As such, despite JPMCC's protestations to the contrary,[233] Default Rate interest must be "reasonable" to be allowed, pursuant to 11 U.S.C. § 506(b).

Here, JPMCC failed to meet its burden of establishing the reasonableness of the Default Rate interest sought.  The Default Rate interest sought is, as the Bankruptcy Court found,[234] unreasonable and an unenforceable "penalty."[235]  Under the operative Loan Agreement, the parties negotiated late fees "in order to defray the expense incurred by Lender in handling and processing [] delinquent payment[s] and to compensate Lender for the loss of the use of such delinquent payment."  Loan Agreement, § 2.3.5.  Thus, by means of the prescribed late fees, the Loan Agreement accounts for the compensation reasonably expected in the event of a monetary default.  The addition of Default Rate interest, which in this case adds up to several millions of dollars, serves no purpose other than to penalize delinquency and induce full performance.[236]  In any event, JPMCC's arguments in this section are irrelevant and serve merely to distract from the real issues surrounding its failure to comply with the Loan Agreement's notice provisions when it issued the defective Notice of Default.

---

[232] The court also rejected the creditor's argument that the default interest could lawfully be charged to compensate for the risk of non-payment.  "Arguably, in fact, default interest *never* compensates for any risk of nonpayment."  *Id.* at 215, n. 8 (emphasis in original).

[233] Opening Brief at 15.

[234] Confirmation Order at 13.

[235] *See DSBC Investments, L.L.C.*, 2009 WL 2998940, *2 (finding the default rate to be a "penalty rate" or "penalty provision" within the meaning of § 365(b)(2)(D) because there was no showing of its compensatory feature).

[236] *See In re DWS Investments, Inc.*, 121 B.R. 845, 849 (Bankr. C.D.Cal. 1990) ("A default rate of interest should not be a penalty. Rather, it should be a means for compensating the creditor for any loss resulting from the nonpayment").

## VI. CONCLUSION

For the foregoing reasons, Sagamore respectfully requests that this Honorable Court (a) affirm the Confirmation Order; and (b) to the extent not rendered moot by the affirmed Confirmation Order (i) affirm the Adversary Judgment or, alternatively, dismiss the appeal of the Adversary Judgment on the grounds that the Court lacks jurisdiction given that the Directed Verdict Order, incorporated therein by reference, became a final and appealable order upon entry of the Bankruptcy Court's Order Denying Motion for Rehearing [Adversary Proceeding ECF No. 411] on November 16, 2012 and was not timely appealed, (ii) reverse the Rule 54(b) Opinion to the extent the Bankruptcy Court erred in certifying the Directed Verdict Order as final under Fed. R. Bankr. P. 7054(b)(1) when the Directed Verdict Order was in fact a final and appealable order on November 16, 2012, and (iii) reverse the Disclosure Statement Order.

Dated: May 13, 2013.

Respectfully submitted,

s/ Peter D. Russin
Peter D. Russin, Esquire
Florida Bar No. 765902
prussin@melandrussin.com
Zachary N. James
Florida Bar No. 893641
zjames@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Attorneys for Sagamore Partners, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 13, 2013, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system and that such document was served electronically on JPMCC 2006-LDP7 Miami Beach Lodging, LLC, LNR Partners, LLC, Berkadia Commerical Mortgage, LLC, Wells Fargo Bank, N.A., as Trustee and U.S. Bank National Association as Successor Trustee, and all other parties registered to receive Notices of Electronic Filing in this case.

<u>s/ Peter D. Russin</u>
Peter D. Russin, Esquire