## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 13-20708-CIV-ROSENBAUM

In re:

SAGAMORE PARTNERS, LTD.,
BANKRUPTCY APPEALS.

_____/

### OPINION AND ORDER

This matter is before the Court upon the Consolidated Opening Brief of Appellants/Cross Appellees JPMCC 2006-LDP7 Miami Beach Lodging, LLC ("JPMCC"), Berkadia Commercial Mortgage, LLC ("Berkadia"), LNR Partners, LLC ("LNR"), Wells Fargo Bank, N.A., as Trustee, and U.S. Bank National Association as Successor Trustee [ECF No. 15], and the Motion to Dismiss Appeals as Equitably Moot of Appellee/Cross-Apellant Sagamore Partners, Ltd. ("Sagamore") [ECF No. 25]. The Court has considered the brief, all supporting and opposing filings, and the record in this case. For the reasons set forth below, the Court affirms the Bankruptcy Court's confirmation of Sagamore's Amended Reorganization Plan and vacates and remands the Bankruptcy Court's denial of attorney's fees and costs.

### BACKGROUND

Sagamore is the owner and operator of the Sagamore Hotel, located in Miami Beach, Florida. ECF No. 15 at 4. Martin W. Taplin indirectly owns or controls a 100% interest in the entities that own Sagamore. *Id.*

On March 24, 2006, Arbor Commercial Mortgage, LLC, made a loan to Sagamore in the amount of $31.5 million secured by a mortgage on the hotel property. *Id.* The Note, Mortgage, and

Loan Agreement have since been assigned to JPMCC, and LNR is the special servicer of the loan. *Id.* Pursuant to the Loan Agreement, Sagamore was required to make interest-only payments on a monthly basis at a rate of 6.54% per annum, ("note rate"), until April 11, 2016, the maturity date of the loan. ECF No. 15-1 at 16, 30, § 2.3.3. On the maturity date, all amounts remaining unpaid, including the $31.5 million, would become payable. *Id.* at 30, § 2.3.4.

But if "any Event of Default shall have occurred and be continuing," interest would be calculated at the default rate of 5% above the note rate—or 11.54%—instead of at the note rate. *Id.* at 29, § 2.2.4. The Loan Agreement provides that an Event of Default occurs

> if (A) Borrower fails to (1) make any regularly scheduled payment with respect to any portion of the Debt when due; or (2) make any regularly scheduled monthly deposit into a Reserve when due; or (B) make any other payments within ten (10) days after receipt of written notice or invoice therefor;

*Id.* at 84, § 8.1(a)(i). Any notice to Sagamore "required or permitted" under the Agreement is effective only if hand delivered or sent to Sagamore's Florida address with a copy to Sagamore's counsel's address in New York. *Id.* at 98-99, § 10.6.

On August 10, 2009, Taplin sent a letter to the Master Servicer of the loan,[1] indicating that "Sagamore is not in a position to fund the August, 2009, [loan] payment" and that "[d]efault is imminent." ECF No. 15-1 at 207. Sagamore failed to make the August 2009 loan payment and all payments thereafter until Sagamore filed for bankruptcy on October 6, 2011, when it began to make monthly adequate protection payments equal to its monthly payments under the Loan Agreement at the note rate. *See In re Sagamore Partners, Ltd.*, No. 11-37867, ECF No. 1 (Bankr. S.D. Fla. Oct.

---

[1] At the time of Taplin's August 10, 2009, letter, Capmark Finance, Inc., was the Master Servicer of the loan. *See* ECF No. 15 at 5 n.13. Berkadia is the current Master Servicer. *Id.*

6, 2011).

On September 28, 2009, in response to Sagamore's failure to make the monthly loan payments, LNR sent Sagamore a letter notifying Sagamore that it was "in default under the Note and other Loan Documents by virtue of, among other things, its failure to pay all amounts when due thereunder." ECF No. 15-1 at 209. The letter noted that "if Lender does not receive all amounts due under the Loan within 10 days of receipt of this letter, Lender will take all such actions as it deems appropriate to protect its interest in the Loan and to collect the debt thereunder . . . . In the event any such actions are taken, Lender will also seek to recover its additional costs and expenses, including attorney's fees and court costs, incurred in any collection efforts." *Id.* The September 28, 2009, Default Notice was mailed to Sagamore's business address in Florida but not to Sagamore's counsel in New York. *See In re Sagamore Partners, Ltd.*, No. 11-03122, ECF No. 401 at 5 (Bankr. S.D. Fla. Nov. 8, 2012).

On November 19, 2009, counsel for JPMCC sent a letter to Sagamore indicating that because of Sagamore's default, JPMCC was accelerating the obligation of Sagamore to repay the loan. ECF No. 15-1 at 213-14. The letter declared the entire principal amount, all interest accrued, and all other amounts outstanding to be immediately due and payable. *Id.* On December 7, 2009, JPMCC initiated foreclosure proceedings in state court because of Sagamore's failure to make these payments. ECF No. 15 at 6.

But on October 6, 2011, days before a summary-judgment hearing was scheduled in the foreclosure proceedings, Sagamore filed for Chapter 11 bankruptcy in this District. *Sagamore*, No. 11-37867, ECF No. 1 (Bankr. S.D. Fla. Oct. 6, 2011). Sagamore then commenced an adversary proceeding to determine the validity, priority, and extent of liens on the property (Count I) and to

object to Creditor JPMCC's unliquidated claim in the amount of $31.5 million (Count II), among other counts. *Sagamore*, No. 11-03122, ECF No. 1 at 43-46, ¶¶ 131-142 (Bankr. S.D. Fla. Dec. 27, 2011).

On March 2, 2012, Sagamore filed a reorganization plan that proposed to cure all amounts due to JPMCC under the loan and render JPMCC's secured loan unimpaired. *Sagamore*, No. 11-37867, ECF No. 110 (Bankr. S.D. Fla. Mar. 2, 2012). But a dispute arose between the parties about whether Sagamore must pay $5,416,250.00 in accrued default-rate interest to cure the loan or could, instead, cure the loan by paying interest at the lower note rate. In an Order sustaining JPMCC's objections to a Disclosure Statement issued by Sagamore in connection with its reorganization plan ("Disclosure Statement Order"), the Honorable A. Jay Cristol initially determined that, under the most persuasive case law, Sagamore must pay all amounts due, including interest at the default rate, to cure the loan. *Sagamore*, No. 11-37867, ECF No. 213 (Bankr. S.D. Fla. July 10, 2012).

Upon hearing evidence at trial[2] in the adversary proceeding that JPMCC failed to send its September 28, 2009, Notice of Default to Sagamore's counsel in New York, however, the Bankruptcy Court determined, as part of its Directed Verdict Order, that Sagamore and its counsel were not provided with sufficient notice of the default as required by the Loan Agreement. *Sagamore*, No. 11-03122, ECF No. 401 (Bankr. S.D. Fla. Nov. 8, 2012). Based on the determination that JPMCC had never served Sagamore with a proper notice of default, the Bankruptcy Court later

---

[2] The Bankruptcy Court bifurcated the trial and tried Counts I and II of the Adversary Complaint separately from all other counts. *Sagamore*, No. 11-03122, ECF No. 339 (Bankr. S.D. Fla. Oct. 26, 2012).

held, in an Order confirming Sagamore's amended reorganization plan[3] in the main bankruptcy case ("Confirmation Order"), that JPMCC is not entitled to interest at the default rate or attorney's fees and costs. *Sagamore*, No. 11-37867, ECF No. 521 at 4 (Bankr. S.D. Fla. Dec. 26, 2012). The Bankruptcy Court also reasoned that default-rate interest was improper because JPMCC initially elected to charge Sagamore late fees instead of default interest, and a Lender cannot charge both late fees and default interest under applicable law. *Id.* at 11-16. In addition, the Confirmation Order rejected JPMCC's arguments that Sagamore had defaulted on the management provisions of the Loan Agreement and that the Reorganization Plan was not feasible. *Id.* at 17-19, 21-24.

After entry of the Confirmation Order, JPMCC moved the Bankruptcy Court to certify that the previous Directed Verdict Order, on which the Confirmation Order based its determination that interest should be paid at the note rate, was final and appealable pursuant to Rule 54(b), Fed. R. Civ. P. *Sagamore*, No. 11-03122, ECF No. 421 (Bankr. S.D. Fla. Dec. 27, 2012). The Bankruptcy Court determined that the Directed Verdict Order was not a final order because it granted only partial disposition in the adversary proceeding. *Id.* ECF No. 430 (Bankr. S.D. Fla. Jan. 11, 2013). Nevertheless, the Bankruptcy Court certified the Directed Verdict Order as appealable in the interest of judicial economy and because "[t]he Court is loath to deny a party the opportunity to seek review of the Court's orders where the economic consequences of the order are as significant as they are here." *Id.* at 9. The Bankruptcy Court thereafter entered Final Judgment in the adversary proceeding, ("Adversary Judgment"), in favor of Sagamore and against JPMCC solely as to the determinations

---

[3] After the Bankruptcy Court initially determined in the Disclosure Statement Order that, under the law, Sagamore must pay interest at the Default Rate to cure the loan, Sagamore amended its reorganization plan to create a Distribution Fund that "shall have all of the funds required to reinstate the indebtedness [to JPMCC], whatever that amount is, as determined by the Court." *Sagamore*, No. 11-37867, ECF No. 216 at 11 (Bankr. S.D. Fla. July 11, 2012).

-5-

concerning the Notice of Default as set forth in the Directed Verdict Order. *Id.* ECF No. 431.

JPMCC appealed the Confirmation Order and, upon the Bankruptcy Court's certification, all Appellants appealed the Adversary Judgment. ECF No. 1; *Berkadia Commercial Mortgage, LLC v. Sagamore Partners, Ltd.*, No. 13-20709, ECF No. 1 (S.D. Fla. Feb. 27, 2013). Sagamore, however, disagreed with the Bankruptcy Court about the appealability of the determinations in the Directed Verdict Order and therefore appealed the Bankruptcy Court's Rule 54(b) Order. *Sagamore Partners, Ltd. v. JPMCC 2006-LDP7 Miami Beach Lodging, LLC*, No. 13-20853, ECF No. 1 (S.D. Fla. Mar. 8, 2013).

On August 8, 2012, prior to the Bankruptcy Court's determination of the sufficiency of the Notice of Default, Sagamore had moved the Honorable Kenneth A. Marra for leave to appeal the Bankruptcy Court's Disclosure Statement Order that had initially found that JPMCC was entitled to interest at the default rate. *Sagamore Partners, Ltd. v. JPMCC 2006-LDP7 Miami Beach Lodging, LLC*, No. 12-23195, ECF No. 1 (S.D. Fla. Aug. 30, 2012). Judge Marra denied the Motion for Leave to Appeal because the "interlocutory appeal will not materially advance the ultimate termination of this case." *Id.* ECF No. 5 at 6. Judge Marra nevertheless concluded that "after entry of a final appealable order, Sagamore can challenge the Bankruptcy Court's ruling that it must pay default interest to render the secured lender unimpaired." Sagamore now cross-appeals the Confirmation Order in the main bankruptcy case "solely to preserve its right to seek review of the [Disclosure Statement Order]." ECF No. 24 at 2. All appeals have been consolidated under the instant case number. ECF No. 12.

### *JURISDICTION*

Federal courts are courts of limited jurisdiction. *Federated Mut. Ins. Co. v. McKinnon*

*Motors, LLC*, 329 F.3d 805, 807 (11th Cir. 2003). With regard to appeals from bankruptcy courts, district courts enjoy jurisdiction over only three types of orders: (1) final orders, as described in 28 U.S.C. § 158(a)(1); (2) interlocutory appeals issued under 11 U.S.C. § 1121(d), as described in 28 U.S.C. § 158(a)(2); and, (3) with leave of the court, other interlocutory orders, as described in 28 U.S.C. § 158(a)(3) and Fed. R. Bankr. Pro. 8001(b). *Tobkin v. Calderin*, 2012 WL 3609867, at *1 (S.D. Fla. Aug. 22, 2012). As this Court has explained, district courts have jurisdiction to hear appeals "from final judgments, orders, and decrees." *Id.* at *1-*2; 28 U.S.C. § 158(a)(1).

Both parties have appealed the Confirmation Order and do not dispute that it is a final, appealable order. *See In re Lindsey*, 726 F.3d 857, 859 (6th Cir. 2013) (order confirming reorganization plan is appealable as a final order); *In re Woolsey*, 696 F.3d 1266, 1269 (10th Cir. 2012) (premature notice of appeal ripens upon issuance of final order approving reorganization plan). But Sagamore, through its appeal of the Rule 54(b) Order, disagrees with the appealability of the determinations made in the Directed Verdict Order. ECF No. 24 at 21-23. Appellants, in turn, contest Sagamore's appeal, through the cross-appeal of the Confirmation Order, of the determinations made in the Disclosure Statement Order. ECF No. 26 at 9-10.

Sagamore contends that the Directed Verdict Order was a final, appealable order but Appellants failed to appeal the Order within fourteen days of its entry, as required by Rule 8002(a), Fed. R. Bankr. P. Thus, according to Sagamore, Appellants' attack of the issues addressed in the Directed Verdict Order through their timely appeals of the Confirmation Order and Adversary Judgment is improper. ECF No. 24 at 21.

Sagamore correctly notes that "bankruptcy is an aggregation of controversies and suits" and therefore "[f]inality is given a more flexible interpretation in the bankruptcy context." *In re*

-7-

*Donovan*, 532 F.3d 1134, 1136 (11th Cir. 2008) (citing *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1548 (11th Cir. 1996)). But "in bankruptcy, adversary proceedings generally are viewed as 'stand-alone lawsuits,' and final judgments issued in adversary proceedings are usually appealable as if the dispute had arisen outside of bankruptcy." *In re Boca Arena, Inc.*, 184 F.3d 1285, 1286 (11th Cir. 1999) (citing 16 Wright, Miller & Cooper, Federal Practice and Procedure, Jurisdiction 2d § 3926.2 (2d ed. 1996)). "[A] bankruptcy order that disposes of fewer than all claims or parties in an adversary proceeding is not immediately appealable unless the bankruptcy judge certifies the order for immediate review pursuant to Bankruptcy Rule 7054, which incorporates Fed. R. Civ. P. 54(b)." *Id.*

The appealability of an interlocutory order in an adversary proceeding is therefore governed by the standard of appealability in the non-bankruptcy context instead of the flexible bankruptcy standard. *See Figueroa v. Wells Fargo Bank N.A.*, 382 B.R. 814, 820-21 (S.D. Fla. 2007) (collecting cases). Sagamore's arguments that even Appellants and the Bankruptcy Court have previously indicated that they believed the Directed Verdict Order "finally decided the issues raised by Counts I and II of the Amended Complaint" does not control the issue of the Order's appealability because, in the non-bankruptcy context, most interlocutory orders are not appealable as of right. ECF No. 24 at 22; *see also* 28 U.S.C. § 1292. The Bankruptcy Court correctly noted that the Directed Verdict Order partially—but not completely—resolved the issues of the adversary proceeding. *Sagamore*, No. 11-03122, ECF No. 430 at 6. The Directed Verdict Order itself expressly reserved judgment on the amount of JPMCC's lien. *Id.* ECF No. 401 at 8 ("In regard to the amount due to JPMCC, the Court is not satisfied with the evidence offered by JPMCC at trial and the amount due is subject to further calculation."). And even assuming that the Directed Verdict Order was truly a "fully consummated decision" with respect to the first two counts of Sagamore's Adversary Complaint,

the Order did not address the other ten counts in the Complaint and was therefore "but [a] step[] towards final judgment in which [it] will merge." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (discussing appealability of interlocutory orders under 28 U.S.C. § 1292). It is only the final judgment that entirely resolves the adversary proceeding that is appealable as of right. *See Commodore Holdings, Inc. v. Exxon Mobil Corp.*, 331 F.3d 1257, 1259 (11th Cir. 2003) (quoting *In re Charter Co.*, 778 F.2d 617, 621 (11th Cir. 1985)).

Nor did the Directed Verdict Order, by itself, completely resolve the issue central to this appeal because at the time of the Directed Verdict Order, the Bankruptcy Court had determined only that the Notice of Default was insufficient but had not yet concluded that, because of that insufficiency, JPMCC was not entitled to default-rate interest. The later Confirmation Order's denial of default-rate interest nevertheless relies heavily on the Directed Verdict Order's determination that the Notice of Default was insufficient. The Bankruptcy Court therefore did not err in granting the Motion for Rule 54(b) Certification so that the central issue behind the denial of default-rate interest—the insufficiency of the Notice of Default—could be considered on JPMCC's timely appeal of the Confirmation Order. As a result, the Court affirms the Bankruptcy Court's Rule 54(b) Order that certified as appealable the determinations made in the Directed Verdict Order.

Appellants, in turn, suggest that Sagamore's cross-appeal of the Confirmation Order to preserve its right to seek review of the Disclosure Statement Order is improper because, after Sagamore filed its Amended Reorganization Plan, a live controversy surrounding the original reorganization plan on which the Disclosure Statement Order was based no longer exists. ECF No. 26 at 10. "A court may not proceed to hear an action if, subsequent to its initiation, the dispute loses 'its character as a present, live controversy of the kind that must exist if [the court is] to avoid

advisory opinions on abstract propositions of law.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 212-13 (2000) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam)).

But the mere fact that Sagamore amended its reorganization plan after the Bankruptcy Court issued the Disclosure Statement Order does not somehow terminate the controversy between the parties about whether, under the law, a debtor must pay all amounts due to the creditor at the default rate of interest instead of at the note rate for the creditor's claim to be unimpaired. In its Amended Reorganization Plan, Sagamore did not specifically concede that the law required payment of interest at the default rate but, rather, merely indicated that it would "reinstate the indebtedness [to JPMCC], whatever that amount is, as determined by the Court." *Sagamore*, No. 11-37867, ECF No. 216 at 11 (Bankr. S.D. Fla. July 11, 2012). Whether the law requires payment of interest at the default rate to render a creditor's claim unimpaired controls the controversy at issue in the instant appeal: the amount that Sagamore must pay JPMCC under the Reorganization Plan. The parties' extensive briefing on this very issue indicates that the "[t]he essential controversy is therefore not moot, but very much alive." *Allee v. Medrano*, 416 U.S. 802, 811 (1974). Accordingly, the Court has jurisdiction to consider Sagamore's cross-appeal of the Disclosure Statement Order.

## STANDARD OF REVIEW

Bankruptcy courts are governed by the Federal Rules of Bankruptcy Procedure. Under Rule 8013, Fed. R. Bankr. P., a district court reviews the factual findings of a bankruptcy court for clear error. As for the conclusions of law of the bankruptcy court and the application of the law to the particular facts of the case, a district court must conduct a *de novo* review. *See In re Feingold*, 474 B.R. 293, 294 (S.D. Fla. 2012) (citing *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009);

*In re Club Assocs.*, 951 F.2d 1223, 1228-29 (11th Cir.1992)) ("The Court reviews the Bankruptcy

Court's factual findings for clear error and its legal conclusions *de novo*").

## DISCUSSION

### A. The Requirement to Pay Default-Rate Interest Under the Bankruptcy Code

Sagamore's cross-appeal challenges the Bankruptcy Court's initial determination in the

Disclosure Statement Order that the Bankruptcy Code requires the payment of interest at the default

rate to render a claim unimpaired. ECF No. 24 at 30-39. Generally, a bankruptcy court can confirm

a debtor's Chapter 11 reorganization plan only if those creditors whose claims are impaired by the

plan approve of the plan. 11 U.S.C. § 1129(a)(7). But creditors with unimpaired claims need not

approve of the plan before the bankruptcy court can confirm the plan. *Id.* § 1129(a)(8). Section 1124

of the Bankruptcy Code provides guidance about which types of claims are considered unimpaired

under a plan:

> . . . a class of claims or interests is impaired under a plan unless, with
> respect to each claim or interest of such class, the plan–
>
> > (1) leaves unaltered the legal, equitable, and contractual rights
> > to which such claim or interest entitles the holder of such
> > claim or interest; or
> >
> > (2) notwithstanding any contractual provision or applicable
> > law that entitles the holder of such claim or interest to
> > demand or receive accelerated payment of such claim or
> > interest after the occurrence of a default–
> >
> > > (A) cures any such default that occurred before or
> > > after the commencement of the case under this title,
> > > other than a default of a kind specified in section
> > > 365(b)(2) of this title or of a kind that section
> > > 365(b)(2) expressly does not require to be cured;
> > >
> > > (B) reinstates the maturity of such claim or interest as
> > > such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124. Therefore, a claim is considered impaired if the plan alters the legal, equitable, and contractual rights of the claim holder. *Id.* § 1124(1). Holders of these impaired claims have the right to vote on a Chapter 11 plan. *See In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982).

But "Congress carved out a small exception to impairment in s 1124(2) providing that curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby 'impair' a creditor's claim." *Id.* at 28-29. "The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain" and no right to vote on the plan. *Id.* at 29 (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 120 (1978)). Thus, if the plan proposes to cure a default, the claim is not impaired, and the claim holder "is conclusively presumed to have accepted the plan." *In re Entz-White Lumber & Supply, Inc.*, 850 F.2d 1338, 1340 n.3 (9th Cir. 1988) (quoting 5 L. King, Collier on Bankruptcy ¶ 1124.03, at 1124-10 (15th ed. 1988)).

Before 1994, the Bankruptcy Code did not define the term "cure." *See Entz-White*, 850 F.2d

-12-

at 1340; *Matter of Clark*, 738 F.2d 869, 871 (7th Cir. 1984). Courts at this time determined what, exactly, a debtor must do to "cure" a default based on the general principle that to cure a default means "to restore matters to the *status quo ante.*" *Entz-White*, 850 F.2d at 1340 (quoting *Clark*, 738 F.2d at 871). If curing is meant to return the creditor to pre-default conditions, these courts reasoned, then "all consequences of default, including avoidance of default penalties such as higher interest," are nullified by the cure. *Entz-White*, 850 F.2d at 1342; *see also In re Se. Co.*, 868 F.2d 335, 338 (9th Cir. 1989); *Matter of Madison Hotel Associates*, 749 F.2d 410, 420-21 (7th Cir. 1984) (payment of interest at the lower pre-default rate to cure under § 1124(2) aligns with Congress's intent that Chapter 11 reorganization be a more economically efficient method to compensate creditors than outright liquidation of the debtor's assets); *In re Singer Island Hotel, Ltd.*, 95 B.R. 845, 848 (Bankr. S.D. Fla. 1989).

But in 1994, Congress enacted 11 U.S.C. § 1123(d), which provides,

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

11 U.S.C. § 1123(d). With the enactment of § 1123(d), courts must now look at the underlying agreement and applicable nonbankruptcy law in order to determine how much a debtor must pay in order to cure a default.

Congress enacted § 1123(d) in the wake of the Supreme Court's decision in *Rake v. Wade*, 508 U.S. 464, 466 (1993), in which the Court held that the Bankruptcy Code entitles oversecured creditors to interest on arrearages of home-mortgage payments under a Chapter 13 plan, notwithstanding state law to the contrary and the lack of a provision requiring such interest in the

-13-

underlying agreement. *Id.* at 467. As the House Judiciary Committee Report explained,

> This section will have the effect of overruling the decision of the Supreme Court in *Rake v. Wade*, 113 S.Ct. 2187 (1993). . . . Notwithstanding State law, this case has had the effect of providing a windfall to secured creditors at the expense of unsecured creditors by forcing debtors to pay the bulk of their income to satisfy the secured creditors' claims. This had the effect of giving secured creditors interest on interest payments, and interest on the late charges and other fees, even where applicable laws prohibit[] such interest and even when it was something that was not contemplated by either party in the original transaction. . . . It is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred.

H.R. Rep. No. 103-835, at 55 (1994); *see also In re Moody Nat. SHS Houston H, LLC*, 426 B.R. 667, 674 (Bankr. S.D. Tex. 2010). Because the *Rake* Court held that the Bankruptcy Code required interest when state law and the underlying agreement did not, § 1123(d)—which provides that a cure amount is determined by the underlying agreement and state law—therefore "put the debtor in the same position as if the default had never occurred." *Id.* This case, however, presents the dilemma of what to do when the underlying agreement does provide for higher default-rate interest, which, if honored under § 1123(d), does not put the parties in a position as if the default had never occurred.

After the 1994 amendments, some courts have considered § 1123(d) to finally define "cure" and fill in the statutory gap that previous courts had filled by resorting to the principle that a cure restores the parties to the *status quo ante*. Instead of applying a presumption that the parties have returned to pre-default conditions and the consequences of the default have never arisen, these courts see § 1123(d) as requiring courts to honor provisions in the underlying agreements or state law that do provide for higher default-rate interest or other late fees. *See In re 1 Ashbury Court Partners, L.L.C.*, No. 11-10131, 2011 WL 4712010, at *4 (Bankr. D. Kan. Oct. 5, 2011) (Section 1123(d) "was enacted in 1994 for the specific purpose of clarifying (unfortunately in a not very clear way) that cure

-14-

and reinstatement required more than simply rolling back the clock as some courts had held"); *Moody*, 426 B.R. at 672 ("To the extent that there was ambiguity as to how to cure a default [prior to 1994], that ambiguity evaporated in 1994 when § 1123(d) was added"); *In re K & J Properties, Inc.*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005) ("The 1994 amendments to section 1123 appear specifically to address this matter," and curing a default under a plan does not eliminate otherwise enforceable, accrued default interest).

But other courts, primarily in the Ninth Circuit, have been reluctant to decide that § 1123(d) overturns that circuit's precedent holding that payment of default-rate interest or late fees is required to cure a default. Some of these courts have merely followed the holding of the pre-1994 cases without discussing the § 1123(d) amendment. *See In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1075 (9th Cir. 2002); *In re Udhus*, 218 B.R. 513, 518 (B.A.P. 9th Cir. 1998).

The bankruptcy court in *In re Phoenix Business Park Ltd. Partnership*, 257 B.R. 517 (Bankr. D. Ariz. 2001), however, addressed § 1123(d) and concluded that the 1994 amendments did not overturn prior Ninth Circuit precedent. In reaching this conclusion, the court relied on 11 U.S.C. § 365(b)(2)(D), a section added to the Bankruptcy Code at the same time as § 1123(d). A claim is unimpaired under § 1124(2)(A) if a plan cures any defaults associated with the claim, but § 1124(2)(A) provides that a plan need not cure defaults "of a kind specified in § 365(b)(2)."[4] 11

---

[4] Section 365(b)(2) lists defaults that breach a provision relating to–

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

U.S.C. § 1124(2)(A). These § 365(b)(2) defaults include "any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under [an] executory contract or unexpired lease."[5] 11 U.S.C. § 365(b)(2)(D).  The *Phoenix Business Park* Court relied on Ninth Circuit precedent that suggests that the secondary modifier concerning nonmonetary obligations applies to "penalty provisions" only and not to "penalty rates" in order to determine that § 1124(2)(A) would not apply to penalty rates triggered by, for example, a payment failure. *Id.* at 521. Because the court had "little difficulty" in determining that the creditor's monthly late fees of $1,056.00 together with a default rate of 24%—against a contract rate of 10.75%—could be considered a "penalty rate" under § 365(b)(2)(D), the court therefore reasoned that the debtor need not satisfy this penalty rate in order to effectuate a cure and leave the creditor unimpaired. *Id.* at 521.

In an attempt to harmonize the two provisions that Congress added to the Bankruptcy Code in 1994—§ 1123(d), which seems to require the payment of default interest if provided for by contract or state law, and § 365(b)(2)(D), which, according to *Phoenix Business Park*, seems to excuse the payment of default-rate interest if it is a penalty rate—the *Phoenix Business Park* Court

---

(D) the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2).

[5] "[E]xecutory contracts are those on which performance remains due to some extent on both sides." *In re Gen. Dev. Corp.*, 84 F.3d 1364 (11th Cir. 1996) (internal quotation marks omitted). Though other circuits consider a promissory note to be neither a lease nor an executory contract, *see In re Craig*, 144 F.3d 593, 596 (8th Cir. 1998); *In re Dixon*, 990 F.2d 626 (5th Cir. 1993), the Eleventh Circuit has indicated that promissory notes are executory contracts. *See Ohio Nat. Life Assur. Corp. v. Langkau ex rel. Estate of Langkau*, 353 F. App'x 244, 254 (11th Cir. 2009); *In re Airlift Intern., Inc.*, 761 F.2d 1503, 1508 (11th Cir. 1985).

looked to the legislative history of § 1123(d) to determine that Congress did not intend to overrule Ninth Circuit precedent that payment of default-rate interest was not required to cure under § 1124(2). *Id.* at 521-22.

The court determined that the legislative history of § 1123(d) indicates that the amendment's purpose was restricted to the limited issue addressed by the Supreme Court in *Rake v. Wade*, namely, the payment of interest on arrearages in consumer mortgage payments. *Id.* The court based this determination on the fact that the language of § 1123(d) was included in the title of the Reform Act that concerned consumer bankruptcy and not in the title concerning corporate bankruptcy and because Congress added identical language to Chapter 13 of the Code, which concerns consumer bankruptcy only. *Id.*; *see also Forestry Products, Inc. v. Hope*, 34 B.R. 753, 754 (M.D. Ga. 1983) ("corporations are not to be considered individuals, and only individuals may file under Chapter 13"). The court also noted that if § 1123(d) is truly meant to take precedence over § 365(b)(2)(D), Congress would have referenced § 365(b)(2)(D) in the limiting preliminary language of § 1123(d). *Id.* Instead, § 1123(d) provides that it applies notwithstanding other enumerated provisions of the Code, including § 506(b)—the provision at issue in *Rake v. Wade*—but does not reference § 365(b)(2)(D). *Id.* The court therefore concluded that the legislative history suggests that Ninth Circuit precedent holding that payment of default-rate interest is not required to effectuate a cure should remain good law. *Id.*; *see also In re Zamani*, 390 B.R. 680, 687 (Bankr. N.D. Cal. 2008) (following the reasoning of *Phoenix Business Park*).

But the *Phoenix Business Park* Court's determination that a broad, text-based interpretation of § 1123(d) is incompatible with § 365(b)(2)(D) stems from the court's own broad reading of § 365(b)(2)(D). The court's interpretation that Ninth Circuit precedent does "not suggest in any way

that the secondary modifier [of § 365(b)(2)(D) ] ('relating to a default arising from any failure of the Debtor to perform nonmonetary obligations') also modified the first clause ('penalty rate')" leads to the conclusion that § 365(b)(2)(D) would cover *any* penalty rate, whether monetary or nonmonetary.[6] *Phoenix Business Park*, 257 B.R. at 521; *see also Zamani*, 390 B.R. at 686 (similarly

_____

[6] Nor is this Court convinced that the Ninth Circuit precedent to which the *Phoenix Business Park* and *Zamani* courts cite continues to mandate the reading of § 365(b)(2)(D) espoused by those courts. In *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029 (9th Cir. 1997), the Ninth Circuit Court of Appeals analyzed an earlier version of § 365(b)(2)(D) that contained the word "penalty" before the word "rate" but not the word "provision." *Id.* at 1033-35. The earlier version of the statutory provision therefore applied to a default arising from failure to satisfy "any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease." Bankruptcy Reform Act of 1994, § 219, Pub. L. No. 103-394, 108 Stat. 4106 (1994). At issue in *Claremont* was whether the previous version of § 365(b)(2)(D) applied to a provision relating to a nonmonetary obligation that was not necessarily a *penalty* provision. *Claremont*, 113 F.3d at 1033.

The court looked to the general structure of § 365(b)(2) and concluded that the adjective "penalty" applies not only to "rates" but also to "provisions." In reaching this determination, the court observed that "[i]n each instance that Congress added a separate or independent exception to § 365(b)(1), it created a separate subclause in § 365(b)(2). [But an interpretation that § 365(b)(2)(D) applies to rates that are penalty rates only and any type of provisions, whether penalty or non-penalty,] requires a deviation from that general construction principle, as it results in a single subclause containing two completely different and unrelated exceptions." *Id.* at 1034. The court also noted that "if subsection (D) is a catch-all provision . . . then subsections (A) through (C) of § 365(b)(2) would be superfluous, as they would be encompassed by subsection (D)." *Id.*

Congress resolved the issue in 2005 when it amended § 365(b)(2)(D) by adding a second "penalty" adjective before the word "provision." Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, § 328, Pub. L. No. 109-8, 119 Stat. 23 ("striking 'penalty rate or provision' and inserting 'penalty rate or penalty provision'"). Nevertheless, *Claremont*'s reading of the previous version of § 365(b)(2)(D) remains instructive in the present matter. The statutory-construction argument that the four independent provisions of § 365(b)(2) each contain a single exception to § 365(b)(1) cuts against *Phoenix Business Park*'s reading that § 365(b)(2) should apply to two different and unrelated exceptions: *any* penalty rate whether monetary or nonmonetary, and only those penalty provisions that are nonmonetary.

Furthermore, *Claremont*'s reasoning is rooted in the notion that the word "or" should not act as a barrier between all that comes before it and all that comes after it but, instead, should unify the concepts of "rate" and "provision." *Claremont*, 113 F.3d at 1033. The statute is not to be read as "[the satisfaction of any penalty rate] or [provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease]," because, as the court notes, such a construction is "both grammatically incorrect and nonsensical."

interpreting the same Ninth Circuit precedent). But no Eleventh Circuit precedent instructs this Court to similarly interpret the language of § 365(b)(2)(D), and "the majority view [instead] considers that both the 'penalty rate' and the 'penalty provision' language refer to and modify the words beginning with 'relating to,' meaning that only penalty rates that punish non-monetary default need not be cured." *1 Ashbury Court Partners, L.L.C.*, 2011 WL 4712010, at *4 (citing *Moody*, 426 B.R. 667; *In re General Growth Properties, Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011)). By reading § 365(b)(2)(D) to limit its applicability to the consequences of the failure to perform nonmonetary obligations only, and not to the consequences of all types of default, courts can avoid "writ[ing] § 1123(d) out of the Code." *Id.*; *see also Moody*, 426 B.R. at 674 ("It would stretch the language of § 1124(2)(A) far beyond its plain meaning to believe that it refers to any default rate of interest on any type of agreement."). A debtor would therefore need to cure defaults that arise from monetary obligations—but not those that arise from nonmonetary obligations—in order to leave the creditor unimpaired. This reading harmonizes §§ 365(b)(2)(D) and 1123(d) without contravening the plain language of either.

This Court further respectfully disagrees that the legislative history suggests that Congress intended § 1123(d) to apply only to consumer bankruptcy and not to corporate bankruptcy. Chapter 11 bankruptcy is available to both individuals and corporations, and Congress amended Chapter 11 with § 1123(d). *See Toibb v. Radloff*, 501 U.S. 157, 166 (1991) (Stevens, J., dissenting) ("Chapter

---

*Id.* at 1034. Instead, the statute should read, "the satisfaction of any penalty [rate or provision] relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease," so that all words of the statute apply equally to both "rate" and "provision." *Id.* Such a reading therefore suggests that § 365(b)(2)(D) applies not to just *any* penalty rate but, rather, to only those penalty rates that arise from a failure to perform nonmonetary obligations.

11 . . . was primarily designed to provide relief for corporate debtors but also unquestionably authorizes relief for individual proprietors of business enterprises"). If Congress had indeed intended to limit the applicability of § 1123(d) to consumer bankruptcy only, it would have so indicated in the text of the statute, not by implication through the uncodified structure of the Reform Act. *See Ex parte Collett*, 337 U.S. 55, 61 (1949) (quoting *Gemsco, Inc., v. Walling*, 324 U.S. 244, 260 (1945)) ("The plain words and meaning of a statute cannot be overcome by a legislative history which through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction."). And though the codification of an identical provision in Chapter 13—which applies only to individuals—may reinforce the notion that Congress intended § 1123(d) to apply to individual bankruptcy, it does not suggest that Congress intended that § 1123(d) not apply to corporate bankruptcy.

In addition, though the House Report does suggest that "[i]t is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred," the Committee also notes that it objected to the Supreme Court's holding in *Rake* because that decision mandated interest when "applicable laws prohibit[] such interest and even when it was something that was not contemplated by either party in the original transaction." H.R. Rep. No. 103-835, at 55 (1994). Congress's two apparent objectives that a debtor cure in accordance with state law and the underlying agreement and that debtors be placed in the same position as if default had never occurred were aligned under the facts of *Rake*, but they are at odds under the facts in the instant matter. The plain language of § 1123(d), however, codifies the congressional intent that a cure honor state law and the underlying contract but makes no reference to placing the debtor in a position as if the cure had never happened. "Given the straightforward statutory command, there

-20-

is no reason to resort to legislative history." *United States v. Gonzales*, 520 U.S. 1, 6 (1997) (citing *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)).

Sagamore's argument that default rate interest is not required relies primarily on decisions made before 1994 that no longer control the Court's interpretation of § 1124(2)(A). *See* ECF No. 24 at 33-34. Sagamore also argues that because § 1124(2)(A) is not referenced in the limiting introductory language of § 1123(d), the later provision should not apply to the former. *Id.* at 35. But just because Congress specified that § 1123(d) applies "[n]otwithstanding [§ 1123(a)] and sections 506(b),[7] 1129(a)(7), and 1129(b) of this title" does not suggest that § 1123(d) should apply only to those enumerated provisions of the Code and to no others. 11 U.S.C. § 1123(d). Far from limiting the application of § 1123(d), the introductory language suggests that § 1123(d) should be applied as broadly as possible, notwithstanding other provisions in the Code that would otherwise limit § 1123(d). Thus, contrary to Sagamore's assertion that a debtor may ignore § 1123(d) when effectuating a cure as part of the four requirements of § 1124(2)(A), the former provision applies to the later and delineates what form the cure must take. *See In re 139-141 Owners Corp.*, 306 B.R. 763, 768 (Bankr. S.D.N.Y. 2004), *aff'd in part, vacated in part, remanded*, 313 B.R. 364 (S.D.N.Y. 2004) ("Nothing in the statute provides expressly or by implication that a debtor has the power to avoid or vitiate a secured creditor's contractual right to default interest by complying with the four subdivisions of [§ 1124(2)]").

The Bankruptcy Court therefore did not err in concluding that the plain language of § 1123(d)

---

[7] Section 506(b) "allow[s] to the holder of [an oversecured] claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b). The Supreme Court relied heavily on this provision to reach its holding in *Rake*. *See Rake*, 508 U.S. at 470-72.

-21-

mandated payment of default-rate interest in accordance with the terms of the Loan Agreement to cure Sagamore's default.

## B. The Sufficiency of the Notice of Default

Though the Bankruptcy Court initially found that the Bankruptcy Code requires the court to honor the Loan Agreement's provision for default-rate interest, the Bankruptcy Court later determined that JPMCC did not provide Sagamore with sufficient notice of the default and therefore concluded that JPMCC was not entitled to default-rate interest. JPMCC counters that it is immaterial whether the notice of default took the contractually mandated form because no notice was required to trigger an Event of Default, which, according to JPMCC, in and of itself, entitles JPMCC to default-rate interest. ECF No. 15 at 16-24. An Event of Default occurred, JPMCC argues, immediately upon Sagamore's failure to make its regularly scheduled loan payments. *Id.* This Court agrees.

Section 8.1 of the Loan Agreement provides,

> Event of Default. (a) Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

> > (i) if (A) Borrower fails to (1) make any regularly scheduled payment with respect to any portion of the Debt when due; or (2) make any regularly scheduled monthly deposit into a Reserve when due; *or* (B) make any other payments within ten (10) days after receipt of written notice or invoice therefor;

> > . . . .

> > (xv) if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xiv) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money . . .

ECF No. 15-1 at 84, § 8.1 (emphasis added). Thus, under the plain language of the Loan Agreement, an Event of Default may occur when Sagamore fails to make any regularly scheduled payments. *See id.* The Loan Agreement provides that Sagamore would make "consecutive monthly payments of interest only accruing on the outstanding principal balance of the Loan at the Interest Rate." *Id.* at 29-30, § 2.3.1. Because the loan payments are a "regularly scheduled payment," Sagamore defaulted immediately upon its failure to make the loan payment.

The Loan Agreement further provides that, upon the occurrence or during the continuance of an Event of Default, Lender may take actions "without notice or demand" such as declaring the debt to be immediately due and payable. *Id.* at 86, § 8.1(b). In addition, the Loan Agreement provides that Sagamore "expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding." ECF No. 15-1 at 86, § 8.1(b). Moreover, Sagamore "expressly waives, and shall not be entitled to any notices of any nature whatsoever from Lender" except for those notices that the Agreement or applicable law expressly require. *Id.* at 100, § 10.11. But Sagamore points to no provision of the Loan Agreement or law that expressly requires notice in order to trigger an Event of Default upon nonpayment of a regularly scheduled payment.

Sagamore instead points to § 10.6 of the Loan Agreement, the section under which the Bankruptcy Court determined that the September 28, 2009, Notice of Default was insufficient because JPMCC did not send the Notice to Sagamore's counsel. ECF No. 24 at 12-21. That section provides,

> Notices. All notices, consents, approvals and requests *required or permitted* hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent . . . addressed as follows

. . . .

    If to Borrower:            [Sagamore's address]

    With a copy to:            [Sagamore's counsel's address]

ECF No. 15-1 at 98, § 10.6 (emphasis added). The Bankruptcy Court considered the Loan Agreement ambiguous and inconsistent because §§ 8.1 and 10.11 do not require notice to be provided in order for an Event of Default to occur on a regularly scheduled payment, but § 10.6 nevertheless mandates that both required and permitted notices take a certain form. *Sagamore*, No. 11-03122, ECF No. 401 at 7 (Bankr. S.D. Fla. Nov. 8, 2012). The Bankruptcy Court declared that "such ambiguities are to be resolved in favor of the borrower (Sagamore) and against the lender (JPMCC)." *Id.*

But this Court does not deem the contractual provisions at issue ambiguous or inconsistent. Under the Loan Agreement, an Event of Default occurred immediately upon Sagamore's failure to make a regularly scheduled payment. ECF No. 15-1 at 84, § 8.1; *see also Sagamore*, No. 11-03122, ECF No. 401 at 6 (Bankr. S.D. Fla. Nov. 8, 2012) ("The Court further concludes that the Loan went into default by virtue of Sagamore's failure to pay its August 11, 2009, debt service payment."). Sagamore expressly waived notices that are not otherwise required by the Agreement or applicable law. *Id.* §§ 8.1(b), 10.11. So, while JPMCC's Notice of Default did not follow the requirements of the Loan Agreement and therefore was insufficient as notice under the Agreement, *id.* § 10.6, whether JPMCC sent a valid Notice of Default, an insufficient Notice of Default, or no Notice of Default at all does not alter the fact that an Event of Default occurred upon Sagamore's failure to make the August 11, 2009, loan payment, and the Event of Default continued during the period of Sagamore's nonpayment of interest on the loan.

-24-

Sagamore also argues that, under § 8.1(d) of the Loan Agreement, JPMCC elected to pursue default by notice instead of immediate default. That provision states,

> <u>Remedies</u>. Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower . . . may be exercised by Lender at any time . . .

ECF 15-1 at 86, § 8.1(d). But § 8.1(d) clearly applies "[u]pon the occurrence and during the continuance of an Event of Default," and is thus available to JPMCC only after an Event of Default has already occurred. Sagamore's notion that no Event of Default occurred because of JPMCC's powers under § 8.1(d), which apply only *after* an Event of Default has already happened, does not hold. Furthermore, § 8.1(d) allows JPMCC to exercise "all or any one or more" of its rights under the agreement, and does not in any way suggest that JPMCC's exercise of its right under the agreement to send a permitted notice somehow erases the immediate Event of Default. Finally, nothing in § 8.1(a)(i) suggests that it is within JPMCC's power to elect to have default occur immediately upon nonpayment or, instead, ten days after notice—by the terms of the Loan Agreement, the former applies to regularly scheduled payments and the later applies to all other payments. *See* ECF No. 15-1 at 84, § 8.1(a). In the case of regularly scheduled payments, such as in this case, the Event of Default is self-actuating upon nonpayment, and it is Sagamore's non-action rather than JPMCC's affirmative action that triggers the default.

The court in *In re WSG Dulles, L.P.*, No. 12-11149, 2013 WL 64759 (Bankr. E.D. Va. Jan. 4, 2013), similarly concluded that it is immaterial whether a notice of default is defective or not when the Loan Agreement provides that default occurs immediately upon nonpayment of a regularly scheduled payment. *Id.* at *10-*12. Sagamore argues that *WSG Dulles* is distinguishable because in that case, the notice provisions of the agreement did not apply to "permitted" notices, whereas the

provision here does. ECF No. 24 at 14. But even if the parties here agreed to have any notice, whether required or permitted, to take a certain form, they also expressly agreed that no notice is required in order for an Event of Default to have occurred if Sagamore failed to make a regularly scheduled payment.

Sagamore also points to a number of Florida nonbankruptcy cases that have denied relief to mortgagees that failed to provide mortgagors with adequate notice of a right to cure a default prior to acceleration of the debt.[8] ECF No. 24 at 19 n.86. But in all of these cases the mortgage documents unambiguously required notice. *Judy v. MSMC Venture, LLC*, 100 So. 3d 1287, 1289 (Fla. 2d DCA 2012); *Wroblewski v. Am. Home Mortg. Servicing, Inc.*, 68 So. 3d 431, 431 (Fla. 5th DCA 2011); *Laurencio v. Deutsche Bank Nat. Trust Co.*, 65 So. 3d 1190, 1191-92 (Fla. 2d DCA 2011); *Konsulian v. Busey Bank, N.A.*, 61 So. 3d 1283, 1285 (Fla. 2d DCA 2011). The Loan Agreement here, however, clearly does not require notice for default to occur under the instant circumstances. These cases are therefore not instructive.

Nevertheless, the Court agrees with Sagamore and the Bankrutpcy Court that the provision of a copy of notice to Sagamore's counsel is an important term of the Loan Agreement. As Sagamore notes, attorneys serve as gatekeepers and can provide legal advice to their clients about, for example, the ramifications of default and failure to cure. ECF No. 24 at 15. Indeed, the Loan Agreement provides that all notices to JPMCC must be copied to JPMCC's counsel, as well, suggesting that JPMCC also understands the importance of prompt legal advice. ECF No. 15-1 at 98-99, § 10.6. JPMCC's Notice of Default was insufficient, and this insufficiency may have ramifications on other

---

[8] As Sagamore's citation of nonbankruptcy cases suggests, the parameters of Sagamore's cure are determined pursuant to the underlying agreement and applicable nonbankruptcy law under 11 U.S.C. § 1123(d).

provisions of the Loan Agreement. But none of those ramifications somehow undoes a continuing Event of Default. The Court therefore reverses the Bankruptcy Court's holding that the insufficient Notice of Default, by itself, leads to the determination that JPMCC is not entitled to default-rate interest.

### C. Sagamore's Election to Charge Late Fees

The Bankruptcy Court also determined that JPMCC was not entitled to default interest because it chose to charge Sagamore with late fees. *Sagamore*, No. 11-37867, ECF No. 521 at 11-16 (Bankr. S.D. Fla. Dec. 26, 2012). The Bankruptcy Court found, and both parties agree, that JPMCC may not collect both late fees and default interest from Sagamore from the date of the acceleration of the loan. ECF No. 15 at 26; ECF No. 24 at 28; *see also In re Vest Associates*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) (citing *In re Kalian*, 178 B.R. 308, 312 n.9 and 316 n.18 (Bankr. D.R.I. 1995); *In re 1095 Commonwealth Ave. Corp.*, 204 B.R. 284, 305 (Bankr. D. Mass. 1997)) ("The decisional law is uniform that oversecured creditors may receive payment of either default interest or late charges, but not both."). But JPMCC disagrees that its initial indication to charge late fees precludes it from now waiving late fees and instead seeking default interest. ECF No. 15 at 24-30.

JPMCC suggests that it was never required to "elect" to charge default interest because under the Loan Agreement, the default-interest rate is self-effectuating upon an Event of Default. In support of this notion, JPMCC points to § 2.2.4 of the Agreement, which provides,

> Default Rate. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such Event of Default occurred.

ECF No. 15-1 at 29, § 2.2.4.

So, by the terms of the Loan Agreement, while all unpaid amounts "shall accrue interest at the Default Rate" during an Event of Default, the accrual of interest at the default rate is limited "to the extent permitted by applicable law." *Id.* The Remedies Provision similarly states that any remedies available to JPMCC "may be pursued independently, singularly, together or otherwise . . . to the fullest extent *permitted by law*." *Id.* at 86-87, § 8.1(d) (emphasis added). Though JPMCC is "not subject to any 'one action' or 'election of remedies' law or rule," JPMCC may exercise these remedies only " to the fullest extent permitted by law." *Id.*

All parties agree that applicable law prevents the collection of both late fees and default interest. The Loan Agreement provides for both of these remedies upon an Event of Default. Though the Default Rate Provision does not expressly state that JPMCC must elect to charge default interest, the provision is expressly limited by applicable law that requires JPMCC to choose between the two remedies available to it under the Agreement. To interpret default interest as self-effectuating would be to write the Late Payment Charge Provision out of the Agreement, because if JPMCC has no control over whether to charge default interest and must always do so upon an Event of Default, then, under applicable law, it could never charge late fees.[9] Logically, if JPMCC can obtain only one of these two remedies, it must choose which one to seek.

After a two-day hearing, the Bankruptcy Court made factual findings that neither the September 28, 2009, Notice of Default nor the November 19, 2009, Acceleration Letter indicated that JPMCC elected to charge default interest. *Sagamore*, No. 11-37867, ECF No. 521 at 11-16

---

[9] Unlike the Default Rate Provision, the Late Payment Charge Provision expressly states that Sagamore shall pay late fees to JPMCC only "on demand," and therefore cannot be considered a self-effectuating provision. ECF No. 15-1 at 30, § 2.3.5.

(Bankr. S.D. Fla. Dec. 26, 2012); *see also* ECF No. 15-1 at 209-14. JPMCC's monthly debt service invoices from January 2010 through December 2011 assessed late fees each month but not default interest. *Id.* JPMCC expressly asserted that it was entitled to default interest for the first time in February 2012, two-and-a-half years after the initial Event of Default—but even then, JPMCC claimed that it was entitled to late fees and default interest. *Id.* LNR's transaction-history reports and other records indicate a monthly assessment of late fees from the Event of Default through November 2012 but no assessment of default interest. *Id.* at 14; *see also* ECF No. 3 at 210:19-214:17. Testimony from a designated representative of Berkadia, the Master Servicer of the Loan, indicated that LNR never requested that default interest be applied to the loan or that any late fees be removed, even though LNR had the power to do so. *Id.*; *see also* ECF No. 4 at 302:14-303:6, 314:4-:7, 318:1-:11.

JPMCC contends that Berkadia's computer files assessed late fees on Sagamore, but not default interest, because Berkadia's computer software automatically assesses late fees but not default interest. ECF No. 15 at 27. But that does not rebut the evidence that Berkadia was never instructed to add default interest or remove the late fees from its files. JPMCC also argues that its monthly debt-service invoices that charges late fees but not default interest were never sent to Sagamore. *Id.* at 26. But even if the statements themselves were not sent to Sagamore, they were addressed to Sagamore—indicating an intent to send—and JPMCC did provide other payoff statements to Sagamore. ECF No. 4 at 362:22-363:8. JPMCC's arguments therefore do not suggest that the Bankruptcy Court's factual findings with respect to JPMCC's election to charge late fees

instead of default interest are clearly erroneous.[10]

Sagamore did not object to the late-fee charge, and paid all accrued late fees on January 9, 2013, the Effective Date of the Plan. ECF No. 24 at 28. JPMCC nevertheless asserts that even if it had initially elected to charge late fees instead of default interest, it was allowed to later waive its right to late fees in favor of a retroactive application of default interest. Courts routinely deny the application of default interest to time periods prior to the triggering event of the default interest. *See In re Crystal Properties, Ltd., L.P.*, 268 F.3d 743, 749 (9th Cir. 2001) (denying retroactive default interest prior to creditor's notice of intent to accelerate when agreement provided that default interest would accrue only after creditor's exercise of option to accelerate); *In re Harvest Oaks Drive Associates, LLC*, No. 10-03145-8, 2011 WL 124495, at *10 (Bankr. E.D.N.C. Jan. 14, 2011) (no retroactive default prior to point in time at which creditor discovered debtor's misrepresentations when contract provided that default interest would accrue only after such discovery); *see also In re Sweet*, 369 B.R. 644, 651 (Bankr. D. Colo. 2007) (where agreement provides that note holder may charge default interest "in its discretion," current note holder cannot apply default interest to time

---

[10] JPMCC asserts that nearly all of the Bankruptcy Court's relevant factual determinations should be subject to *de novo* review, and not the clearly erroneous standard, because they all touch upon interpretation of the underlying Loan Agreement to some degree and are therefore mixed questions of law and fact. ECF No. 15 at 3. "Merely labeling the issues 'mixed questions,' however, does not establish that they receive *de novo* review." *Ornelas v. United States*, 517 U.S. 690, 701 (1996). The Bankruptcy Court's finding that JPMCC intended to charge late fees only and not default interest for nearly two years is not so inextricably intertwined with the text of the Loan Agreement that it cannot stand alone as fact without reliance upon a controlling legal standard. *See, e.g.*, *Thompson v. Keohane*, 516 U.S. 99, 111-12 (1995) (issues of fact are "basic, primary, or historical facts" about "what happened," while mixed questions of fact and law, such as a determination about whether a defendant was "in custody," require the application of the controlling legal standard to the historical facts). Accordingly, the Court applies the clearly erroneous standard to the Bankruptcy Court's factual findings.

period during which the note was held by the previous holder, who did not choose to apply default interest).

The Loan Agreement here provides that default interest may accrue immediately upon the occurrence of an Event of Default, and JPMCC does not seek to apply default interest prior to this triggering event. ECF No. 15-1 at 29, § 2.2.4. Nevertheless, applicable law requires the election of either late fees or default interest. The evidence shows that JPMCC assessed late fees but not default interest for two years, and only began to assert that it was also entitled to default interest in February 2012, after Sagamore had filed for bankruptcy, under which it reinstated loan payments at the note rate. Nor did JPMCC affirmatively express an intent to switch from late fees to default interest in February 2012—rather, JPMCC's first indication that it was entitled to default interest also continued to seek late fees as well. *See* ECF No. 15 at 27. JPMCC has pointed to no evidence of record of any affirmative action by JPMCC to waive its right to late fees and instead charge default interest that occurred during the continuance of the Event of Default.

The Loan Agreement provides that, upon an Event of Default, Sagamore shall pay late fees "in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment." ECF No. 15-1 at 30, § 2.3.5. Sagamore has paid these late fees and thereby compensated JPMCC for the losses it suffered because of the default. JPMCC's *ex post facto* assertion that it is entitled to default interest instead of late fees is not supported by the law. Accordingly, the Court affirms the Bankruptcy Court's holding that JPMCC is not entitled to default interest because it has already charged—and received—late fees.

### D. Attorney's Fees and Costs

The Bankruptcy Court denied JPMCC's request for attorney's fees and costs because JPMCC did not properly provide Sagamore with a Notice of Default. *Sagamore*, No. 11-37867, ECF No. 521 at 4, 9 (Bankr. S.D. Fla. Dec. 26, 2012). In this regard, the Bankruptcy Court reasoned that JPMCC "cannot issue a defective notice that spawned years of litigation, and very likely this bankruptcy proceeding, and then genuinely ask that it be paid default interest in excess of $5.1 million and attorney's fees in excess of $2.7 million for these cascading events." *Id.* at 4. But this Court now determines that the August 11, 2009, Event of Default continued notwithstanding JPMCC's insufficient Notice of Default and finds, therefore, that if the years of foreclosure and bankruptcy litigation can be traced to a single event, it was Sagamore's nonpayment of the loan interest—and not the insufficient Notice of Default—that precipitated the current controversy.

Each party must generally pay its own fees and costs unless a statute or enforceable contract provides otherwise. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975). JPMCC asserts that it is entitled to attorney's fees under § 1.04(d) of the Promissory Note between Sagamore and JPMCC. ECF No. 15 at 30-32. That section provides,

> Borrower agrees to pay on demand all expenses and costs of enforcement, administration and collection incurred or paid including, but not limited to, reasonable attorney's fees and disbursements of Lender, whether or not any legal proceeding is commenced hereunder.

ECF No. 15-1 at 169, § 1.04(d). The note provides that Sagamore would pay reasonable attorney's fees and other costs on demand "whether or not any legal proceeding is commenced" and, thus, envisions situations in which Sagamore shall pay JPMCC's attorney's fees and costs even when a court has not declared JPMCC a prevailing party.

"Provisions in ordinary contracts awarding attorney's fees and costs to the prevailing party are generally enforced." *Lashkajani v. Lashkajani*, 911 So.2d 1154, 1158 (Fla. 2005). But "[u]nder Florida law, a trial court has the discretion to deny contractual attorney's fees if the party seeking fees is unsuccessful on the merits of its claim." *Tartaglia v. Big Apple Consulting USA, Inc.*, No. 09-591-28, 2011 WL 6937465, at *3 (M.D. Fla. Nov. 22, 2011), *report and recommendation adopted*, No. 09-591-258, 2012 WL 11115 (M.D. Fla. Jan. 3, 2012) (citing *B & H Const. & Supply Co., Inc. v. Dist. Bd. of Trustees of Tallahassee Cmty. Coll., Florida*, 542 So. 2d 382, 387 (Fla. 1st DCA 1989)); *see also Singer v. Shannon & Luchs Co.*, 779 F.2d 69, 71 (D.C. Cir. 1985) ("it is clear that even when a party is entitled to attorneys' fees under the terms of a contract, it may nonetheless be denied an award if it is unsuccessful on the merits of its claim"). When a party achieves partial, but not complete, success, a partial award of attorney's fees may be granted based on "the degree of success obtained." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).

Section 57.105(7), Fla. Stat., further complicates the inquiry. That section provides,

> If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract.

Fla. Stat. § 57.105(7). Thus, "Florida law permits such one-sided contractual attorney's fee provisions [like the one at issue here] to be applied reciprocally." *High Bid, LLC v. Everett*, 522 F. App'x 688, 694 (11th Cir. 2013). But § 57.105(7), even if used to apply a contractual attorney's fee provision reciprocally, cannot be used to expand the scope of that provision. *Placida Prof'l Ctr., LLC v. F.D.I.C.*, 512 F. App'x 938, 952 (11th Cir. 2013).

Though Sagamore ultimately prevails under this Court's ruling, the Court also ruled in favor of JPMCC on the preliminary issues of statutory and contract interpretation, reversing a portion of the Bankruptcy Court's Order in the process. The Court therefore remands this issue to the Bankruptcy Court to determine whether JPMCC is entitled to a partial award of its reasonable attorney's fees and costs.[11]

### E. Sagamore's Alleged Non-Monetary Default

In addition to its argument that Sagamore has failed to cure the default by not paying default-rate interest, JPMCC also argues that Sagamore has failed to cure alleged non-monetary defaults related to the plan. Specifically, JPMCC contends that the hotel is not being managed in accordance with the Loan Agreement. After entering into the Loan Agreement, Sagamore replaced the original Qualified Manager of the hotel, Tecton Miami Beach Management Company, LLC ("Tecton"), with Crescent Hotels & Resorts, LLC ("Crescent"). ECF No. 15 at 32-33. But JPMCC alleges that this constitutes a non-monetary default of the Agreement. *Id.*

Section 5.2.1 of the Loan Agreement provides,

> Borrower shall not, without Lender's prior consent (which consent shall not be unreasonably withheld, conditioned, or delayed): (i) surrender, terminate or cancel the Management Agreement; provided, that Borrower may, without Lender's consent, terminate the Management Agreement and replace the Manager so long as the replacement manager is a Qualified Manager pursuant to a Replacement Management Agreement.

ECF No. 15-1 at 64, § 5.2.1(a). JPMCC concedes that Crescent is a Qualified Manager under the agreement. ECF No. 15 at 33. But JPMCC contends that Sagamore's Replacement Management

---

[11] Though § 57.105 provides that attorney's fees may be applied reciprocally, it does not similarly allow for costs to apply reciprocally. Fla. Stat. § 57.105(7).

Agreement with Crescent is truly only a services agreement, and that the managerial functions of the hotel are in actuality being performed by Harbour Realty Associates, Inc. ("HRA"), which JPMCC asserts is not qualified to manage the hotel under the Agreement. *Id.*

As the Bankruptcy Court noted, the plain language of the Management Agreement with Crescent requires Crescent to provide various management services to Sagamore, including corporate and administrative services, sales and marketing support and services, internal auditing, project management, and financial analysis. ECF No. 15-1 at 223-225. These are managerial services. Nor does JPMCC's suggestion that the agreement could not possibly be a Management Agreement because the services are provided at below-market rate alter that fact.

Moreover, even if HRA, not Crescent, is the true manager of the Hotel, that does not indicate that Sagamore has breached the Loan Agreement. JPMCC argues that HRA cannot be a Qualified Manager only because it is affiliated with Taplin, the owner of Sagamore. ECF No. 15 at 33. But the Loan Agreement expressly provides that a Qualified Manager "may be an affiliate of Borrower." ECF No. 15-1 at 20, § 1.1. As JPMCC provides no other reason why the Court should consider HRA unqualified, the Bankruptcy Court's determination that Sagamore did not default with respect to the management provisions of the Loan Agreement is affirmed.

### F. Feasibility of Sagamore's Amended Reorganization Plan

Finally, JPMCC asserts that the Bankruptcy Court erred in determining that Sagamore's Amended Reorganization Plan was feasible when it confirmed the plan. ECF No. 15 at 35-38. A bankruptcy court can confirm a plan only if

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). For a plan to be feasible, "[i]t is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success." *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11], at 1129-54 (15th ed. 1991)). "The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required." *Id.* (citing *Matter of U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd sub nom. In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir. 1986)).

JPMCC argues that the plan is not feasible because the hotel revenue will not generate at least $31.5 million in net cash by March 2016 to make the balloon payment at maturity. But Taplin testified that he had several strategies to raise funds for the balloon payment, including refinancing and making up any shortfall with personal funds, franchising the hotel, or, if needed, selling the hotel. ECF No. 3 at 166:11-167:12. Sagamore's plan is therefore neither "visionary [n]or speculative." *Drexel*, 138 B.R. at 762. Given that JPMCC is an oversecured creditor and Sagamore is contemplating sale of the secured property in order to pay back JPMCC's loan, the Bankruptcy Court correctly concluded that Sagamore's Amended Reorganization Plan has a "reasonable expectation of success" and is not likely to lead to Sagamore's further liquidation or reorganization. *Id.* The Bankruptcy Court's confirmation of Sagamore's Amended Reorganization Plan is therefore affirmed.[12]

---

[12] Because the Court affirms the confirmation of the Reorganization Plan, the issues raised in Sagamore's Motion to Dismiss Appeals as Equitably Moot [ECF No. 25] are moot.

*CONCLUSION*

For the foregoing reasons, the Bankruptcy Court's confirmation of Sagamore's Amended Reorganization Plan and denial of default-rate interest is **AFFIRMED** and the Bankruptcy Court's denial of attorney's fees and costs to JPMCC is **VACATED and REMANDED** for reconsideration in light of the Court's holding. The Clerk of Court shall **CLOSE** this case. All pending motions are **DENIED as MOOT.**

**DONE and ORDERED** in Fort Lauderdale, Florida, this 26th day of February 2014.


ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record